UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

ANDRIS KURINS, individually and as a Shareholder
of, SILVERSEAL CORPORATION,

Plaintiff,

-against-

JOHN SILVERMAN and ALAN SERRINS,

Defendants.
-----------------------------------------------------------------x

Case No. 08-CIV-6886

ECF Case

**NOTICE OF MOTION**

PLEASE TAKE NOTICE that upon the annexed affidavit of Andrew J. Goodman, duly

sworn August 7, 2008, the exhibits annexed thereto and the memorandum of law submitted

herewith, the undersigned will move this Court before the Honorable Laura Taylor Swain,

U.S.D.J., for a judgment, dismissing the complaint (a) pursuant to Rule 12(b)(6) of the Federal

Rules of Civil Procedure ("FRCP") for failure to state a claim on which relief can be granted, or

(b) pursuant to FRCP Rule 12(b)(5) for insufficient service of process.

PLEASE TAKE FURTHER NOTICE that pursuant to Rule 6.1 of the Civil Rules of this

Court, all papers to be considered in opposition to this motion are to be served so that they are

received by the undersigned within ten (10) business days of the date of service hereof.

Dated: New York, New York
August 8, 2008

GARVEY SCHUBERT BARER

By:

Andrew J. Goodman, Esq. (AG-3406)
A Member of the Firm
Attorneys for Defendants
100 Wall Street, 20th Floor
New York, New York  10005
(212) 965-4534

To:    Judd Burstein, Esq.
       Judd Burnstein, PC
       *Attorneys for Plaintiff Andris Kurins*
       1790 Broadway, Suite 1501
       New York, NY 10019

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

ANDRIS KURINS, individually and as a Shareholder
of, SILVERSEAL CORPORATION,

Case No. 08-CIV-6886

                    Plaintiff,

ECF Case

         -against-

**AFFIDAVIT IN SUPPORT
OF MOTION TO DISMISS**

JOHN SILVERMAN and ALAN SERRINS,

                    Defendants.
-----------------------------------------------------------------x

STATE OF NEW YORK      )
                       )
COUNTY OF NEW YORK   ) ss.:

ANDREW J. GOODMAN, being duly sworn, deposes and says:

1.       I am an attorney duly admitted to the practice law in New York State and this
Court, and am a partner in Garvey Schubert Barer, counsel for Defendants John Silverman and
Alan Serrins. I respectfully submit this affidavit in support of Defendants' motion to dismiss the
complaint (a) pursuant to Rule 12(b)(6) of the <u>Federal Rules of Civil Procedure</u> ("FRCP") for
failure to state a claim on which relief can be granted, or (b) pursuant to FRCP Rule 12(b)(5) for
insufficient service of process. The complaint alleges four counts in both personal and derivative
capacity: the first claiming violation of the Racketeer Influenced and Corrupt Organization Act
("RICO"), 18 U.S.C. § 1961, *et seq.*, the second for breach of fiduciary duty against Silverman,
the third for fraud and the fourth for breach of fiduciary duty against Serrins.

2.       I am also counsel for Silverseal Corporation ("Silverseal") and Mr. Silverman in
the proceeding pending before the Supreme Court of the State of New York, County of New
York, entitled <u>Andris Kurins v. Silverseal Corporation and John Silverman</u>, Index No. 07-

603565 (the "Dissolution Proceeding").  In that proceeding, Plaintiff has had full and complete access to all of Silverseal's books and records, including, but not limited to, the escrow account by Mr. Serrins.  In fact, Plaintiff's representatives went to Mr. Serrins' office to review and copy all documents related to the escrow account.

3.      Attached as Exhibit A is a copy of an arbitration Statement of Claim dated July 27, 2007 that Plaintiff filed with the American Arbitration Association.

4.      Attached as Exhibit B is a copy of the Petition that Plaintiff filed in the Dissolution Proceeding under BCL §1104-a.

5.      Attached as Exhibit C is the complaint filed by Plaintiff against Defendants John Silverman and Alan Serrins on July 11, 2008 before the Supreme Court of the State of New York, County of New York, Index No. 08-602048, and removed to this Court.

6.      Attached as Exhibit D is a copy of Silverseal and Mr. Silverman's Notice of Cross-Motion and Opposition to Plaintiff's Petition in the Dissolution Proceeding.

7.      Attached as Exhibit E are copies of the Affidavits of Service in connection with the complaint filed by Plaintiff against Defendants Silverman and Serrins in this action.

Andrew J. Goodman

Sworn to before me this
___ day of August 2008

Notary public

MAUREEN LOOK
Notary Public, State of New York
No. 01LO6152568
Qualified in New York County
Commission Expires 9/18/20__

# EXHIBIT A

**American Arbitration Association**
*Dispute Resolution Services Worldwide*

### COMMERCIAL ARBITRATION RULES
### DEMAND FOR ARBITRATION

| | |
|---|---|
| ***MEDIATION:*** *If you would like the AAA to contact the other parties and attempt to arrange a mediation, please check this box.* ☐ *There is no additional administrative fee for this service.* | |

| | |
|---|---|
| Name of Respondent<br>SilverSeal Corporation and John Silverman | Name of Representative (if known) |
| Address<br>19 Fulton Street, 3rd Floor | Name of Firm (if applicable) |
| | Representative's Address |

| City<br>New York | State<br>NY | Zip Code<br>10038- | City | State | Zip Code |
|---|---|---|---|---|---|
| Phone No.<br>212-732-1897 | | Fax No.<br>212-732-2017 | Phone No. | | Fax No. |
| Email Address:<br>info@silverseal.net | | | Email Address: | | |

The named claimant, a party to an arbitration agreement dated <u>as of January 1, 2003</u>, which provides for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration.

THE NATURE OF THE DISPUTE
Dissolution of SilverSeal Corporation under Section 1104-a of the New York Business Corporation Law, or in the alternative, fixing the value of claimant's interest and awarding that amount to claimant and against respondent, John Silverman. Also relief for claims of waste, breach of contract, breach of fiduciay duty, including back salary, expenses, profits and benefits. Related interim relief.

| | |
|---|---|
| Dollar Amount of Claim $  5-10 million | Other Relief Sought: ☒ Attorneys Fees  ☒ Interest<br>☒ Arbitration Costs ☒ Punitive/ Exemplary ☒ Other injunction |

AMOUNT OF FILING FEE ENCLOSED WITH THIS DEMAND (please refer to the fee schedule in the rules for the appropriate fee) $10,000.00

PLEASE DESCRIBE APPROPRIATE QUALIFICATIONS FOR ARBITRATOR(S) TO BE APPOINTED TO HEAR THIS DISPUTE:
Attorney familiar with business transactions, close corporations and valuations of businesses.

| | |
|---|---|
| Hearing locale  New York, New York          (check one) ☐ Requested by Claimant  ☒ Locale provision included in the contract | |

| | |
|---|---|
| Estimated time needed for hearings overall:<br>_____ hours or  7-10  days | Type of Business:  Claimant  Investigations, security<br>Respondent Investigations, security |

Is this a dispute between a business and a consumer? ☐Yes ☒ No  Does this dispute arise out of an employment relationship? ☐ Yes ☒ No

If this dispute arises out of an employment relationship, what was/is the employee's annual wage range? Note: This question is required by California law. ☐Less than $100,000 ☐ $100,000 - $250,000 ☐ Over $250,000

You are hereby notified that copies of our arbitration agreement and this demand are being filed with the American Arbitration Association's Case Management Center, located in (check one)  ☐ Atlanta, GA  ☐ Dallas, TX  ☒ East Providence, RI  ☐ Fresno, CA  ☐ International Centre, NY, with a request that it commence administration of the arbitration.  Under the rules, you may file an answering statement within fifteen days after notice from the AAA.

| | |
|---|---|
| Signature (may be signed by a representative)  Date: 7/27/07 | Name of Representative<br>Richard N. Gray and Anthony L. Tersigni |
| Name of Claimant<br>Andris Kurins | Name of Firm (if applicable)<br>Meyers Tersigni Feldman & Gray LLP |
| Address (to be used in connection with this case)<br>12 Sylvan Road North | Representative's Address<br>14 Wall Street, 19th Floor |

| City<br>Westport | State<br>CT | Zip Code<br>06880- | City<br>New York | State<br>NY | Zip Code<br>10005-2101 |
|---|---|---|---|---|---|
| Phone No.<br>212-692-3515 | | Fax No. | Phone No.<br>212-422-1500 | | Fax No.<br>212-422-1650 |
| Email Address:<br>akurins@pc-investigations.com | | | Email Address:<br>rgray@mtfglaw.com and atersigni@mtfglaw.com | | |

To begin proceedings, please send two copies of this Demand and the Arbitration Agreement, along with the filing fee as provided for in the Rules, to the AAA.  Send the original Demand to the Respondent.

Please visit our website at www.adr.org if you would like to file this case online.  AAA Customer Service can be reached at 800-778-7879



RECEIVED
JUL 3 1 2007
hand
GARVEY SCHUBERT
BARER

## STATEMENT OF CLAIMS

### Parties and Related Parties

1.      Claimant, Andrew Kurins ("Kurins"), and respondent, John Silverman ("Silverman"), are the sole shareholders of respondent, SilverSeal Corporation ("SilverSeal"), a company which, through its operating entities, is in the investigative and security services businesses.

2.      SilverSeal is not registered as an investment company under the Investment Company Act of 1940 (15 USCA §§80a-1 *et seq.*), and none of its shares are listed on a national securities exchange or regularly quoted in the over-the-counter market by one or more members of a national or an affiliated securities association.  SilverSeal is an "S" corporation.

3.      The various operating entities comprising the business are discussed below.

### Summary of Claims

4.      Kurins brings this proceeding pursuant to BCL §1104-a to dissolve SilverSeal on the grounds, more fully described below, that (i) the directors or those in control of the corporation, including, but not limited to Silverman, have been guilty of fraudulent or oppressive actions toward Kurins and (ii) the property or assets of the corporation are being looted, wasted or diverted for non-corporate purposes by directors, officers or those in control of the corporation, including, but not limited to Silverman.  As an alternative to dissolution, Kurins requests that the arbitrator fix the value of his interest in the business and enter an award for a judgment against Silverman in that amount.

5.      Kurins also seeks related relief resulting from waste, breach of contract and breach of fiduciary duties, including the repayment of salary, expenses, profits and benefits withheld from Kurins.  In addition, Kurins seeks an accounting of monies in a certain escrow account maintained for the benefit of SilverSeal and its operating entities, and restitution by Silverman of any sums shown by the accounting to have been improperly paid.

6.      Finally, Kurins seeks an award of interim relief, enjoining Silverman and SilverSeal from (i) dissipating the assets of SilverSeal and its operating corporations during the pendency of this proceeding and (ii) utilizing corporate funds for legal and other professional expenses incurred in defense of the claims asserted in this proceeding.

### Background

7.      Kurins is a former special agent of the FBI, who voluntarily resigned from the FBI in 1991 and went into the private investigative services business.

8.      Silverman is a former New York City police officer, who was dismissed from the force in or about 1988 and thereafter started his own investigative services business.

9.    Kurins was introduced to Silverman in or about 1993, and he and Silverman began working together on various investigations.

10.    Shortly after they began working together, Kurins asked Silverman to assist in a certain investigation for which Kurins was hire by Kroll Associates. However, the president of Kroll, who was a former Commissioner of the New York City Police Department, advised Kurins that Silverman could not work on the assignment because of the circumstances of his dismissal from the police force. Kurins therefore worked on the investigation himself, although the matter continued to be billed through their joint business.

11.    In 1994, Silverman incorporated the business under the name Silverman Assoc. Inc. ("SAI"), and it was agreed that Kurins would purchase a 49% interest in the corporation. At the time, Silverman claimed the corporation was grossing approximately $300,000, and he asked Kurins to pay that amount for his interest in the business. Kurins agreed, and over the next five years paid the purchase price out of his earnings.

12.    At the time Kurins agreed to become a shareholder in SAI, it was further agreed between Kurins and Silverman that so long as Kurins remained a shareholder in the business, he would be an officer and director of the corporation, he would work out of the corporation's offices, he would participate in all decision making, he would receive compensation equal to that of Silverman and the remaining profits of the business would be split 50-50 notwithstanding the 49-51 stock allocation.

13.    It was Kurins' reasonable expectation that the business would be operated in the manner agreed to, and in fact, as shown in greater detail below, it was operated in that manner until late 2006, when Silverman announced to Kurins that he wished to change the arrangement.

14.    In 1995, SAI obtained an assignment from Bloomberg Communications Inc. ("Bloomberg") to investigate a Princeton, New Jersey office employee's use of Bloomberg employees and materials at his residence. Kurins obtained the appropriate New Jersey license and brought in former FBI agents to assist in the investigation. After a successful conclusion of that assignment, Bloomberg hired SAI to perform additional investigative assignments.

15.    Thereafter, Bloomberg requested SAI to provide security guard services for its offices in New York City.

16.    In November 1996 S.E.A.L. Security Inc. ("S.E.A.L. Inc.") was organized to perform the Bloomberg security guard business. Initially Kurins was the sole shareholder of S.E.A.L. Inc. (with 49 shares) as well as its chairman, president, treasurer and secretary. Kurins and Silverman agreed that the profits of the company would be shared equally.

17.    It was Kurins' understanding that Silverman did not want to show an interest in S.E.A.L. Inc. for personal reasons, however, it was understood that Silverman would, at some point in time, be given an option to purchase 51 shares of the S.E.A.L. Inc. stock. In early 2000, the parties executed such an option agreement, and thereafter Silverman exercised the option.

2

However, as with SAI, despite the slight disparity in shareholdings, Kurins and Silverman agreed that they would continue to split the profits of the company 50-50.

18.    In early 2002, S.E.A.L. Inc.'s attorneys, Dienst & Serrins, LLP, established an escrow account maintained at the law firm on behalf of the corporation and its operating entities. On information and belief, the escrow account is now maintained at the firm of Serrins & Associates, LLC. The precise purpose of the account was not explained to Kurins. Over the years, the account balances in the escrow account were at times in excess of $1,000,000.

19.    At about the time the escrow account was established, Silverman told Kurins that he wanted to hire his (Silverman's) girlfriend, Maria Weissman, an attorney, to handle various legal and other work for the business. Kurins objected.

20.    Notwithstanding Kurins' objection, he later learned that Silverman had retained Weissman allegedly to perform various services for the company and arranged that Weissman's bills would be paid out of the escrow account.

21.    On several occasions Kurins complained to Alan Serrins (SilverSeal's attorney) that he was not given access to information regarding Weissman's work or invoices and was relying on Serrins to monitor the Weissman work and bills. Serrins told Kurins that he did not think highly of Weissman's work and that the same work could be done better and less expensively by his own firm. Moreover, Serrins expressed concern about the propriety of retaining Weissman and told Kurins that although Silverman admitted he knew it was wrong, he nonetheless was going to continue doing it.

22.    At one point Silverman asked Weissman to prepare a marketing plan to market the company's new security access management program. Serrins told Kurins that Weissman's work product was useless, and the marketing plan was never utilized.

23.    Despite all of these reservations, Weissman continued doing work, allegedly for the company, and her bills continued to be paid out of the escrow account, over which Kurins had no control.

24.    As of this date, Kurins still has not been given an adequate explanation of the reasons for the establishment of the escrow account or of various payments made out of the account.

25.    Kurins and Silverman continued to operate under SAI and S.E.A.L. Inc., as originally agreed, with each getting equal salaries and an equal share of profits, until on or about December 31, 2002, when SilverSeal Corporation ("SilverSeal") was organized, and SAI and S.E.A.L. Inc were merged into SilverSeal. As before, Kurins owned 49 shares of SilverSeal and Silverman owned 51 shares. As before, Kurins and Silverman were the sole directors of SilverSeal, and it was agreed that their salaries and profit participations in the business would continue to be equal.

26.     In connection with the organization of SilverSeal, and the merger, Kurins and Silverman entered into a shareholders' agreement dated as of January 1, 2003, which provided, in part, that (i) the corporation would pay a mandatory dividend for taxes and the premiums for disability insurance for the parties and (ii) all of the books and records of the corporation, of any nature, would be available for inspection or audit by the parties or their designated representatives during normal working hours of the corporation. The shareholders' agreement also provides for arbitration of disputes by a single arbitrator in New York in accordance with the rules of the American Arbitration Association. The shareholders' agreement did not provide for the sale and purchase of a party's shares, except in the event of death or disability.

27.     For some reason not explained to Kurins, in January 2003, at or shortly after the time of the merger, two new operating entities were formed – apparently replacing SAI and S.E.A.L. Inc. – namely, Silverman Investigative Services, LLC ("SIS LLC") and S.E.A.L. Security, LLC ("S.E.A.L. LLC").   On information and belief, SIS LLC and S.E.A.L. LLC are wholly owned by SilverSeal and are the entities through which the business is operated.

28.     In any event, the business continued to be operated as it always had been operated, and in 2004, S.E.A.L. LLC began performing security services for Bloomberg's offices in New Jersey and Washington, D.C. Later in 2004, Bloomberg asked S.E.A.L. LLC to make a proposal for security services, including emergency evacuation planning, for its offices in Latin America. Based on the team put together by Kurins, and the presentation made to Bloomberg, S.E.A.L. LLC was awarded the contract.

29.     In 2006, based in significant part on the work Kurins had done in connection with organizing the Latin American team, S.E.A.L. LLC was asked to bid on Bloomberg's security work for its offices in London, and once again, S.E.A.L. LLC obtained the contract.

30.     In sum, from the inception of their association, up until the Fall of 2006, as agreed to and in accordance with Kurins' reasonable expectations, Kurins and Silverman continued to act as the sole directors and officers of the companies and continued to receive equal compensation and profit distributions.

31.     As a result of their efforts, the companies' annual revenues increased substantially from approximately $300,000 at inception to more than $19,000,000 presently.

32.     Some time prior to September 2006, Silverman determined that he wanted a greater portion of the companies' profits and devised a plan to force Kurins out of the business at a price far less than the value of his interest. In furtherance of his plan, Silverman engaged in the following unlawful and oppressive conduct:

a.     In early September 2006, the day before Kurins was leaving for a scheduled vacation, Silverman announced to Kurins that he wanted a larger share of the profits. In response to a question from Kurins, Silverman said he was not looking to buy Kurins out of the business.

4

b.  After Kurins returned from vacation, Silverman said that he had changed his mind and did, in fact, want to buy Kurins out.  Kurins said he was not interested in being bought out.

c.  At the end of October 2006, Silverman and Kurins agreed to allow a four-member group of SilverSeal's consultants (Alan Serrins, SilverSeal's general counsel; Seth Molod, SilverSeal's accountant; Andrew Goodman, SilverSeal's outside corporate and litigation counsel; and Douglas Grover, SilverSeal's outside criminal counsel) to mediate Kurins' refusal to agree to a buy-out of his shares in SilverSeal.

d.  At the beginning of November 2006, Kurins was removed as the principal qualified member of S.E.A.L. LLC and was replaced on the company's security license issued by the State of New Jersey.

e.  In December 2006, Kurins and Silverman both appeared before the mediators for the first and only time.  Kurins was told that, should the mediation not succeed, the information provided the mediators could not be used in litigation and each of the mediators was "conflicted out" from representing any of the parties in future litigation between them.  Nothing came of the mediation, and it appeared to Kurins that Silverman never intended it to succeed.

f.  In late December 2006, Silverman demanded that Kurins pay the company back for money it had advanced to buy a new car for Kurins' business use, which he did.  Silverman made this demand allegedly because the company's cash flow was inadequate, notwithstanding the fact that Silverman himself had recently purchased a new car for approximately $100,000, which was advanced by the company.

g.  Also in December 2006, Silverman canceled the customary Christmas bonuses and the December paychecks.  Reduced salary was paid in January.

h.  Silverman also directed Kurins not to come into the company's offices and not to have any communications with Bloomberg.  The staff was then instructed to tell callers asking for Kurins that he no longer worked at the company.  In addition, Silverman directed that the hard drive be removed from Kurins' computer.

i.  The company was in the process of finding new office space, and the plans for the new space did not provide for any office for Kurins.

j.  On February 5, 2007, a special meeting of stockholders and directors of SilverSeal was held.  At the meeting, two individuals designated by Silverman (Messrs. Serrins and Dienst) were elected as directors, in addition to the two original directors, Silverman and Kurins.  Kurins objected to the election, noting for the record that the obvious purpose of the meeting was to pressure him to sell his shares in SilverSeal, something he did not want to do.  Silverman, with his 51 shares, elected the new directors over Kurins' objection.

k.  The two new directors then passed a resolution drastically reducing Kurins' annual compensation from the approximately $1.5 million of the year before to $100,000.  At the

same time Silverman's compensation was fixed at $1.5 million. In addition, the two new directors eliminated all reimbursement of Kurins' business expenses.

32.     At the beginning of March 2007, Seth Molod, who had for some time been the accountant for SilverSeal, Silverman and Kurins, wrote to Kurins informing him that his firm was resigning Kurins' account, while continuing to represent SilverSeal and Silverman. In his letter Molod stated that he had "always found you [Kurins] to be an individual of high character."

33.     At the beginning of April, counsel for Kurins wrote to SilverSeal on behalf of Kurins, exercising Kurins' rights under the shareholders' agreement, and his common law rights as a shareholder and director, to inspect certain books and records of SilverSeal, SSI, S.E.A.L. Inc., S.E.A.L. LLC and SIS LLC. In response, Silverman's attorneys sought to limit the inspection only to SilverSeal itself, the non-operating management company, thereby negating any meaningful inspection of the records of the operating businesses. To date, only a selective few of the books and records requested by Kurins have been made available.

34.     In April, Kurins was notified by Molod that the corporation was not going to make a distribution to him for taxes, although, as noted, such a distribution is required by the shareholders' agreement. Additionally, the corporation discontinued its payment of premiums for Kurins' disability insurance, although that, too, is required by the shareholders' agreement.

35.     The above-described actions were undertaken, and continue to be undertaken, by Silverman in furtherance of his plan to wrest the business away from Kurins, for a price far less than the true value of his interest, at a time when the business is growing substantially. All this is being done for Silverman's sole benefit, to the exclusion of Kurins, in an attempt to deprive Kurins of the fruits of his approximately thirteen years of loyal devotion, labors and significant contribution to the success of the business.

### FIRST CLAIM

36.     The actions on the part of Silverman described above constitute illegal, fraudulent and oppressive conduct toward Kurins (pursuant to BCL §1104-a), all designed to force Kurins out of the business and to coerce him into relinquishing his interest in the business for grossly inadequate consideration.

37.     Under the circumstances, dissolution of SilverSeal is reasonable for the protection of Kurins' rights and interests. As an alternative, the arbitrator may fix the value of Kurins' interest in the business and render an award against Silverman in that amount as a means of giving Kurins a fair return on his substantial investment of time and money.

### SECOND CLAIM

38.     The actions of Silverman constitute breaches of his fiduciary duties to Kurins as a director and shareholder in a close corporation.

6

THIRD CLAIM

39.     The actions of Silverman and SilverSeal constitute breaches of the contract entered into between Kurins and Silverman at the outset of their relationship, and reaffirmed repeatedly throughout the relationship in acts and words, that, among other things, so long as Kurins remained a shareholder in the business, he would receive compensation equal to that of Silverman and the remaining profits of the business would be split 50-50.

40.     The actions of Silverman and SilverSeal also constitute breaches of the parties' shareholders' agreement, including, in particular, those provisions relating to the making of distributions for the purpose of paying taxes, the payment of premiums for disability insurance and to a party's right to inspect the books and records of the business.

FOURTH CLAIM

41.     The actions of Silverman constitute waste of corporate assets, for which restitution should be made by Silverman, and/or the value of the corporation should be increased in determining the value of Kurins' interest therein.

REQUEST FOR INTERIM RELIEF

Kurins requests that the arbitrator grant interim relief, pursuant to Rule 34 of the Commercial Arbitration Rules, enjoining Silverman and SilverSeal from (i) dissipating the assets of SilverSeal and its operating corporations during the pendency of this proceeding and (ii) utilizing corporate funds for legal and other professional expenses incurred in defense of the claims asserted in this proceeding. In furtherance of such interim relief, Kurins also requests that the arbitrator provide a form of oversight to monitor respondents' compliance with such interim measures.

ULTIMATE RELIEF REQUESTED

Kurins requests that the arbitrator grant the following ultimate relief:

A.     Dissolving SilverSeal Corporation pursuant to BCL § 1104-a, or, in the alternative, fixing the value of Kurins' interest in the business and making an award in favor of Kurins and against Silverman in that amount;

B.     Enjoining respondents, so long as corporation remains in existence, from continuing their acts of oppressive conduct toward Kurins, including: (i) implementing any reduction of Kurins' salary and other benefits from levels existing prior to January 1, 2007, (ii) excluding Kurins from access to the books and record of the business and (iii) otherwise excluding Kurins from participation in the affairs of the business;

C.      Awarding Kurins compensatory damages in an amount to be determined, including, but not limited to, all back compensation, business expenses, benefits and distributions to which he is entitled;

D.      Awarding Kurins punitive damages in an amount to be determined;

E.      Directing an accounting of the escrow account established with the firm of Dienst & Serrins, LLP, and directing restitution by Silverman of all amounts shown to have been improperly paid, and/or increasing the value of the corporation by said amounts in determining the value of Kurins' interest therein;

F.      Awarding restitution for all amounts of corporate waste;

G.      Awarding Kurins attorneys fees; and

H.      Awarding Kurins the costs of this arbitration, together with such other relief as the arbitrator deems appropriate.

ARBITRATION AGREEMENT

**SILVERSEAL CORPORATION**
45 John Street
New York, New York 10038

As of January 1, 2003

**ANDRIS KURINS,**
3 Merrill Road, Norwalk,
Connecticut, ("**Kurins**") and

**JOHN SILVERMAN,**
77 Fulton Street,
New York, New York 10038 ("**Silverman**")

Gentlemen:

    This letter agreement constitutes an AMENDED AND RESTATED SHAREHOLDERS' AGREEMENT ("**Agreement**") made effective as of the 1st day of January, 2003 by and among **SILVERSEAL CORPORATION,** a New York corporation with an address at 45 John Street, New York, New York 10038 (the "**Company**"), and each of you. Each of you are sometimes hereafter referred to individually as a "**Shareholder**" and together as the "**Shareholders**".

    The Shareholders are parties to an Agreement, dated as of June 30, 2000 (the "**Shareholders Agreement**") governing, among other things, certain interests each of them had in Silverman Assoc. Inc., and in S.E.A.L. Security, Inc. As of January 1, 2003, the corporate existence of each of Silverman Assoc. Inc. and of S.E.A.L Security, Inc. (each, a "**Prior Corporation**" and, together, the "**Prior Corporations**") has been merged into the Company. In connection with the merger, the Company has issued 51 of its shares of Common Stock to Silverman and 49 of its shares of Common Stock to Kurins. The Shareholders desire now to amend and restate in its entirety the Shareholders Agreement and to continue its applicability to the Company, all as more particularly set forth herein.

    Accordingly, in consideration of the mutual agreements contained herein, the parties hereto agree that the Shareholders Agreement is hereby amended and restated in its entirety as follows:

1.    **RESTRICTION ON TRANSFER OF SHARES.**

    (a)   <u>No Transfer</u>. No interest in any Shares in the Company may be sold, assigned, transferred, pledged, encumbered, hypothecated, conveyed or otherwise transferred to any person or entity other than in accordance with this Agreement. Any purported transfer of Shares of any Shareholder or any interest therein or rights thereunder, otherwise than as provided herein, including a transfer by legal process or by operation of law, will be a nullity as against the Company and every other Shareholder unless and until a court of competent jurisdiction shall otherwise direct.

be given by registered or certified mail, return receipt requested, and shall be deemed given three (3) days after the same is deposited in an official U.S. mail depository, postage and other charges prepaid, enclosed in a properly addressed and sealed wrapper.

(c)     Amendments and Waivers.  The provisions of this Agreement may be amended or modified, and the observance of any term of this Agreement may be waived, only by a written instrument executed by the party against which enforcement of the amendment, modification or waiver is sought.  No waiver of the breach of any provision of this Agreement shall be deemed or construed to be a waiver of other or subsequent breaches.

(d)     Conflicts of Interest.  This Agreement was prepared by Kurzman Eisenberg Corbin Lever & Goodman, LLP, as attorneys for the Company.  Each Shareholder hereby acknowledges (i) that his or her interests and those of the Company and the other Shareholder under this Agreement may be diverse and in conflict; (ii) that the purchase and sale of Shares pursuant to this Agreement has tax consequences to each party involved in the transaction and that he or she has not received any representations from the Company's counsel about the tax consequences of this Agreement or any transaction hereunder and (iii) that he or she has had the opportunity, before signing this Agreement, to seek separate independent legal counsel and tax advice.

(e)     Parties in Interest.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.  Except as expressly provided in this Agreement, no right or remedy pursuant to this Agreement shall inure to the benefit of any person which is not a party to this Agreement.

(f)     Entire Agreement.  This Agreement constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior oral and written agreements and understandings between the parties with respect to the subject matter of this Agreement.

(g)     Gender, Number.  Except where the context otherwise requires, words used in the masculine gender include the feminine and neuter; and words used in the singular number include the plural, and the plural the singular.

(h)     Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original but all of which, when taken together, shall constitute one and the same instrument, and this Agreement shall be effective when one or more counterparts have been signed by each party to this Agreement and delivered to the other parties to this Agreement.

(i)     Arbitration.  If any controversy or claim arises out of this Agreement and cannot be settled by the parties, such controversy or claim shall be settled by arbitration by a single arbitrator in New York, New York, in accordance with the then current rules of the American

Arbitration Association, and judgment upon the award may be entered in any court having jurisdiction thereof.

(j)    Governing Law.  This Agreement and the legal relations between the parties relating to the transactions described in this Agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts made and to be performed entirely in the State of New York.

(k)    Exhibits.  The Exhibits attached to this Agreement are incorporated into this Agreement by reference.  All references contained in this Agreement to **"Articles"**, **"Sections"** or **"Paragraphs"** refer to paragraphs of this Agreement unless a different document is expressly referred to.  All references contained in this Agreement to **"Exhibits"** refer to those Exhibits which are attached to this Agreement.

(l)    Headings.  The descriptive headings of the several Sections, subsections, paragraphs and Exhibits of this Agreement are inserted for convenience of reference only and do not constitute a part of this Agreement.

(m)    Assignment.  No party to this Agreement may assign any of its rights under this Agreement, in whole or in part, to any person without the prior written consent of the other parties to this Agreement.

(n)    Separability of Provisions.  Each provision of this Agreement shall be considered separable; and if, for any reason, any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid.

IN WITNESS WHEREOF, the undersigned hereby execute this Agreement as of the date first above written.

SILVERSEAL CORPORATION

By: _____

Name: J.L. SILVERMAN

Title: PRESIDENT.

_____
Andris Kurins

_____
John Silverman

# EXHIBIT B

At IAS Part 49 of the Supreme Court of New York held in a for the County of New York at_____, New York, New York, on the 30 day of _____October_____, 2007.

HON. _____, Justice

-------------------------------------------------------------x

In the matter of the Application of
ANDRIS KURINS,

                     Petitioner,

For the Dissolution of
SILVERSEAL CORPORATION, a New York
Corporation, Pursuant to BCL § 1104-a,

   -against-

SILVERSEAL CORPORATION and JOHN SILVERMAN,

                  Respondents.

-------------------------------------------------------------x

**MOTION SEQUENCE #001**

Index No. 07/603565

**ORDER TO SHOW CAUSE
FOR DISSOLUTION
PURSUANT TO BCL §1104-a
AND RELATED RELIEF**

INDEX NUMBER 603565 YEAR 2007
  6 RJI FEE        95.00
 15 MOTIONS      45.00
  TOTAL          140.00
  CHECK          95.00
  CHECK          45.00

Upon the annexed verified petition of Andris Kurins sworn to October 29, 2007, whereby it appears that petitioner is the holder of 49%, and respondent John Silverman ("Silverman") is the holder of the remaining 51%, of the outstanding shares entitled to vote at the election of directors of SilverSeal Corporation, a New York corporation with its offices in New York County; and upon the affidavit of Andris Kurins sworn to October 29, 2007; it is

    **ORDERED**, that respondents, the State Tax Commission and all interested parties show cause before IAS Part 49 of the Supreme Court of the State of New York, County of New York, at the Courthouse located at 60 Centre St., New York, New York, on Dec. 7, 2007 at 9:30 a.m., why SilverSeal Corporation should not be dissolved pursuant to BCL § 1104-a and why a schedule of information should not be furnished by the corporation pursuant to BCL § 1106; and it is further

RECEIVED

NOV 0 1 2007
Hand; 10:17am
GARVEY SCHUBERT
BARER

ORDERED, that respondents show cause before this Court at the time and place set forth above why an order for preliminary injunctive relief should not be granted, pending final judgment, prohibiting respondents from (i) utilizing corporate funds to pay Silverman's legal or other professional fees and expenses in connection with this proceeding and (ii) excluding petitioner from access to the books and records of the corporation; and it is further

ORDERED, that pending the hearing of petitioner's application for preliminary relief, respondents are temporarily restrained from (i) utilizing corporate funds to pay Silverman's legal or other professional fees and expenses in connection with this proceeding and (ii) excluding petitioner from access to the books and records of the corporation; and it is further

ORDERED, that petitioner shall cause a copy of this order to be published in the New York Law Journal, a newspaper of general circulation in New York County, once a week for each of the three weeks immediately preceding the return date of this petition; and it is further

ORDERED, that service of a copy of this order to show cause and all supporting papers be made upon respondents, by personal service on or before _Nov. 1_, 2007, and upon the State Tax Commission and other interested parties, if any, in the manner prescribed by BCL § 1106, and that such service shall be deemed sufficient.

ORDERED, that opposition papers, if any, shall be served on the _____ on or before _____

ENTER

_____
                J.S.C.

ORAL ARGUMENT
DIRECTED
_____
                J.S.C.

2

At IAS Part ___ of the Supreme Court of New York
held in a for the County of New York at_____,
New York, New York, on the _____ day of
_____, 2007.

HON. _____ , Justice

------------------------------------------------------------------------x

In the matter of the Application of
ANDRIS KURINS,

                                            Petitioner,

For the Dissolution of
    SILVERSEAL CORPORATION, a New York
Corporation, Pursuant to BCL § 1104-a,

    -against-

SILVERSEAL CORPORATION and JOHN SILVERMAN,

                                            Respondents.

------------------------------------------------------------------------x

RECEIVED

OCT 29 2007
hand; 11:29 A.M.
GARVEY SCHUBERT
BARER

Index No. 07/603565

**ORDER TO SHOW CAUSE
FOR DISSOLUTION
PURSUANT TO BCL §1104-a
AND RELATED RELIEF**

    Upon the annexed verified petition of Andris Kurins sworn to October   , 2007, whereby

it appears that petitioner is the holder of 49%, and respondent John Silverman ("Silverman") is

the holder of the remaining 51%, of the outstanding shares entitled to vote at the election of

directors of SilverSeal Corporation, a New York corporation with its offices in New York

County; and upon the affidavit of Andris Kurins sworn to October   , 2007; it is

    **ORDERED**, that respondents, the State Tax Commission and all interested parties show

cause before IAS Part ___ of the Supreme Court of the State of New York, County of New York,

at the Courthouse located at _____, New York, New York, on _____, 2007

at 9:30 a.m., why SilverSeal Corporation should not be dissolved pursuant to BCL § 1104-a and

why a schedule of information should not be furnished by the corporation pursuant to BCL §

1106; and it is further

**ORDERED**, that respondents show cause before this Court at the time and place set forth above why an order for preliminary injunctive relief should not be granted, pending final judgment, prohibiting respondents from (i) utilizing corporate funds to pay Silverman's legal or other professional fees and expenses in connection with this proceeding and (ii) excluding petitioner from access to the books and records of the corporation; and it is further

**ORDERED**, that pending the hearing of petitioner's application for preliminary relief, respondents are temporarily restrained from (i) utilizing corporate funds to pay Silverman's legal or other professional fees and expenses in connection with this proceeding and (ii) excluding petitioner from access to the books and records of the corporation; and it is further

**ORDERED**, that petitioner shall cause a copy of this order to be published in the New York Law Journal, a newspaper of general circulation in New York County, once a week for each of the three weeks immediately preceding the return date of this petition; and it is further

**ORDERED**, that service of a copy of this order to show cause and all supporting papers be made upon respondents, by personal service on or before _____, 2007, and upon the State Tax Commission and other interested parties, if any, in the manner prescribed by BCL § 1106, and that such service shall be deemed sufficient.

ENTER

_____

J.S.C.

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------------x
In the matter of the Application of
    ANDRIS KURINS,

<div align="center">Petitioner,</div>

For the Dissolution of
    SILVERSEAL CORPORATION, a New York
    Corporation, Pursuant to BCL § 1104-a,

    -against-

SILVERSEAL CORPORATION and JOHN SILVERMAN,

<div align="center">Respondents.</div>
-------------------------------------------------------------------------x

Index No.

**PETITION FOR
DISSOLUTION PURSUANT
TO BCL § 1104-a**

Petitioner, Andris Kurins, for his petition to dissolve SilverSeal Corporation pursuant to

BCL § 1104-a, and for related relief, alleges as follows:

<div align="center">Parties</div>

1.    Petitioner, Andris Kurins ("petitioner" or "Kurins") is a former special agent of

the FBI, who voluntarily resigned from the FBI in 1991 and went into the private investigative

services business.  Kurins, is an officer and director of SilverSeal Corporation ("SilverSeal").

Kuirins and respondent John Silverman ("Silverman") are the sole shareholders of SilverSeal,

with Kurins owning 49 shares and Silverman owning 51 shares.

2.    Silverman is a former New York City police officer, who was dismissed from the

force in or about 1988 and thereafter started his own investigative services business.  Silverman

is an officer and director, as well as one of the two shareholders, of SilverSeal.

3.    SilverSeal is a corporation organized and existing under the laws of New York,

which, through its operating entities, is in the investigative and security services businesses.

SilverSeal is not registered as an investment company under the Investment Company Act of

1940 (15 USCA §§80a-1 *et seq.*), and none of its shares are listed on a national securities exchange or regularly quoted in the over-the-counter market by one or more members of a national or an affiliated securities association.  SilverSeal is an "S" corporation.

<u>Summary of Claims</u>

4.     Kurins brings this proceeding pursuant to BCL §1104-a to dissolve SilverSeal on the grounds, more fully described below, that (i) the directors (other than Kurins) or those in control of the corporation, including, but not limited to Silverman, have been guilty of fraudulent or oppressive actions toward Kurins and (ii) the property or assets of the corporation are being looted, wasted or diverted for non-corporate purposes by directors, officers or those in control of the corporation, including, but not limited to Silverman.  As an alternative to dissolution, Kurins is requesting that the Court fix the value of his interest in the business and enter a judgment against Silverman in the amount so fixed.

5.     Kurins also is seeking related relief resulting from breach of contract and breach of fiduciary duties, including the payment of back salary, expenses and profits withheld from him.

6.     In addition, Kurins is seeking related injunctive relief, including an injunction prohibiting respondents from (i) utilizing corporate funds for legal and other professional expenses incurred by Silverman in defense of the claims asserted in this proceeding and (ii) excluding petitioner from access to the books and records of the corporation.

<u>Background</u>

7.     In or about 1993, when, having earlier voluntarily retired from the FBI, Kurins was in the private investigative services business, he was retained by Kroll Associates ("Kroll") to assist in a substantial ongoing investigation.

2

8.      Shortly before he was retained by Kroll, Kurins had been introduced to Silverman. When he obtained the Kroll assignment, Kurins arranged for Silverman to work on the investigation.   Silverman was permitted to continue working on the assignment for Kroll even though certain questions concerning Silverman's dismissal from the New York City Police Department were raised by Kroll's president, who was a former Commissioner of the Department.

9.      While this initial investigation was proceeding, Kurins and Silverman became business partners and conducted their business under the name Silverman Associates. At that time, the primary source of income of Silverman Associates was the Kroll retention.

10.     When the initial Kroll assignment was concluded, Kurins was retained by Kroll for certain other investigations; however, he was advised that Silverman could not work on these assignments because of the circumstances of his dismissal from the police force.  Kurins therefore worked on the investigations himself, although the matters continued to be billed through, and his fees were paid into, the parties' joint business, Silverman Associates.

11.     In 1994, Silverman incorporated the business under the name Silverman Assoc. Inc. ("SAI"), and it was agreed that Kurins would purchase a 49% interest in the corporation. At the time, Silverman claimed the corporation was grossing approximately $300,000, and he asked Kurins to pay that amount for his interest in the business.  Kurins agreed, and, over the next five years, he paid the purchase price out of his earnings.

12.     At the time Kurins agreed to become a shareholder in SAI, it was further agreed between Kurins and Silverman that so long as Kurins remained a shareholder in the business, he would be an officer and director of the corporation, he would work out of the corporation's offices, he would participate in all decision making, he would receive compensation equal to that

3

of Silverman and he would be entitled to receive 50% the net profits of the business, notwithstanding the 49-51 stock allocation.

13.    It was Kurins' reasonable expectation that the business would be operated in the manner agreed to, and in fact, it was operated in that manner until late 2006, when, as further explained below, Silverman announced to Kurins that he wished to change the arrangement previously agreed to by them.

14.    In 1995, SAI obtained an assignment from Bloomberg Communications Inc. ("Bloomberg") to investigate certain suspected wrongdoing on the part of an employee in its Princeton, New Jersey office.  Kurins obtained the appropriate New Jersey license, and he put together a team of former FBI agents to assist in the investigation.  The investigation led by Kurins was successfully concluded, as a result of which Bloomberg hired SAI to perform additional investigative assignments, which were also successfully concluded.

15.    Following these successful investigations, Bloomberg requested SAI to provide security guard services for its offices in New York City.

16.    In November 1996 S.E.A.L. Security Inc. ("SEAL") was organized to perform the Bloomberg security guard business.  Initially Kurins was the sole shareholder of SEAL (with 49 shares) as well as its chairman, president, treasurer and secretary.  Kurins and Silverman agreed that the profits of the company would be shared equally.

17.    Upon information and belief, Silverman, for personal reasons, did not want his interest in SEAL disclosed; however, it was understood that Silverman would, at some later time, be given an option to purchase 51 shares of the SEAL stock.  In early 2000, the parties executed such an option agreement, and thereafter Silverman exercised the option.  However, as with SAI,

despite the slight disparity in shareholdings, Kurins and Silverman agreed that they would continue to split the profits of the company 50-50.

18.    In early 2002, Silverman caused SEAL's attorneys, Dienst & Serrins, LLP, to establish an escrow account, which was maintained at the law firm on behalf of the corporation and its operating entities (the "escrow account"). On information and belief, the escrow account is now maintained at the firm of Serrins & Associates, LLC. Kurins was not consulted regarding the establishment of the escrow account.

19.    The professed reason for establishing the escrow account, as stated to Kurins, was to maintain a reserve in case the corporation lost the Bloomberg account and had to develop new business. However, contrary to its stated purpose, the escrow account was used, without Kurins' prior knowledge or consent, for various other purposes, including, as discussed below, payments to Silverman's girlfriend for alleged work performed by her and, upon information belief, for Silverman's personal business unrelated to the corporation. In addition, the escrow account was "expensed out" each year by the corporation's accountants, thereby make funds available to Silverman.

20.    Over the years, the balances in the escrow account were at times in excess of $1,000,000. Although Kurins questioned the need for, and propriety of, the escrow account, it continued to be maintained.

21.    At about the time the escrow account was established, Silverman told Kurins that he wanted to retain his (Silverman's) girlfriend, Maria Weissman, an attorney, to handle various legal and other work for the business. Kurins objected.

5

22.     Despite his objection, Kurins later learned that Silverman had nonetheless retained Weissman, allegedly to perform various services for the company, and arranged that Weissman's bills would be paid out of the escrow account.

23.     On several occasions Kurins complained to Alan Serrins (SilverSeal's attorney) that he (Kurins) was not given access to information regarding Weissman's work. Since this information was being withheld from him, Kurins told Serrins that he was relying on Serrins to monitor Weissman's work and invoices. Serrins admitted to Kurins that he did not think highly of Weissman's work and that his own firm could handle the work more professionally and less expensively. Moreover, Serrins expressed concern about the propriety of retaining Weissman, and he told Kurins that although Silverman recognized that retaining his girlfriend was improper, he (Silverman) nonetheless was going to continue to do so.

24.     At one point Silverman asked Weissman to prepare a marketing plan to market the company's new security access management program. Although, upon information and belief, Weissman was compensated for this work, Serrins admitted to Kurins that the marketing plan was useless, and it was never utilized.

25.     Despite all of these reservations, Weissman was permitted by Silverman to continue doing work, allegedly for the company, and, over Kurins' objection, her bills continued to be paid out of the escrow account, over which Kurins had no control.

26.     As of this date, Kurins still has not been given an adequate explanation of the reasons for the establishment of the escrow account or of various payments made out of the account.

27.     Kurins and Silverman continued to operate under SAI and SEAL, as originally agreed, with each getting equal salaries and an equal share of profits, until on or about December

6

31, 2002, when SilverSeal Corporation ("SilverSeal") was organized, and SAI and SEAL were merged into SilverSeal. As before, Kurins owned 49 shares of SilverSeal, and Silverman owned 51 shares. As before, Kurins and Silverman were the sole directors of SilverSeal, and, as before, it was agreed that their salaries and profit participations in the business would continue to be equal.

28.    In connection with the organization of SilverSeal, and the merger, Kurins and Silverman entered into a written shareholders' agreement dated as of January 1, 2003, which provided, in part, that (i) the corporation would pay a mandatory dividend for their individual taxes and the premiums for disability insurance for the parties and (ii) all of the books and records of the corporation, of any nature, would be available for inspection or audit by the parties or their designated representatives. The shareholders' agreement was silent regarding the sale and purchase of a party's shares, except in the event of death or disability.

29.    For some reason not explained to Kurins, in January 2003, at or shortly after the time of the merger, two new operating entities were formed – apparently replacing SAI and SEAL – namely, Silverman Investigative Services, LLC ("SIS LLC") and S.E.A.L. Security, LLC ("SEAL LLC").   On information and belief, SIS LLC and SEAL LLC are wholly owned by SilverSeal and are the entities through which the business currently operates. Notwithstanding the formation of these two new entities, the business continued to be operated as it always had been operated, and in particular, with respect to the relationship between, and compensation of, Silverman and Kurins.

30.    In 2004, SEAL LLC was retained to perform security services for Bloomberg's offices in New Jersey and Washington, D.C. Later in 2004, Bloomberg asked SEAL LLC to make a proposal for security services, including emergency evacuation planning, for its offices in

Latin America. Once again, Kurins put together a team for this purpose, and SEAL LLC was awarded the contract.

31.    In 2006, based in significant part on the work Kurins had done in connection with organizing the Latin American team, SEAL LLC was asked to bid on Bloomberg's security work for its offices in London, and once again, SEAL LLC obtained the contract.

32.    In sum, from the inception of their association, up until the Fall of 2006, as agreed to, and in accordance with, Kurins' reasonable expectations, Kurins and Silverman continued to act as the soleshareholders, directors and officers of the companies and continued to receive equal compensation and profit distributions.

33.    As a result of their efforts, the companies' annual revenues increased substantially, from approximately $300,000 at inception to more than $19,000,000 presently.

34.    Some time prior to September 2006, Silverman determined that he wanted a greater portion of the companies' profits, and he devised a plan to force Kurins out of the business at a price far less than the value of his interest. In furtherance of his plan, Silverman engaged in, among other things, the following unlawful and oppressive conduct:

a.    In early September 2006, the day before Kurins was leaving for a scheduled vacation, Silverman announced to Kurins that he wanted a larger share of the profits. In response to a question from Kurins, Silverman said he was not looking to buy Kurins out of the business.

b.    After Kurins returned from vacation, Silverman said that he had changed his mind and did, in fact, want to buy Kurins out. Kurins said he was not interested in being bought out.

c.    At the end of October 2006, Silverman and Kurins agreed to allow a four-member group of SilverSeal's consultants (Alan Serrins, SilverSeal's general counsel; Seth Molod,

8

SilverSeal's accountant; Andrew Goodman, SilverSeal's outside corporate and litigation counsel; and Douglas Grover, SilverSeal's outside criminal counsel) to mediate Kurins' refusal to agree to a buy-out of his shares in SilverSeal.

d.   At the beginning of November 2006, Kurins was removed as the principal qualified member of SEAL LLC and was replaced on the company's security license issued by the State of New Jersey.

e.   In December 2006, Kurins and Silverman both appeared before the mediators for the first and only time. Kurins was told that, should the mediation not succeed, the information provided the mediators could not be used in litigation and each of the mediators was "conflicted out" from representing any of the parties in future litigation between them. Nothing came of the mediation, and it appeared to Kurins that Silverman never intended it to succeed.

f.   In late December 2006, Silverman demanded that Kurins pay the corporation back for money it had advanced to buy a new car for Kurins' business use. Silverman proffered the explanation that this was required allegedly because the company's cash flow was inadequate, notwithstanding the fact that Silverman himself had recently purchased a new car for approximately $100,000, which was advanced by the company.

g.   Also in December 2006, Silverman unilaterally canceled the customary Christmas bonuses and the December paychecks. Reduced salary was paid in January.

h.   Silverman also directed Kurins not to come into the company's offices and not to have any communications with Bloomberg. The staff was then instructed to tell callers asking for Kurins that he no longer worked at the company. In addition, Silverman directed that the hard drive be removed from Kurins' computer.

9

i. The company was in the process of finding new office space, and the plans for the new space did not provide for any office for Kurins.

j. On February 5, 2007, a special meeting of stockholders and directors of SilverSeal was held. At the meeting, two individuals designated by Silverman (the corporation's attorneys, Messrs. Serrins and Dienst) were elected as directors, in addition to the two original directors, Silverman and Kurins. Kurins objected to the election, noting for the record that the obvious purpose of the meeting was to pressure him to sell his shares in SilverSeal, something he did not want to do. Silverman, with his 51 shares, elected the new directors over Kurins' objection.

k. The two new directors then passed a resolution drastically reducing Kurins' annual compensation from the approximately $1.5 million of the year before to $100,000 for the current year. At the same time Silverman's compensation was fixed at $1.5 million. In addition, the two new directors passed a resolution eliminating all reimbursement of Kurins' business expenses.

35. At the beginning of March 2007, Seth Molod, who had for some time been the accountant for SilverSeal, Silverman and Kurins, wrote to Kurins informing him that his firm was resigning Kurins' account, while continuing to represent SilverSeal and Silverman. Upon information and belief, Molod took this action in order to maintain the SilverSeal account. In his letter Molod stated that he had "always found you [Kurins] to be an individual of high character."

36. At the beginning of April 2007, counsel for Kurins wrote to SilverSeal on behalf of Kurins, exercising Kurins' rights under the shareholders' agreement, and his common law rights as a shareholder and director, to inspect certain books and records of SilverSeal, SSI,

SEAL, SEAL LLC and SIS LLC. In response, Silverman's attorneys sought to limit the inspection only to SilverSeal itself, the non-operating holding company, thereby negating any meaningful inspection of the records of the operating businesses. To date, only a few selective books and records have been made available to Kurins.

37.    In April 2007, Kurins was notified by Molod that the corporation was not going to make a distribution to him for taxes, although, as noted, such a distribution was required by the shareholders' agreement. Additionally, the corporation discontinued its payment of premiums for Kurins' disability insurance, although that, too, was required by the shareholders' agreement.

38.    In July 2007, Kurins commenced an arbitration before the American Arbitration Association, asserting essentially the same claims as are asserted herein. In August 2007, Silverman and SilverSeal moved, by order to show cause, to permanently stay the arbitration. The day before the service of the order to show cause, for purely tactical purposes related to the motion, SilverSeal paid Kurins the taxes and the disability insurance premium that it had previously refused to pay. Kurins consented to the permanent stay of the arbitration in order to avoid unnecessary expense and extended litigation on a tangential matter.

39.    Upon information and belief, Silverman, without the knowledge or consent of Kurins, improperly caused SilverSeal to prepay legal fees of approximately $1,000,000 for the purpose, among possible others, of defending the claims asserted by Kurins.

40.    The above-described actions were undertaken, and continue to be undertaken, by Silverman in furtherance of his plan to wrest the business away from Kurins, for a price far less than the true value of his interest, at a time when the business is growing substantially. Silverman's actions were engaged in for his sole benefit, to the exclusion of Kurins, in an

11

attempt to deprive Kurins of the fruits of his approximately thirteen years of loyal devotion to the business, labors and significant contributions to the success of the business.

## FIRST CAUSE OF ACTION
### (Dissolution Pursuant to BCL § 1104-a)

41.    Kurins repeats and realleges the allegations contained in paragraphs 1 through 40.

42.    The actions on the part of Silverman described herein constitute illegal, fraudulent and oppressive conduct toward Kurins (pursuant to BCL §1104-a), all designed to force Kurins out of the business and to coerce him into relinquishing his interest in the business for grossly inadequate consideration.

43.    Under the circumstances, dissolution of SilverSeal should be ordered as reasonably necessary to protect the rights and interests of Kurins.

44.    As an alternative, the value of Kurins' interest in the business should be fixed, and a judgment should be rendered against Silverman in that amount as a means of giving Kurins a fair return on his substantial investment of time and money.

## SECOND CAUSE OF ACTION
### (Breach of Fiduciary Duty)

45.    Kurins repeats and realleges the allegations contained in paragraphs 1 through 40 and 42 through 44.

46.    The actions of Silverman constitute breaches of his fiduciary duties to Kurins as a director and shareholder in a close corporation, as a result of which, Kurins is entitled to recover a judgment against Silverman for compensatory and punitive damages in amounts to be determined at trial.

12

THIRD CAUSE OF ACTION
(Breach of Contract)

47.     Kurins repeats and realleges the allegations contained in paragraphs 1 through 40, 42 through 44 and 46.

48.     The actions of Silverman and SilverSeal constitute breaches of the contract entered into between Kurins and Silverman at the outset of their relationship, and reaffirmed repeatedly throughout the relationship in acts and words, that, among other things, so long as Kurins remained a shareholder in the business, he would receive compensation equal to that of Silverman and the remaining profits of the business would be split 50-50.

49.     The actions of Silverman and SilverSeal also constitute breaches of the parties' shareholders' agreement, including, in particular, those provisions relating to the making of distributions for the purpose of paying taxes, the payment of premiums for disability insurance and to a party's right to inspect the books and records of the business.

FOURTH CAUSE OF ACTION
(Waste of Corporate Assets)

50.     Kurins repeats and realleges the allegations contained in paragraphs 1 through 40, 42 through 44, 46, 48 and 49.

51.     The actions of Silverman constitute waste of corporate assets, for which the value of the corporation should be increased in determining the value of Kurins' interest therein.

FIFTH CAUSE OF ACTION
(Injunctive Relief)

52.     Kurins repeats and realleges the allegations contained in paragraphs 1 through 40, 42 through 44, 46, 48, 49 and 51.

53.     Based on the actions of Silverman described herein, Silverman and SilverSeal should be enjoined, so long as corporation remains in existence, or until Kurins is paid the value

13

of his interest in the corporation, from continuing their acts of oppressive conduct toward Kurins, including: (i) implementing any reduction of Kurins' salary and other benefits from levels existing prior to January 1, 2007, (ii) excluding Kurins from access to the books and record of the business and (iii) otherwise excluding Kurins from participation in the affairs of the business.

54.     In addition, an injunction should be issued prohibiting Silverman and SilverSeal from utilizing corporate funds for legal and other professional expenses incurred by Silverman in defense of the claims asserted in this proceeding.

55.     Kurins has no adequate remedy at law.

WHEREFORE, Kurins demands judgment as follows:

A.     Dissolving SilverSeal Corporation pursuant to BCL § 1104-a, or, in the alternative, fixing the value of Kurins' interest in the corporation and awarding judgment in favor of Kurins and against Silverman in that amount;

B.     Awarding Kurins compensatory damages in an amount to be determined, including, but not limited to, all back compensation, business expenses, benefits and distributions to which he is entitled;

C.     Awarding Kurins punitive damages in an amount to be determined;

D.     With respect to all amounts improperly paid from the escrow account, increasing the value of the corporation by said amounts, and any other amounts determined to have constituted waste, in fixing the value of Kurins' interest therein;

E.     Enjoining respondents, so long as corporation remains in existence, or until Kurins is paid the value of his interest in the corporation, from continuing their acts of oppressive conduct toward Kurins, including: (i) implementing any reduction of Kurins' salary and other benefits from levels existing prior to January 1, 2007, (ii) excluding Kurins from

14

access to the books and record of the business and (iii) otherwise excluding Kurins from participation in the affairs of the business;

F.    Enjoining Silverman and SilverSeal from utilizing corporate funds for legal and other professional expenses incurred by Silverman in defense of the claims asserted in this proceeding; and

G.    Awarding Kurins costs, disbursements and attorneys fees, together with such other relief as may be appropriate.

Dated: October   , 2007

MEYERS TERSIGNI FELDMAN & GRAY LLP
Attorneys for Petitioner

By: _____
        Richard N. Gray
        Anthony L. Tersigni
        14 Wall Street, 19th Floor
        New York, New York 10005
        (212) 422-1500

15

## VERIFICATION

STATE OF NEW YORK      )
                            ) ss.:
COUNTY OF NEW YORK   )

     The undersigned, being duly sworn deposes and says:  I am the petitioner in this proceeding.  I have read the foregoing petition and know the contents thereof.  The same is true to my own knowledge, except as to matters therein stated to be upon information and belief, and as to those matters I believe it to be true.

_____
                             Andris Kurins

Sworn to before me this
24th day of October, 2007

_____
     Notary Public
       RICHARD N. GRAY
Notary Public, State of New York
      No. 02GR4677103
   Qualified in New York County
Commission Expires May 31, 2010

Kurins Affidavit

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------------x
In the matter of the Application of
   ANDRIS KURINS,

<div align="center">Petitioner,</div>

Index No.

For the Dissolution of
   SILVERSEAL CORPORATION, a New York
   Corporation, Pursuant to BCL § 1104-a,

**AFFIDAVIT IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

     -against-

SILVERSEAL CORPORATION and JOHN SILVERMAN,

<div align="center">Respondents.</div>

-------------------------------------------------------------------------x

STATE OF NEW YORK    )
                    ) ss.:
COUNTY OF NEW YORK  )

ANDRIS KURINS, being duly sworn, deposes and says:

1.     I am the petitioner in this action to dissolve SilverSeal Corporation ("SilverSeal") pursuant to BCL § 1104-a and for related relief. I respectfully submit this affidavit in support of my application for preliminary injunctive relief pending final judgment. I incorporate by reference herein my verified petition dated October  , 2007.

2.     As noted in the petition, this dispute arises out of an attempt by respondent John Silverman to force me out of the business that we began together approximately fourteen years ago, and which together we grew from a business with annual revenues of approximately $300,000 when it started, to more that $19,000,000 currently. In furtherance of his effort to coerce me into relinquishing my interest in the business at a price significantly less than the true value of my interest, Silverman, among other things more specifically set forth in my verified

petition, elected two of his and SilverSeal's attorneys as directors of the corporation (giving him a 3 to 1 control of the board), removed me from the corporation's offices, removed the hard drive from my computer, withheld corporate records and documents from me, instructed employees to tell callers that I was not longer working in the business and prohibited me from having contact with a major client of the business.

3.      In addition, in February of this year, Silverman's newly elected board members, at the behest of Silverman, reduced my annual compensation from the $1.5 million that I had earned the year before, to $100,000 for the current year and, at the same time, eliminated all reimbursement of my business expenses.  Silverman was given an annual salary of $1.5 and continued to receive reimbursement for his business expenses.

4.      Earlier this year, SilverSeal also refused to pay me a substantial tax distribution and certain disability insurance premiums to which I was entitled pursuant to the terms of our written shareholders' agreement dated as of January 1, 2003 (Exhibit 1).  Obviously recognizing my entitlement to these payments, Silverman caused these amounts to be paid many months later.  However those payments were made solely for tactical purposes to support SilverSeal's motion to permanently stay arbitration proceedings that I had commenced.  As discussed in the verified petition (¶38), I consented to the permanent stay in order to avoid unnecessary expense and extended litigation on a tangential matter.

5.      As noted, I have devoted my working life to this business for approximately fourteen years.  As discussed in the verified petition, Silverman's oppressive conduct toward me, and the unilateral drastic reduction of my salary, are simply part of his undisguised, heavy-handed attempt to force me out of the business, at a time of significant growth, for a price far below the true value of my interest.

6.    In furtherance of his plan to oust me, Silverman has retained and is utilizing the services of two separate attorneys – SilverSeal's regular corporate counsel, Alan Serrins, and its outside corporate and litigation counsel, Andrew Goodman.  I am advised by my attorneys that (as discussed in the accompanying memorandum of law) where, as here, the matter is in essence a dispute between shareholders in a close corporation, professional fees and expenses may not be paid out of corporate funds.  It would be grossly unfair, to say the least, to have me bear the expenses of defending myself against Silverman's unlawful and oppressive conduct toward me -- especially in light of the drastic reduction of my compensation – while, at the same time, Silverman is permitted to utilize the corporate treasury to finance his scheme to force me out.  In this regard, I note that SilverSeal's current financial statements show an item designated "prepaid legal" in the amount of $1.1 million.  The financial statements do not indicate to whom these legal expenses were prepaid.  Nor do they indicate the purpose of the so-called prepayment. When asked about this, Mr. Serrins indicated that there were no threatened or pending lawsuits, other than my claims, which would require such a prepayment.

7.    With respect to corporate documents, as noted in the petition, at the beginning of April 2007, my counsel wrote to SilverSeal on my behalf, exercising my rights under our written shareholders' agreement, and my common law rights as a shareholder and director of the corporation, to inspect certain books and records of SilverSeal and its related entities.  In response, Silverman's attorneys sought to limit the inspection only to SilverSeal itself, the non-operating holding company, thereby negating any meaningful inspection of the records of the operating businesses.  While Silverman's attorneys and accountants ultimately agreed that such a limitation was not warranted, to date, only a few selective books and records have been made available to me.  It is important for me to have access to the corporation's books and records in

3

order to protect, and to properly value, my interest in the corporation. Without such access, I would be severely disadvantaged in this proceeding.

8.  I have made no prior application for the relief requested herein.[1]

9.  For the reasons stated in this affidavit, in the petition and in the accompanying memorandum of law, I respectfully request that the Court grand my application for preliminary injunctive relief. For all the same reasons, and because I will suffer immediate and irreparable injury unless relief is granted prior to the hearing and determination of my application, I also request that, pending said hearing and determination, a temporary restraining order be granted.

_____
ANDRIS KURINS

Sworn to before me this
24th day of October, 2007

_____
Notary Public
RICHARD N. GRAY
Notary Public, State of New York
No. 02GR4677103
Qualified in New York County
Commission Expires May 31, 2010

---

[1] I had asked for certain preliminary relief in my claim for arbitration, which was discontinued prior to the appointment of an arbitrator as discussed above.

4

Exhibit 1

**SILVERSEAL CORPORATION**
45 John Street
New York, New York 10038

As of January 1, 2003

**ANDRIS KURINS,**
3 Merrill Road, Norwalk,
Connecticut, ("**Kurins**") and

**JOHN SILVERMAN,**
77 Fulton Street,
New York, New York 10038 ("**Silverman**")

Gentlemen:

This letter agreement constitutes an AMENDED AND RESTATED SHAREHOLDERS' AGREEMENT ("**Agreement**") made effective as of the 1st day of January, 2003 by and among **SILVERSEAL CORPORATION**, a New York corporation with an address at 45 John Street, New York, New York 10038 (the "**Company**"), and each of you. Each of you are sometimes hereafter referred to individually as a "**Shareholder**" and together as the "**Shareholders**".

The Shareholders are parties to an Agreement, dated as of June 30, 2000 (the "**Shareholders Agreement**") governing, among other things, certain interests each of them had in Silverman Assoc. Inc., and in S.E.A.L. Security, Inc. As of January 1, 2003, the corporate existence of each of Silverman Assoc. Inc. and of S.E.A.L Security, Inc. (each, a "**Prior Corporation**" and, together, the "**Prior Corporations**") has been merged into the Company. In connection with the merger, the Company has issued 51 of its shares of Common Stock to Silverman and 49 of its shares of Common Stock to Kurins. The Shareholders desire now to amend and restate in its entirety the Shareholders Agreement and to continue its applicability to the Company, all as more particularly set forth herein.

Accordingly, in consideration of the mutual agreements contained herein, the parties hereto agree that the Shareholders Agreement is hereby amended and restated in its entirety as follows:

I.    **RESTRICTION ON TRANSFER OF SHARES**.

(a)    No Transfer. No interest in any Shares in the Company may be sold, assigned, transferred, pledged, encumbered, hypothecated, conveyed or otherwise transferred to any person or entity other than in accordance with this Agreement. Any purported transfer of Shares of any Shareholder or any interest therein or rights thereunder, otherwise than as provided herein, including a transfer by legal process or by operation of law, will be a nullity as against the Company and every other Shareholder unless and until a court of competent jurisdiction shall otherwise direct.

(b)    Legend. Certificates representing Shares will be surrendered to the Company on demand to be replaced by substitute certificates bearing the following conspicuous notice:

"The sale, assignment, transfer, pledge, encumbrance, hypothecation or conveyance of the Shares represented by this Certificate is restricted by an Amended and Restated Shareholders' Agreement dated as of January 1, 2003, a copy of which is on file at the office of the Company."

(c)    Right of First Refusal. Each of Messrs. Silverman and Kurins agrees that if he receives from another person, corporation, partnership or entity an offer to purchase any of the Corporation's shares, and Mr. Silverman or Mr. Kurins, as the case may be, proposes to transfer any of the Corporation's shares, such shareholder shall give not less than thirty (30) days' prior written notice to the Corporation, which notice shall specify

(i)       the Corporation's shares to be so transferred,

(ii)      the identity of the prospective transferee,

(iii)     the method of transfer, and

(iv)     the terms of any offer made by the prospective transferee.

Such notice shall constitute an irrevocable offer to sell such shares to the Corporation, and to the extent hereinafter provided, to the other non-selling shareholder, at the lesser of (y) the value of the shares determined as of the end of the fiscal year immediately preceding the date of the notice to the Corporation, or (z)  the price to be paid by the prospective purchaser.

The Corporation shall have ninety (90) days after its receipt of such notice within which to notify the selling shareholder in writing of its election to purchase any or all of the shares offered. If the Corporation fails to exercise the option provided herein with respect to any of the shares, then the non-selling shareholder shall have the right, upon written notice to the Corporation, for a period of fifteen (15) days after the expiration of the time period during which the Corporation is entitled to elect to purchase the shares, to purchase (in proportion to the holdings of the Stockholders exercising their purchase rights hereunder) all, but not less than all, of the shares which the Corporation did not purchase from the selling shareholder, for the same purchase price per share. In the event that all of the shares offered by the selling shareholder are not purchased by the Corporation and/or the other shareholders, the selling shareholder may dispose of all of such shares to the prospective transferee named in the notice under this Section at a price and on terms not more favorable than those specified in such notice, but only within sixty (60) days after the expiration of the fifteen (15) day period during which the non-selling shareholder(s) could have purchased the shares and only in compliance with Federal and applicable state securities laws. The transferee shall, prior to the transfer, execute and deliver a written agreement that the shares so transferred shall continue to be subject to all the restrictions

and other provisions of this Agreement and that the transferee shall be bound by such restrictions and provisions as if the transferee were an original party to this Agreement.

2.    **S ELECTION PROVISIONS.**

(a)    Application of Section 1377(a). If at the time of the transfer of any shares hereunder there shall be in effect an election (an "**S Election**") by the Company to be treated as an "S" corporation under Section 1362 of the Internal Revenue Code of 1986 (as amended from time to time, the "**Code**"), the Shareholders hereby agree that Section 1377(a) of the Code shall be deemed to apply as if the then taxable year of the Company consisted of two taxable years, the first of which ends on the date of such transfer.

(b)    No Termination of S Election. If and so long as an "S" Election is in effect for the Company, no Shareholder shall commit any act which would deny the Company its continued status as an "S" corporation, except with the prior written consent of the other Shareholder.

(c)    Mandatory Tax Dividends. While the "S" election is in effect, the Company shall make pro rata distributions to the Shareholders in an amount at least equal to the estimated federal and state income taxes attributable to their pro rata share of the Company's net long-term and Code Section 1231 capital gains and nonseparately computed income pursuant to Code Section 1366(a). This estimated tax liability, which shall be computed by the accountant who regularly prepares the Company's tax returns, shall be computed on the basis of the highest marginal rate applicable to individuals on capital gains and other taxable income for the tax year in question. Unless prevented from making any distributions under applicable state law, or unless the Shareholders unanimously otherwise agree, the total amount of the minimum mandatory dividend required by this Section shall be declared and paid no later than April 5 of the calendar year following the close of the Company's taxable year. The total pro rata distributions made to the Shareholders during the prior taxable year of the Company shall be taken into account in determining the amount, if any, of additional distributions that must be made by the following April 5th in order to meet the requirements of this Section.

3.    **SALE OF SHARES AT DEATH.**

(a)    Insurance. In accordance with the provisions of the Shareholders Agreement, each Shareholder has acquired and contributed to a predecessor of the Company one or more insurance policies on the life of the other Shareholder, which policies are listed on **EXHIBIT "A"** hereto (the "**Policies**"). The Policies provide, as to each Shareholder, a payment to the Company on the death of that Shareholder of not less than $1,500,000 for so long as this Agreement is in effect.

(b)    Premiums. In accordance with the provisions of the Shareholders Agreement, the Company (as successor to the Prior Corporations) shall maintain the Policies in force.

(c)    <u>Mandatory Sale on Death</u>. Upon the death of a Shareholder, the estate of such deceased Shareholder shall sell, and the Company shall purchase, all Shares owned by such deceased Shareholder on the date of death for the purchase price described in clause (d) below.

(d)    <u>Purchase Price</u>. The purchase price (the "**Purchase Price**") with respect to any transaction pursuant to clause (c) of this Section 3 shall be equal to the greater of (i) the proceeds, if any, actually received by the Company under the Policies insuring the life of the deceased Shareholder and owned by the Company, and (ii) the product obtained by multiplying (x) the deceased Shareholder's proportionate interest in the total outstanding Shares of the Company as of the date of death by (y) the total value of the Company (the "**Agreed Value**"), as set forth on a Certificate of Agreed Value in effect as of the date of death of the deceased Shareholder, but, in any event, **not greater than** the Special Value as determined by the provisions of **EXHIBIT "B"**. For the purposes of this Agreement, the Agreed Value as of the date of this Agreement is set forth on the Certificate of Agreed Value annexed hereto as **EXHIBIT "C"**. Within 75 days after the end of each fiscal year of the Company, the Shareholders shall, by mutual agreement, redetermine the Agreed Value and such redetermined Agreed Value shall be entered on the Certificate of Agreed Value, and each Shareholder shall date and sign **EXHIBIT "C"**. If the Shareholders fail to redetermine the Agreed Value as of the end of any fiscal year, the last previous stipulated Agreed Value shall apply.

(e)    <u>Closing</u>. The closing of the purchase and sale of the deceased Shareholder's Shares (the "**Closing**") shall take place within thirty (30) days after the last to occur of (i) the appointment of a personal representative ("**Personal Representative**") for the deceased Shareholder and (ii) the receipt of proceeds, if any, by the Company from the applicable Policies.

(f)    <u>Payment of Purchase Price</u>. At the Closing, the Purchase Price shall be payable as follows:

(1)    any life insurance proceeds actually received by the Company under Policies listed in **EXHIBIT "A"** shall be remitted to the deceased Shareholder's Personal Representative. The balance of the Purchase Price (or the entire Purchase Price in the event that no insurance proceeds are received for any reason whatsoever) shall be evidenced by a non-negotiable promissory note (the "**Note**") in an amount equal to the balance of the Purchase Price.

(2)    The Note will accrue interest from the date of the Note computed on the unpaid balance at the prime rate published by Citibank, N.A. and shall be payable in sixty (60) equal self-amortizing monthly installments of principal and interest, with the first such monthly installment to be due and payable on the first (1st) day of the second (2nd) calendar month following the Closing, and succeeding monthly installments to be due and payable on the first (1st) day of each succeeding calendar month until the Note shall be

paid in full. If a default occurs in the payment of any installment, in whole or in part, which is not cured within fifteen (15) days after the due date thereof, the holder of the Note shall have the right to accelerate the maturity of the Note so as to make the same immediately due and payable. The Note will be prepayable, in whole or in part, in the inverse order of maturity, without penalty or premium.

(g)     Obligations of Personal Representative. At the Closing, the Personal Representative of the deceased Shareholder shall deliver the certificates representing the Shares of the deceased Shareholder, together with appropriate stock powers executed in blank, and such other documents evidencing his appointment, qualification and authority to act as shall be reasonably satisfactory to the attorneys for the Company.

(h)     Intra Party Loans. If, at the time of the deceased Shareholder's death, such Shareholder owed any money to the Company, then the estate of the deceased Shareholder shall pay such indebtedness to the Company at the Closing. If the Company owes any money to the deceased Shareholder on the closing date of the sale of such Shares, then the Company shall pay the amount owed to the deceased Shareholder to his estate at the Closing.

(i)     Redemption Under Section 302 of Internal Revenue Code. The purchase by the Company of the Shares of a deceased Shareholder (or of a disabled Shareholder under Section 4, below) shall, as nearly as possible qualify as a complete redemption of the interests of the affected Shareholder as permitted under Section 302 of the Internal Revenue Code.

(j)     Limit on Amount of Annual Payment. Notwithstanding any other provision of this Agreement, the annual payment to be made by the Company in respect of either a deceased Shareholder or a disabled Shareholder shall not exceed, in any year, 37.5% of the Company's net operating income for that year. To the extent that the annual payment may exceed that level, the excess amount of the required payment shall be deferred to the Company's next year, and such excess shall be paid, dollar for dollar, at the same time as any payments are made to the remaining Shareholder.

## 4.     SALE OF SHARES ON DISABILITY.

(a)     Right of First Refusal. If a Shareholder becomes disabled (as defined below) while a Shareholder in the Company, the Company will purchase all (but not less than all) of the shares owned by the disabled person at the time of his disability at the Purchase Price as defined in Section 3. To help fund the purchase of the shares owned by the disabled person, each of Messrs. Silverman and Kurins has heretofore purchased and contributed to a Prior Corporation (and the Company shall continue to maintain in force) one or more policies of long-term disability insurance. Each long-term disability insurance policy is payable after no more than a two year "waiting" period, and its face amount shall be payable in monthly segments to the disabled person over a term of five (5) years. With the completion of each segment of three

monthly payments, five (5%) percent of the shares owned by the disabled person at the time of his disability shall be canceled so that at the end of the payment of twenty (20) quarterly segments of disability insurance, the entire shareholding interest of the disabled person shall be extinguished. If the disabled person recovers from his disability and is able to resume his full time service with the Company, the payments from the policy of disability insurance shall cease, and no further shares shall be canceled. The disabled person who resumes his full time service with the Company may reacquire from the Company (at a price equal to the payments made to him pursuant to the disability insurance policy) the shares which the Company had canceled so that the formerly disabled person may resume his relative ownership of the Company. Until otherwise agreed by the parties, the long-term disability insurance policy shall pay Mr. Silverman an aggregate of One Million Two Hundred Thousand ($1,200,000) Dollars, and shall pay Mr. Kurins an aggregate of Seven Hundred Fifty Thousand ($750,000) Dollars. The parties acknowledge that the disparity in the amount of insurance coverage provided under this paragraph of the agreement reflects issues (such as occupational risk and family circumstances) not related to the relative ownership of the shares of the Company.

Notwithstanding the policy of long-term disability insurance, if either of Messrs. Silverman or Kurins sustains a long-term disabling incident while this Agreement is in effect, the Company shall have the right from the date of such event, to reduce for a period of two years during the continuation of the disability, the remuneration of the disabled person to seventy five (75%) percent of that person's salary and bonus rate for the tax year immediately preceding the date of the disabling event. If the disabled person has not recovered and resumed his full time responsibilities with the Company by the end of the two year period, the remuneration of the disabled person shall be adjusted to a salary of One Hundred Sixty Thousand ($160,000) Dollars per year for a period of five (5) years and no bonus shall be paid; thereafter, no further salary or bonus shall be required to be paid to the disabled person.

5.    **MANAGEMENT OF THE COMPANY.**

(a)    Election of Directors. Each Shareholder hereby agrees to cast all votes to which such holder is entitled in respect of the Shares, whether at any annual or special meeting, by written consent or otherwise, as follows:

(i)    Number of Directors. To fix the number of directors of the Corporation at such number as may be specified from time to time by Silverman; it being understood that the board of directors of the Corporation (the "Board") shall initially consist of two (2) members, and that those two members shall be Messrs. Kurins and Silverman.

(ii)    Election of Directors. To elect as directors the individuals nominated by Silverman.

(b)    Successors. In the event a director shall cease to serve for any reason, then Silverman shall have the right to nominate a successor. Each Shareholder shall, upon receipt of notice identifying such successor nominee, promptly take all action necessary to cause the election of such nominee to the Board pursuant to the Company's By-laws and Certificate of Incorporation.

(c)    The Company. The Company agrees not to give effect to any action by any holder of common stock which is in contravention of this Section 5.

(d)    Period. This Section 5 shall expire on the earliest of (i) the tenth anniversary of the date hereof (or such later date as may be permitted by law); (ii) the first date on which either of Messrs. Silverman or Kurins ceases to be a shareholder of the Company; or (iii) the closing of a transaction in which the Company or substantially all of its assets are acquired by any third party.

(e)    Voting. Each Shareholder agrees to cast his votes so as to elect and continue in office and to re-elect each other as a Director during the term of this Agreement.

6.    **ACCESS TO INFORMATION.**

The parties hereto covenant and agree that all books and records of account and corporate books and records of any nature, including correspondence, invoices, etc., shall be available to each of the parties hereto and their respective accountants, attorneys or other designated representatives for inspection or audit during the normal working hours of the Company provided, however, that the parties seeking such inspection and/or audit have fully complied with all covenants and conditions of this Agreement at the time the inspection and/or audit is sought.

7.    **TERMINATION OF AGREEMENT.**

This Agreement shall be terminated:

(a)    Upon a written agreement signed by both of the Shareholders;

(b)    As to any Shareholder, upon the sale by such Shareholder of all of such Shareholder's Shares and his receipt of full payment therefor; or

(c)    Upon a dissolution and complete liquidation of the Company adopted in accordance with the terms of this Agreement.

8.    **MISCELLANEOUS.**

(a)    <u>Assurances</u>. Each Shareholder shall execute all certificates and other documents and shall do all such filing, recording, publishing and other acts as the Company deems appropriate to comply with the requirements of law for the operation of the Company and to comply with any laws, rules and regulations relating to the acquisition, operation or holding of the property of the Company.

(b)    <u>Notices, Etc</u>. Any notice, request, demand or other communication given, or required to be given, pursuant to this Agreement shall be in writing and shall either be personally delivered or sent by a reputable commercial courier guaranteeing overnight delivery and shall be deemed to have been given upon receipt if personally delivered, or, otherwise one (1) business day after it is delivered to such delivery service addressed as follows:

| | |
|---|---|
| If to the Company to: | SILVERSEAL CORPORATION.<br>45 John Street<br>Suite 800<br>New York, New York 10038<br>Attention: John Silverman |
| with a copy to: | ALAN SERRINS, ESQ.<br>233 Broadway, 18th Floor<br>New York, New York 10279<br>212-384-0202 |
| If to Shareholders to: | Their respective addresses set forth on the records of the Company. |

Any party may, by giving notice to the other parties in the manner set forth above, change the address to which notices shall be sent to it, provided that any such change of address shall be effective three (3) days after it is given. If a reputable commercial courier guaranteeing overnight delivery does not service the area to which notice is required to be given, notice to such area shall

be given by registered or certified mail, return receipt requested, and shall be deemed given three (3) days after the same is deposited in an official U.S. mail depository, postage and other charges prepaid, enclosed in a properly addressed and sealed wrapper.

(c)     Amendments and Waivers.  The provisions of this Agreement may be amended or modified, and the observance of any term of this Agreement may be waived, only by a written instrument executed by the party against which enforcement of the amendment, modification or waiver is sought.  No waiver of the breach of any provision of this Agreement shall be deemed or construed to be a waiver of other or subsequent breaches.

(d)     Conflicts of Interest.  This Agreement was prepared by Kurzman Eisenberg Corbin Lever & Goodman, LLP, as attorneys for the Company.  Each Shareholder hereby acknowledges (i) that his or her interests and those of the Company and the other Shareholder under this Agreement may be diverse and in conflict; (ii) that the purchase and sale of Shares pursuant to this Agreement has tax consequences to each party involved in the transaction and that he or she has not received any representations from the Company's counsel about the tax consequences of this Agreement or any transaction hereunder and (iii) that he or she has had the opportunity, before signing this Agreement, to seek separate independent legal counsel and tax advice.

(e)     Parties in Interest.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.  Except as expressly provided in this Agreement, no right or remedy pursuant to this Agreement shall inure to the benefit of any person which is not a party to this Agreement.

(f)     Entire Agreement.  This Agreement constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior oral and written agreements and understandings between the parties with respect to the subject matter of this Agreement.

(g)     Gender, Number.  Except where the context otherwise requires, words used in the masculine gender include the feminine and neuter; and words used in the singular number include the plural, and the plural the singular.

(h)     Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original but all of which, when taken together, shall constitute one and the same instrument, and this Agreement shall be effective when one or more counterparts have been signed by each party to this Agreement and delivered to the other parties to this Agreement.

(i)     Arbitration.  If any controversy or claim arises out of this Agreement and cannot be settled by the parties, such controversy or claim shall be settled by arbitration by a single arbitrator in New York, New York, in accordance with the then current rules of the American

Arbitration Association, and judgment upon the award may be entered in any court having jurisdiction thereof.

(j)    <u>Governing Law</u>. This Agreement and the legal relations between the parties relating to the transactions described in this Agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts made and to be performed entirely in the State of New York.

(k)    <u>Exhibits</u>. The Exhibits attached to this Agreement are incorporated into this Agreement by reference. All references contained in this Agreement to **"Articles"**, **"Sections"** or **"Paragraphs"** refer to paragraphs of this Agreement unless a different document is expressly referred to. All references contained in this Agreement to **"Exhibits"** refer to those Exhibits which are attached to this Agreement.

(l)    <u>Headings</u>. The descriptive headings of the several Sections, subsections, paragraphs and Exhibits of this Agreement are inserted for convenience of reference only and do not constitute a part of this Agreement.

(m)    <u>Assignment</u>. No party to this Agreement may assign any of its rights under this Agreement, in whole or in part, to any person without the prior written consent of the other parties to this Agreement.

(n)    <u>Separability of Provisions</u>. Each provision of this Agreement shall be considered separable; and if, for any reason, any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid.

IN WITNESS WHEREOF, the undersigned hereby execute this Agreement as of the date first above written.

SILVERSEAL CORPORATION

By: _____
Name: J.L. SILVERMAN
Title: PRESIDENT

_____
**Andris Kurins**

_____
John Silverman

EXHIBIT "A"

| Name of Insured | Life Insurance Policy No. | Policy Type | Face Amount | |
|---|---|---|---|---|
| Andris Kurins | LI037620 | Adjustable Premium Term BUY SELL | $ 1,250,000.00 | |
| Andris Kurins | DBH03558470 | ~~Modified Whole Life~~ DISABILITY | $400,000.00 | |
| John Silverman | LI037619 | Adjustable Premium Term BUY SELL | $ 1,250,000.00 | |
| John Silverman | DBH03558471 | ~~Whole Life~~ DISABILITY | $ 600,000.00 | |

EXHIBIT "B"

Determination of Special Value

"Special Value" as required by the Shareholders Agreement shall be determined by the following procedures:

1.    The Company's net operating income ("NOI") for each of the last three full fiscal years shall be determined by the Company's auditors, by reference to the Company's annual financial statements and records.  The determination of NOI shall be on the accrual basis (and not on the "cash" basis used by the Company for purposes of income tax reporting).

2.    For purposes of the Special Value calculation, NOI shall not include income from nonoperating assets, such as tradeable securities held or owned by the Company. However, for purposes of the Special Value calculation, to the NOI, there shall be added back salaries and bonuses paid to the Shareholders, interest on borrowed money, and any non-cash charges used in determining NOI.  The result of the computations in this Paragraph 2 shall be the "Adjusted NOI".

3.    A weighted average of the Adjusted NOI for the three fiscal years prior to the date of the Special Value calculation shall be determined by adding to the Adjusted NOI for the earliest two years of the three fiscal years, twice the Adjusted NOI for the most recent fiscal year. The sum so obtained shall be divided by four to obtain the weighted average of the Adjusted NOI.

4.    The weighted average of the Adjusted NOI shall be multiplied by 1.75.

5.    To the product of the multiplication in Step 4, add the fair market value of the Company's nonoperating assets as at the most recent month end prior to the date of the Special Value calculation.

6.    The sum of the addition in Step 5 is the Special Value.

In certain circumstances set forth below, Special Value may be adjusted by an Adverse Change or by a Late Adverse Change (or by both an Adverse Change and a Late Adverse Change).

An Adverse Change is a reduction, on a year-over-year basis, of either 25% or more in the Company's gross revenues by reason of the loss of (or a reduction in revenue from) one of the Company's customers, or of 33% or more in the Company's gross revenues by reason of the loss of (or a reduction in revenue from) not more than two of the Company's customers. An Adverse Change may occur only before the date on which a Special Calculation to determine a Purchase Price under Section 3(d) of the Agreement is effective.  If an Adverse Change occurs in either of the two full fiscal years before the date on which a Special Value calculation is made, and the

effect of the Adverse Change continues until the date on which a Special Value calculation is required, then the NOI for all three years used in the calculation shall reflect the revenue reduction on a *pro rata* basis. For example, if the Company enjoys gross revenues in years 1 and 2 of $7,500,000, but, by virtue of the effect of a reduction in required service from Customer Q, the Company's gross revenues in year 3 are reduced to $5,500,000, then, to the extent that revenues (and related expenses) from Customer Q were part of the NOI for years 1 and 2, the NOI for each of those years shall be adjusted accordingly. More specifically, if Customer Q revenues for years 1 and 2 were $3,000,000 per year, and in year 3, Customer Q revenues fell to $1,000,000, then for purpose of the Special Value calculation, there would be a *pro forma* adjustment to NOI for each of years 1 and 2 by reason of the 66 2/3% reduction in Customer Q revenues (and related expenses) for those years. The NOI as reduced on a *pro forma* basis would then be used in obtaining the weighted average of the NOI for step 3, above.

A Late Adverse Change occurs only after a Special Value calculation has been made, a Purchase Price for the purposes of Section 3(d) of the Agreement has been determined, and the Company is making payments to the Shareholder affected within the "Payout Period". A Late Adverse Change is a reduction, on a year over year basis (but measured each calendar quarter), of ten (10%) percent or more in the Company's gross revenues by reason of the loss of (or a reduction in revenue from) one of the Company's customers. If a Late Adverse Change occurs, then all payments otherwise due the affected Shareholder after the end of the calendar quarter in which the Late Adverse Change has eventuated shall be reduced by the same percentage as the reduction in the Company's gross revenues. For example, if the payments to a Shareholder during the Payout Period were at the annual rate of $400,000, and if there were a Late Adverse Change arising from the loss of Customer DD resulting in a reduction of gross revenues by 20% beginning in the second quarter of Year 3 of the Payout Period, then the payment to the affected Shareholder for the next calendar quarter (and thereafter) would be reduced from $100,000 to $80,000. The reduced payment would remain in force until such time as the Company had rebuilt its gross revenues (from all sources) to the point achieved prior to the occurrence of the Late Adverse Change. The affected Shareholder would have no right to receive more than the reduced amount, and, if a Late Adverse Change occurs, the affected Shareholder shall be deemed to have consented to a reduction in the Purchase Price in accordance with the principles set forth herein.

-3-

EXHIBIT "C"

CERTIFICATE OF AGREED VALUE

We, the undersigned, being all of the Shareholders of SilverSeal Corporation. (the Corporation) do hereby agree and certify that the value of each outstanding share of stock of the Corporation is $          as of the date hereof.

This certificate may be executed by the Shareholders in multiple counterparts.

Dated:               200_

In the presence of:

_____
HELENE NIVES

_____
John Silverman

_____
Andris Kurins

SUPREME COURT OF NEW YORK
COUNTY OF NEW YORK

Index No.

In the matter of the Application of

ANDRIS KURINS,

Petitioner,

For the Dissolution of
SILVERSEAL CORPORATION, a New York
Corporation, Pursuant to BCL § 1104-a,

-against-

SILVERSEAL CORPORATION and
JOHN SILVERMAN,

Respondents.

ORDER TO SHOW CAUSE, PETITION AND
AFFIDAVIT IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTIVE RELIEF

MEYERS TERSIGNI FELDMAN & GRAY LLP
Attorneys for Petitioner

14 WALL STREET, 19TH FLOOR
NEW YORK, NEW YORK 10005
(212) 422-1500

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

----------------------------------------------------------------------x

In the matter of the Application of
ANDRIS KURINS,

<div align="center">Petitioner,</div>

For the Dissolution of
    SILVERSEAL CORPORATION, a New York
Corporation, Pursuant to BCL § 1104-a,

    -against-

SILVERSEAL CORPORATION and JOHN SILVERMAN,

<div align="center">Respondents.</div>

----------------------------------------------------------------------x

RECEIVED

OCT 29 2007
Hand; 11:2a Am.
GARVEY SCHUBERT
BARER

Index No. 07/603565

## PETITIONER'S MEMORANDUM IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

This memorandum of law is submitted on behalf of petitioner, Andris Kurins ("petitioner" or "Kurins"), in support of his motion for a preliminary injunction prohibiting respondents, pending final judgment, from (i) utilizing corporate funds to pay the legal or other professional fees and expenses incurred by respondent, John Silverman ("Silverman") in connection with this proceeding and (ii) excluding petitioner from access to the books and records of SilverSeal Corporation ("SilverSeal") and its related entities. Petitioner owns 49% of the issued and outstanding stock of SilverSeal; Silverman owns the other 51%.

The facts are set forth in the verified petition and the accompanying affidavit of petitioner. They will not be repeated here, but will be referred to in the argument below.

**Argument**

**AN INJUNCTION SHOULD BE GRANTED (i) PROHIBITING
THE USE OF CORPORATE FUNDS TO PAY SILVERMAN'S
LEGAL OR PROFESSIONAL FEES IN THIS PROCEEDING AND
(ii) PROHIBITING RESPONDENTS FROM DENYING PETITIONER
ACCESS TO THE BOOKS AND RECORDS OF THE CORPORATION**

This proceeding for dissolution of SilverSeal and related relief arises out of

attempts by Silverman to wrest the business away from Kurins, for a price far less than the true

value of his interest, at a time when the business is growing substantially, having increased its

annual revenues from approximately $300,000 when the corporation was formed in 1994, to in

excess of $19 million currently.

It is well established that shareholders in a closely held corporation share a

fiduciary duty among themselves, akin to that of partners, which imposes upon the shareholders

a high degree of fidelity and good faith. *See Global Minerals and Metals Corp. v. Holme*, 35

A.D.3d 93, 98, 824 N.Y.S.2d 210, 214 (1st Dept. 2006); *see also Fender v. Prescott*, 101 A.D.2d

418, 476 N.Y.S.2d 128 (1st Dept. 1984), *aff'd*, 64 N.Y.2d 1077, 489 N.Y.S.2d 880, 479 N.E.2d

225 (1985). An additional fiduciary duty arises when one is a corporate officer or director. *See*

*Global, Id.*; *see also Alpert v. 28 Williams St. Corp.*, 63 N.Y.2d 557, 568, 483 N.Y.S.2d 667,

673, 473 N.E.2d 19, 25 (1984). This fiduciary duty "is a sensitive and inflexible rule of fidelity,

barring not only blatant self-dealing, but also requiring avoidance of situations in which a

fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty."

*Global, Id.*; *Birnbaum v. Birnbaum*, 73 N.Y.2d 461, 466, 541 N.Y.S.2d 746, 748, 539 N.E.2d

574, 576 (1989). These fiduciary duties are not extinguished by acrimonious relationships

between shareholders. *See Global, Id.* at 98, 214-15; *see also Blue Chip Emerald LLC. v. Allied*

*Partners*, 299 A.D.2d 278, 279, 750 [*5] N.Y.S.2d 291, 294 (1st Dept 2002).

2

The New York Court of Appeals long ago held that a court of equity will protect a minority shareholder against acts or threatened acts of the controlling shareholder which violate this fiduciary relationship. *Kavanaugh v. Kavanaugh Knitting Co.,* 226 N.Y. 185, 195 (1919). In addition to these general equitable principles adopted by the courts for the protection of minority shareholders, New York Business Corporation Law §1104-a was enacted to enhance protection for minority shareholders who have been oppressed and/or excluded from participating in the affairs of the corporation, and injunctive relief is available in this specific context as well. *See, e.g., Matter of Public Relation Aids,* 109 A.D.2d 502, 492 N.Y.S.2d 736 (1st Dept. 1985).

## 1.
## Use of Corporate funds to pay Silverman's Legal and Professional Fees

In connection with his plan to oust petitioner, Silverman has retained, in addition to Alan Serrins (SilverSeal's general counsel), Andrew J. Goodman, of the firm of Garver Schubert Barer. Serrins was one of two new directors elected by Silverman to SiverSeal's board of directors in February 2007 (the other being his then law partner, Richard Dienst). It was Serrins and Dienst who adopted the resolutions reducing Kurins' annual compensation from $1.5 million for the year before, to $100,000 for the current year, and eliminating all reimbursement of Kurins' business expenses. At the same time, they fixed Silverman's compensation at $1.5 million annually. Pet., ¶¶34 (j) and (k). It was Goodman who commenced the earlier action to stay the arbitration that had been commenced by Kurins. Pet., ¶38.

It appears that both Serrins and the Garver firm are being paid by SilverSeal. In this regard, as set forth in the accompanying affidavit of Kurins, SilverSeal's current financial statements show an item designated "prepaid legal" in the amount of *$1.1 million.* While the financial statements do not indicate to whom these exorbitant legal expenses were prepaid or the

3

purpose of the so-called prepayment, when asked about this, Serrins indicated that there were no threatened or pending lawsuits, other than the claims being asserted by Kurins, which would require such a prepayment. Kurins' Affid., ¶6.

Kurins, on the other hand, has been compelled to hire and pay for his own attorneys to defend himself against Silverman's oppressive and unlawful conduct. It would be grossly unfair, to say the least, for Kurins to have to bear the expenses of defending against such conduct – especially in light of the drastic reduction of his compensation (ironically adopted by one the very attorneys who are now being paid out of corporate funds) – while, at the same time, Silverman is permitted to utilize the corporate treasury to finance his scheme to force Kurins out.

The courts have long recognized this gross inequity in allowing one party to a dispute between shareholders to utilize the corporate treasury for his own purposes, while requiring the other party to bear his own legal and professional expenses.   Thus, it has been uniformly held that where, as here, a dissolution proceeding is, in substance, simply a dispute between shareholders, professional fees and expenses of the disputing shareholders may not be paid out of corporate funds.[1] *Matter of Dissolution of Penepent Corp.,* 198 A.D.2d 782, 605 N.Y.S.2d 691 (1st Dept. 1993) ("The court properly granted petitioner's motion to restrain respondent from using corporate funds to pay for professional services engaged in this [dissolution] proceeding.") (relying on *Reinschreiber and Cantelmo, infra; Public Relations Aids, supra*); *Matter of Park Inn Ford, Inc.,* 249 A.D.2d 307, 671 N.Y.S.2d 288 (2nd Dept. 1998) (court properly enjoined two-thirds majority shareholder in closely held corporation from using corporate funds to pay counsel fees incurred in defending dissolution proceedings); *Matter of*

---

[1] While it may be appropriate for SilverSeal to pay for its own professional fees in this matter, it is recognized that a corporation is only a nominal party in a dissolution proceeding, "for the limited and passive purpose of rendering it amendable to the orders of the court." *Matter of Public Relation Aids, supra,* at 510-511. Accordingly, the fees for SilverSeal should be minimal.

*Rappaport*, 110 A.D.2d 639, 487 N.Y.S.2d 376 (2nd Dept. 1985) ("This court has previously held

that there is no authority for the allowing of counsel fees incurred in defending a dissolution

proceeding of this type to be paid out of corporate funds.") (citing *Reinschreiber, infra*); *Matter*

*of Reinschreiber*, 70 A.D.2d 596, 416 N.Y.S.2d 31 (2nd Dept. 1979) (finding abuse of discretion

where trial directed that shareholder's counsel fees incurred in defending against dissolution

proceedings be paid out of corporate funds); *Matter of Cantelmo*, 278 A.D. 800, 104 N.Y.S.2d

282 (1st Dept. 1951) (court had no power to fix attorney fees of 50% shareholder incurred while

resisting dissolution).

       Accordingly, based on general equitable principles, the existence of a fiduciary

relationship between the parties and the authorities discussed above, respondents should be

prohibited from utilizing corporate funds, including the so-called "prepaid" fees, to pay for

Silverman's professional fees in this matter.

<div align="center">

**2.**
**<u>Access to Corporate Books and Records</u>**

</div>

       It is well established that corporate directors have "an absolute, unqualified right,

having its roots in the common law, to inspect their corporate books and records." *Cohen v.*

*Cocoline Products, Inc.*, 309 N.Y. 119, 123 (1955). *See, also, Matter of Johnson Lau*, 102

A.D.2d 794, 477 N.Y.S.2d 151 (1st Dep't 1984). In addition, a stockholder has the right to

inspect certain books and records of his corporation for a proper purpose. *Matter of Johnson*

*Lau, supra.*

       This principle has been applied to enjoin respondents in a dissolution proceeding

from denying the petitioner access to the books and records of the corporation whose dissolution

is sought. Thus, in *Public Relations Aids, supra*, 109 A.D.2d at 506, 510, the First Department

upheld Special Term's order directing respondents to make available to petitioner and his

<div align="center">

5

</div>

accountants all corporate records prior to the date of the commencement of the dissolution proceeding.

In the present case, not only does Kurins have the right, as a director and shareholder, to inspect the corporate books and records, but the parties shareholders' agreement expressly provides that all of the books and records of the corporation, of any nature, would be available for inspection or audit by the parties or their designated representatives.  Pet., ¶28; Kurins Affid., Exhibit 1.

At the beginning of April 2007, Kurins' counsel wrote to SilverSeal on Kurins' behalf, exercising Kurins' rights under the written shareholders' agreement, and his common law rights as a shareholder and director of the corporation, to inspect certain books and records of SilverSeal and its related entities.  In response, Silverman's attorneys sought to limit the inspection only to SilverSeal itself, the non-operating holding company, thereby negating any meaningful inspection of the records of the operating businesses.  While Silverman's attorneys and accountants ultimately agreed that such a limitation was not warranted, to date, only a few selective books and records have been made available to Kurins.  Kurins Affid., ¶7.

It is essential for Kurins to have access to the corporation's books and records in order to protect, and to properly value, his interest in the corporation.  Otherwise, Kurins would be put at a significant disadvantage in connection with this proceeding.

Therefore, based on the authorities discussed above, an injunction should be issued prohibiting respondents from denying Kurins access to the books and records of SilverSeal and its related entities.  Respondents should be directed to make the books and records available at a place and times to be agreed upon by the parties and their representatives.

## Conclusion

For all the reasons stated in the verified petition, the affidavit of Andris Kurins and this memorandum of law, petitioner's motion for preliminary injunctive relief, and his application for a temporary restraining order, should be granted in their entirety.

Dated:  October 24, 2007

MEYERS TERSIGNI FELDMAN & GRAY LLP
Attorneys for Petitioner

By: _____
        Richard N. Gray
        Anthony L. Tersigni
        14 Wall Street, 19th Floor
        New York, New York 10005
        (212) 422-1500

7

SUPREME COURT OF NEW YORK
COUNTY OF NEW YORK

Index No.

In the matter of the Application of

ANDRIS KURINS,

Petitioner,

For the Dissolution of
SILVERSEAL CORPORATION, a New York
Corporation, Pursuant to BCL § 1104-a,

-against-

SILVERSEAL CORPORATION and
JOHN SILVERMAN,

Respondents.

**MEMORANDUM OF LAW IN
SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTIVE RELIEF**

**MEYERS TERSIGNI FELDMAN & GRAY LLP**
**Attorneys for Petitioner**

14 WALL STREET, 19ᵀᴴ FLOOR
NEW YORK, NEW YORK 10005
(212) 422-1500

# EXHIBIT C

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
--------------------------------------------------------------------X
ANDRIS KURINS, individually and as a Shareholder of,
SILVERSEAL CORPORATION,

                        *Plaintiff,*

          - against –

JOHN SILVERMAN and ALAN SERRINS,

                       *Defendants.*
--------------------------------------------------------------------X

**SUMMONS**

Index No: O8 602048

Plaintiff resides at
3 Merrill Road
Norwalk, CT 06851

**To the above named Defendants:**

    **You are hereby summoned** to answer the Complaint in this action, and to serve a copy of your answer within twenty days after the service of this summons, exclusive of the day of service, where service is made by delivery upon you personally within the state, or within 30 days after completion of service where service is made in any other manner. In case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the Complaint.

    The basis of the venue designated is CPLR § 509.

Dated: New York, New York
      July 11, 2008

                        Yours, etc.

                        JUDD BURSTEIN, P.C.

                        By:_____
                            Judd Burstein
                        1790 Broadway, Suite 1501
                        New York, New York 10019
                        Tel:   (212) 974-2400
                        Fax:  (212) 974-2944
                        *Attorneys for Plaintiff Andris Kurins,*
                        *individually and as a Shareholder of*
                        *Silverseal Corporation*

To:   **Alan Serrins, Esq.**
233 Broadway, 18th Floor
New York, New York 10279

61 Broadway, 25th Floor
New York, New York 10006

**John Silverman**
19 Fulton Street, 3rd Floor
New York, New York 10038

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

----------------------------------------------------------------------X

ANDRIS KURINS, individually and as a Shareholder of
SILVERSEAL CORPORATION,                                        Index No. _____

*Plaintiff,*

– against –                                                    **COMPLAINT**

JOHN SILVERMAN and ALAN SERRINS,

*Defendants.*

----------------------------------------------------------------------X

Plaintiff Andris Kurins, by his attorneys, Judd Burstein, P.C., complaining of the Defendants

both individually and as a shareholder of Silverseal Corporation, alleges as follows:

### INTRODUCTION

1.    This is an action to redress wrongs done to Plaintiff Andris Kurins ("Kurins"), both

as an individual and as a shareholder of Silverseal Corporation ("Silverseal"), by a corrupt lawyer

and his client.

2.    Commencing as early as January of 2002, and continuing until at least December of

2006, Silverman and Serrins used an escrow account consisting solely of Silverseal's funds –

supposedly maintained by Serrins, as attorney for Silverseal, for the benefit of Silverseal – as a

personal piggy bank for Defendant John Silverman ("Silverman"), the majority owner and President

of Silverseal.  Further, compounding his terrible ethical violations, Serrins paid himself out of the

escrow account for purely personal, non-corporate legal services he had rendered to Silverman.

3.    As a result of these outrageous breaches of fiduciary duty, Silverseal is entitled,

pursuant to *TPL Associates v. Helmsley-Spear, Inc.*, 146 A.D.2d 468, 536 N.Y.S.2d 754 (1st Dep't

1989), and *GRG Group, Inc. v. Ravenal*, 247 A.D.2d 201, 668 N.Y.S.2d 352 (1st Dep't 1998), to

damages in an amount equal to **all** compensation paid to Silverman, and **all** fees paid to Serrins or his firm after January of 2002. Further, because Silverman and Serrins also violated the RICO statute, 18. U.S.C. §§ 1961, *et seq.*, those damages must be trebled together with an award of legal fees.

## PARTIES

4.     Plaintiff Kurins is the owner of 49% of the outstanding stock of Silverseal.

5.     Defendant Silverman is the owner of 51% of the outstanding stock of Silverseal. He is also the President of the company.

6.     At all times relevant to this Complaint, Serrins served as primary outside counsel to Silverseal, as well as personal counsel to Silverman. Commencing in 2007, Serrins joined the Board of Directors.

7.     Nominal Plaintiff Silverseal is a corporation organized under the laws of the State of New York, with its principal place of business in New York County, New York.

## ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

8.     Through its subsidiaries, Silverseal is engaged in the business of corporate security and private investigation.

9.     In late January of 2002, and unbeknownst to Kurins, Silverman and Serrins arranged for the creation of a secret escrow account with Serrins's law firm, Dienst & Serrins LLP ("D&S") to, *inter alia*, permit Silverman to funnel funds to his girlfriend Maria Weissman ("Weissman"), and permit the use of corporate funds to pay Silverman's personal legal expenses.

2

10.    On or about January 28, 2002, Silverman arranged for the deposit of $25,000 in Silverseal funds into the escrow account. On information and belief, Silverman sent this check to Serrins by mail or overnight interstate carrier.

11.    On or about February 21, 2002, Silverman arranged for the deposit of $25,000 in Silverseal funds into the escrow account. On information and belief, Silverman sent this check to Serrins by mail or overnight interstate carrier.

12.    On or abo ut February 26, 2002, Serrins authorized payment of $1,487.50 to Weissman. On information and belief, this payment was made by a check sent to Weissman from Serrins by mail or overnight interstate carrier. At the time, Weissman was Silverman's girlfriend. Although she is a lawyer, Weissman, on information and belief, had no litigation experience. Nonetheless, in order to fraudulently provide her with tax-deductible monies from Silverseal, Silverman arranged for her to provide entirely superfluous "assistance" to Serrins in connection with a sexual harassment complaint made at Silverseal. However, with respect to this February 26, 2002 payment, Silverseal's books and records do not even reflect that Weissman ever submitted an invoice.

13.    On or about March 14, 2002, Silverman arranged for the deposit of $12,663.50 in Silverseal funds into the escrow account. On information and belief, Silverman sent this check to Serrins by mail or overnight interstate carrier.

14.    On or about October 1, 2002, Silverman arranged for the deposit of $25,000 in Silverseal funds into the escrow account. On information and belief, Silverman sent this check to Serrins by mail or overnight interstate carrier.

3

15.    In or about late 2002, Silverman advised Kurins that Silverseal should begin creating a "rainy day" fund in the event that one of its subsidiaries, S.E.A.L. Security LLC ("Seal Security") were to someday lose its major client and the parties needed cash to restructure.

16.    Based upon this representation, Kurins agreed that Silverseal should deposit $300,000 into the escrow account. In discussing the matter, Silverman fraudulently hid the fact that the escrow account had been in existence for almost a year and was being used to make improper payments for the benefit of Silverman.

17.    In addition, Silverman needed to inform Kurins about the escrow account because, on or about December 12, 2002, Silverman had used a Silverseal check to funnel $100,000 to Serrins personally, and needed an explanation from Kurins should he enquire about it. On information and belief, the sources of which include the fact that the check has a notation of "Escrow" on it, but it was never deposited into the escrow account, this check was either (a) a payoff to Serrins so that he would allow his escrow account to be used to pay Silverman's non-corporate expenses, or (b) a payment that was then funneled to Silverman by Serrins. On information and belief, Silverman either mailed or sent the check to Serrins by mail or overnight interstate carrier.

18.    The $300,000 was deposited into the escrow account by way of a check, dated December 19, 2002, signed by Kurins. On information and belief, this check was sent to Serrins by mail or overnight interstate carrier.

19.    Following the deposit of the $300,000 into the escrow account, Silverman's and Serrins's fraud continued.

20.    On or about March 18, 2003, the law firm of Kurzman Eisenberg Corbin Lever & Goodman LLP ("Kurzman") sent Silverman an invoice for legal services rendered to him in

4

connection with "Account No. 57054-001M," a matter entitled "Real Estate Entity (Matrimonial)" ("Matrimonial Matter"). These charges were for personal legal services rendered to Silverman and were not a proper Silverseal corporate expense. On information and belief, this invoice was either mailed or sent by overnight interstate carrier.

21. On or about April 1, 2003, Serrins signed a check payable to Kurzman from the escrow account in payment of a number of invoices which included the invoice for the Matrimonial Matter. On information and belief, this check was either mailed or sent by overnight interstate carrier.

22. On or about April 24, 2003, Kurzman sent Silverman an invoice for legal services rendered to him in connection with "Account No. 57054-003M," a matter entitled "Estate and Will Planning" ("Estate Matter"). These charges were for personal legal services rendered to Silverman and were not a proper Silverseal corporate expense. On information and belief, this invoice was either mailed or sent by overnight interstate carrier.

23. On or about May 2, 2003, Serrins signed a check payable to Kurzman from the escrow account in payment of a number of invoices which included the invoice for the Estate Matter. On information and belief, this check was either mailed or sent by overnight interstate carrier.

24. On or about July 30, 2003, Serrins authorized payment of $3,850 to Weissman. On information and belief, this payment was made by a check sent to Weissman from Serrins by mail or overnight interstate carrier. Silverseal's records do not reflect any bill for these services.

25. On or about October 14, 2003, Weissman sent an invoice to Serrins. On information and belief, this invoice was sent to Serrins by mail or overnight interstate carrier.

26.    On or about October 15, 2003, Weissman was paid by a check from Serrins that was, on information and belief, sent to her by mail or overnight interstate carrier.

27.    The manner in which Weissman's October 2003 "bill" was paid further evidences the fact that the invoices and "services" provided by Weissman were merely a conduit for Silverman to give gifts to his girlfriend. Rather than paying Weissman directly from the escrow account, Serrins paid her from his firm's account and then repaid his firm with a check from the escrow account. On information and belief, Serrins paid Weissman in this fashion so that the payments to Weissman would not be reflected in the escrow account bank records were Kurins ever to seek to review them. Further, Serrins immediately approved payment of Weissman's invoice on October 15, 2003. In addition to the fact that this instantaneous approval was in marked contrast to Serrins practice of not paying other lawyers' bills for weeks or months, the invoice submitted by Weissman was totally inadequate in terms of detail. Indeed, it asked for payment for the time that Weissman spent merely depositing an envelope in the mail.

28.    On or about December 3, 2003, Weissman sent a letter to Silverseal in which she discussed the balance of monies left on retainer with her office, and asking for a check for $6,325 "in order to fully replenish the retainer." On information and belief, the books and records of Silverseal do not reflect any retainer agreement with Weissman providing for leaving monies on retainer. Moreover, the amount of money requested by Weissman suggests that she had at one point been paid a $7,500 retainer fee by Silverseal for "legal services." This payment is not reflected in the escrow account records. On information and belief, then, all or at least most of the monies paid to Weissman from the escrow account were not for legal services that she rendered. Rather, to the

6

extent that she did provide "legal services," Silverseal paid for those services directly, and the monies paid from the escrow account were not a proper corporate expense of Silverseal.

29.     On or about December 19, 2003, Weissman sent an invoice to Silverman at Silverseal which reflected that, at some point between December 3 and December 19, Weissman had been paid an amount in excess of $5,000. This money, which, information and belief, was paid through a check that was sent by mail or overnight interstate carrier, did not come from the escrow account.

30.     On or about January 12, 2004, Kurzman sent Silverman an invoice for legal services rendered to Yolanda Rubel for "Estate Planning." The invoice was marked "PERSONAL AND CONFIDENTIAL." Yolanda Rubel is Silverman's mother, and the legal services rendered to her were not a proper Silverseal corporate expense. On information and belief, this invoice was either mailed or sent by overnight interstate carrier.

31.     On or about January 15, 2004, Serrins, either individually or pursuant to his direction, sent Weissman a check for $3,850, curiously the same amount he had sent her the preceding July. On information and belief, this check was sent either by mail or overnight interstate carrier. Moreover, on information and belief, this money was not in payment for legal services, because Weissman's billing records do not reflect any such payment, whereas they do reflect payments directly from Silverseal of $4,225 on or about January 16, 2004, $3,587.50 on or about February 21, 2004, and another $6,000 or more in March of 2004. None of these payments came from the escrow account and, further, none of the payments from the escrow account (other than the October 2003 bill discussed above in Paragraph 25) are supported by bills from Weissman.

32.     On or about March 15, 2004, Kurzman sent Silverman two invoices. On information and belief, these invoices were sent together to Silverman by mail or overnight interstate carrier. The

7

first invoice sought payment of an invoice for legal services rendered to Silverman in connection with the Estate Matter. These services were for personal legal services rendered to Silverman and were not a proper Silverseal corporate expense.

33. The second invoice was for the same legal services rendered to Yolanda Rubel for which Kurzman had sought payment through its January 12, 2004 invoice to Silverman.

34. On or about May 2, 2003, Serrins signed a check from the escrow account payable to Kurzman in payment of a number of invoices which included the invoice for the Estate Matter and the invoice for the Yolanda Rubel work. On information and belief, this check was either mailed or sent by overnight interstate carrier.

35. On or about December 16, 2004, Kurzman sent Silverman invoices for legal services rendered to him in the Estate Matter and the Matrimonial Matter. These charges were for personal legal services rendered to Silverman and were not a proper Silverseal corporate expense. On information and belief, these invoices were either mailed or sent by overnight interstate carrier.

36. On or about January 26, 2005, Kurzman resent these invoices to Silverman, together with an additional charge for the Matrimonial Matter. These additional services were for personal legal services rendered to Silverman and were not a proper Silverseal corporate expense. On information and belief, these invoices were either mailed or sent by overnight interstate carrier.

37. On or about February 10, 2005, Serrins signed a check from the escrow account for payment of a D&S invoice dated February 10, 2005. Some of this payment was for personal legal services rendered to Silverman that were not a proper Silverseal corporate expense. The precise breakdown of which charges were for personal services is peculiarly within the knowledge of

8

Serrins. However, at least one of the charges – related to "Montclair Multiples" – was plainly not a legitimate Silverseal corporate expense.

38.    On or about February 28, 2005, Serrins signed a check payable to Kurzman from the escrow account in payment of a number of invoices which included the invoices described above in Paragraphs 35 and 36. On information and belief, this check was either mailed or sent by overnight interstate carrier.

39.    On or about May 11, 2005, Silverman arranged for the deposit of $152,777.24 in Silverseal funds into the escrow account. On information and belief, Silverman sent this check to Serrins by mail or overnight interstate carrier.

40.    On September 21, 2005, Serrins wrote a check from the escrow account to D&S in payment of a September 21, 2005 invoice. Some of this payment was for personal legal services rendered to Silverman and was not a proper Silverseal corporate expense. The precise breakdown of which charges were for personal services is peculiarly within the knowledge of Serrins. However, at least one of the charges – for the drafting of an April 25, 2005 letter to a co-op board – was plainly not a legitimate Silverseal corporate expense.

41.    On or about January 17, 2006, Kurzman sent Silverman an invoice for legal services rendered to him in connection with the Estate Matter. These charges were for personal legal services rendered to Silverman and were not a proper Silverseal corporate expense. On information and belief, this invoice was either mailed or sent by overnight interstate carrier.

42.    On or about March 21, 2006, Kurzman sent Silverman an invoice for legal services rendered to him in connection with the Estate Matter, and an invoice for legals services rendered to him in connection with Montclair Multiples. These services were for personal legal services

9

rendered to Silverman and were not a proper Silverseal corporate expense. On information and belief, this invoice was either mailed or sent by overnight interstate carrier.

43.    On or about April 12, 2006, Serrins signed a check payable to Kurzman from the escrow account in payment of the invoice described above in Paragraph 42. On information and belief, this check was either mailed or sent by overnight interstate carrier to Kurzman.

44.    On or about April 21, 2006, Kurzman sent Silverman an invoice for legal services rendered to him in connection with the Estate Matter. These charges were for personal legal services rendered to Silverman and were not a proper Silverseal corporate expense. On information and belief this invoice was either mailed or sent by overnight interstate carrier.

45.    On or about April 28, 2006, Serrins signed a check payable to Kurzman from the escrow account which included partial payment of the invoice described above in Paragraph 44. On information and belief, this check was either mailed or sent by overnight interstate carrier to Kurzman.

46.    On or about June 22, 2006, Kurzman sent Silverman an invoice for services rendered to him on the Estate Matter and in connection with Montclair Multiples. These charges were for personal legal services rendered to Silverman and were not a proper Silverseal corporate expense. On information and belief, this invoice was either mailed or sent by overnight interstate carrier to Kurzman.

47.    On or about July 10, 2006, Serrins signed a check payable to Kurzman from the escrow account which included payment of the invoice described above in Paragraph 46. On information and belief, this check was either mailed or sent by overnight interstate carrier to Kurzman.

10

48.     On or about October 19, 2006, Silverman arranged for the deposit of $156,968.15 in Silverseal funds into the escrow account.  On information and belief, Silverman sent this check to Serrins by mail or overnight interstate carrier.

49.     On or about October 12, 2006, the law firm of Garvey Schubert Barer ("Garvey") sent Silverman an invoice for legal services rendered to him in connection with "Montclair Multiples." These charges were for personal legal services rendered to Silverman and were not a proper Silverseal corporate expense.  On information and belief, this invoice was either mailed or sent by overnight interstate carrier.

50.     On or about October 30, 2006, Serrins signed a check payable to Garvey from the escrow account in payment of a number of invoices which included the invoice referenced above in Paragraph 49. On information and belief, this check was either mailed or sent by overnight interstate carrier.

51.     On or about December 14, 2006, Serrins directed another authorized signatory on the escrow account to send a check to the law firm of Kossoff & Unger for services rendered or to be rendered to Silverman personally, as opposed to Silverseal.  As such, the payment was not for a proper Silverseal expense.  On information and belief, this check was either mailed or sent by overnight interstate carrier.

52.     On information and belief, all of the above-described payments were, at the direction of Silverman and Serrins, fraudulently reported to federal and state taxing authorities as legitimate business expenses, as opposed to income to Silverman.

53.     Also on information and belief, other payments from the escrow account to D&S were for personal legal services rendered to Silverman rather than services rendered to Silverseal.  The

11

details of these payments are peculiarly within Serrins's knowledge due to the vagueness of his time entries.

## ABSENCE OF A DEMAND

54.    No demand upon Silverseal's Board of Directors has been made pursuant to B.C.L. § 626(c) because, given that Silverman and Serrins control the Board, such demand would be futile.

## FIRST CAUSE OF ACTION

55.    Plaintiff repeats and realleges all of the allegations set forth above as if fully restated in this Paragraph.

56.    Silverseal is an enterprise as that term is defined by 18 U.S.C. § 1961(4). The affairs of Silverseal affect interstate and foreign commerce.

57.    From January 2002, through at least December 2006, Defendants have knowingly and intentionally participated in the scheme to defraud Plaintiff and Silverseal that is alleged above in Paragraphs 8 through 53. The scheme was also a scheme to defraud federal and state taxing authorities. Defendants caused at least those mailings or overnight deliveries by interstate carrier service detailed above in Paragraphs 10-14, 17-18, 20-27, 29-32, 34-36, 38-39, and 41-51. In addition, fraudulent federal and state tax returns were mailed on dates peculiarly within the knowledge of Defendants.

58.    The contents of these mailings or overnight interstate carrier deliveries served to further the schemes to defraud set forth above, although the content of any particular mailing or overnight interstate carrier delivery may not have been fraudulent. Each such mailing or overnight interstate carrier delivery was foreseeable to each of the Defendants as part of the schemes to defraud

12

and each such mailing or overnight interstate carrier delivery was a separate violation of 18 U.S.C.
§ 1341 by Defendants.

59.    As a result thereof, Defendants have engaged in a pattern of racketeering as that term
is defined by 18 U.S.C. § 1961(5).

60.    Silverman participated in the operation and management of Silverseal through his role
as President and majority shareholder of the company.

61.    Although Serrins served as outside counsel to Silverseal, he nonetheless participated
in its operation and management because his services far exceeded the rendering of legal advice and
constituted actual participation in and management of the fraudulent scheme by approving payments
from the escrow account for Silverman's personal expenses and indeed by paying his own firm for
non-corporate services rendered to Silverman.

62.    Defendants thereby participated in the operation and management of Silverseal
through the pattern of racketeering activity alleged above.

63.    By reason thereof, Silverseal has been injured in its property and business and
Plaintiff, on behalf of Silverseal, is entitled to recover three times its actual damages plus attorneys'
fees.

## SECOND CAUSE OF ACTION

64.    Plaintiff repeats and realleges all of the allegations set forth above as if fully restated
in this Paragraph.

65.    Defendants each owed fiduciary duties to Silverseal and breached those duties.

66.    Each of the Defendants knowingly participated in and provided substantial assistance
to the other's breach of his fiduciary duties.

13

67.    By reason of these breaches of fiduciary duty, Plaintiff, on behalf of Silverseal, is entitled to recover its actual damages as determined at trial, including all compensation earned by Defendants after January of 2002, as a result of their relationship with Silverseal.

68.    In addition, because Defendants' conduct was wanton, willful and malicious, Plaintiff, on behalf of Silverseal, should be awarded punitive damages as determined at trial.

69.    Pursuant to B.C.L. § 626(e), Plaintiff should be awarded reasonable expenses, including reasonable attorneys' fees.

## THIRD CAUSE OF ACTION

70.    Plaintiff repeats and realleges all of the allegations set forth above as if fully restated in this Paragraph.

71.    Defendants defrauded Silverseal.

72.    By reason of this fraud, Plaintiff, on behalf of Silverseal, is entitled to recover its actual damages as determined at trial.

73.    In addition, because Defendants' conduct was wanton, willful and malicious, Plaintiff, on behalf of Silverseal, should be awarded punitive damages as determined at trial.

74.    Pursuant to B.C.L. § 626(e), Plaintiff should be awarded reasonable expenses, including reasonable attorneys' fees.

## FOURTH CAUSE OF ACTION

75.    Plaintiff repeats and realleges all of the allegations set forth above as if fully restated in this Paragraph.

76.    As Silverseal's attorney, Serrins owed a direct fiduciary duty to Plaintiff as a minority shareholder of Silverseal, and breached that duty.

14

77.    Silverman knowingly participated in and gave substantial assistance to Serrins in his breach of his fiduciary duty to Plaintiff.

78.    By reason of the breaches of fiduciary duty described above, as well as other breaches, Plaintiff is entitled to recover actual damages as determined at trial.

79.    In addition, because Serrins's conduct was wanton, willful and malicious, Plaintiff should be awarded punitive damages as determined at trial.

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    On Plaintiff's First Cause of Action, three times Plaintiff's actual damages, plus legal fees and expenses;

B.    On Plaintiff's Second and Third Causes of Action, Plaintiff's actual damages as proven at trial, an award of punitive damages, and Plaintiff's reasonable expenses, including reasonable attorneys' fees; and

C.    On Plaintiff's Fourth Cause of Action, Plaintiff's actual damages as proven at trial, as well as an award of punitive damages; and

D.    A Judgment and Order granting such other and further relief as deemed just and proper by the Court.

Dated: July 11, 2008
　　　　New York, New York

JUDD BURSTEIN, P.C.

By_____
Judd Burstein
1790 Broadway
New York, New York 10019
(212) 974-2400
(212) 974-2944 (Fax)
jburstein@burlaw.com

16

# EXHIBIT D

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

In the matter of the Application of
ANDRIS KURINS,
                              Petitioner,

For the Dissolution of
SILVERSEAL CORPORATION, a New York
Corporation, Pursuant to BCL §1104-a,

        -against-

SILVERSEAL CORPORATION and JOHN
SILVERMAN,

                              Respondents.

Index No. 603565/07

**NOTICE OF
CROSS-MOTION**

I.A.S. Part 49
Cahn, J.S.C.

029144

PLEASE TAKE NOTICE that, upon the annexed affirmation of Alan Serrins, dated November 27, 2007, the exhibits annexed thereto, and all the prior papers and proceedings in this proceeding, the undersigned will cross-move this Court, at IAS Part 49 thereof, on the 4th day of December, 2007, at 9:30 a.m., or as soon thereafter as counsel can be heard, for an Order:

(1)    pursuant to Section 407 of the Civil Practice Law & Rules ("CPLR"), severing the first (corporate dissolution) cause of action from the remaining causes in the Petition;

(2)    pursuant to Section 1118(b) of the Business Corporation Law ("BCL") staying prosecution of the first cause of action on the grounds that Respondent SilverSeal Corporation ("SilverSeal") has elected to purchase Petitioner's shares of SilverSeal pursuant to BCL Section 1118(a);

(3)    pursuant to BCL Section 1118(b) directing the judicial determination of the fair value of Petitioner's SilverSeal shares;

NY_DOCS:600219.1

(4)     pursuant to CPLR Section 404 and Rule 406, dismissing the second, third, fourth and fifth causes of action for points of law;

(5)     in the event the motion to dismiss is denied in whole or in part, pursuant to CPLR Section 408, permitting discovery on any of the second, third, fourth and fifth causes of action which are not dismissed, in accordance with CPLR Article 31 as if this were an action; and

(6)     for such other, further and different relief as the Court deems just and proper.

Dated: New York, New York
       November 28, 2007

                            GARVEY SCHUBERT BARER

                            By:

                                Andrew J. Goodman, Esq.
                                A Member of the Firm
                                Attorneys for Respondents
                                100 Wall Street, 20th Floor
                                New York, New York 10005
                                (212) 431-8700

To:    Richard N. Gray, Esq.
       Mayers Tersigni Feldman & Gray LLP
       Attorneys for Petitioner
       14 Wall Street, 19th Floor
       New York, New York 10005

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

In the matter of the Application of
ANDRIS KURINS,

                Petitioner,

For the Dissolution of
SILVERSEAL CORPORATION, a New York
Corporation, Pursuant to BCL §1104-a,

    -against-

SILVERSEAL CORPORATION and JOHN
SILVERMAN,

                Respondents.

Index No. 603565/07

**AFFIRMATION: IN
OPPOSITION TO PETITION
AND IN SUPPORT OF
CROSS-MOTION**

I.A.S. Part 49
Cahn, J.S.C.

---

Alan Serrins, an attorney duly admitted to the practice of law before the Courts of the State of New York, under the penalties of perjury affirms:

1.     I am regular outside counsel to, and a member of the Board of Directors of, Respondent SilverSeal Corporation ("SilverSeal"). I respectfully submit this affirmation:

    A.     In opposition to the petition by Andris Kurins ("Kurins") for dissolution of SilverSeal pursuant to Section 1104-a of the Business Corporation Law ("BCL"), and for damages for alleged breaches of contract and fiduciary duty; and

    B.     In support of the cross-motion by SilverSeal and co-Respondent John Silverman ("Silverman") for an order:

        (i)     pursuant to Section 407 of the Civil Practice Law & Rules ("CPLR"), severing the first (corporate dissolution) cause of action from the remaining causes in the Petition;

(ii)    pursuant to BCL Section 1118(b) staying prosecution of the first cause of action on the grounds that Respondent SilverSeal Corporation ("SilverSeal") has elected to purchase Petitioner's shares of SilverSeal pursuant to BCL Section 1118(a);

(iii)    pursuant to BCL Section 1118(b), directing the judicial determination of the fair value of Petitioner's SilverSeal shares;

(iv)    pursuant to CPLR Section 404 and Rule 406, dismissing the second, third, fourth and fifth causes of action for points of law; and

(v)    in the event the motion to dismiss is denied in whole or in part, pursuant to CPLR Section 408, permitting discovery in accordance with CPLR Article 31 as if this were an action, on any of the second, third, fourth and fifth causes of action which are not dismissed.

2.    The factual matters set forth herein are of my own personal knowledge.

3.    At a meeting of SilverSeal's Board of Directors on November 28, 2007, SilverSeal elected to purchase Kurins' SilverSeal shares pursuant to BCL Section 1118(a). Annexed hereto as Exhibit "A" is a copy of that election previously served on Kurins' counsel in this proceeding.  Annexed hereto as Exhibit "B" is a copy of SilverSeal's Board resolution authorizing the election.

4.    Consequently, under BCL Section 1118(b), the first cause of action in the petition for judicial dissolution of SilverSeal should be stayed.

5.    Additionally, before Kurins filed the petition, the parties had engaged in lengthy efforts to agree on a price for the sale of Kurins' SilverSeal shares.  These efforts proved unsuccessful.  On or about July 27, 2007, Kurins then filed an arbitration claim, including a request for dissolution.  Upon a motion by SilverSeal and Silverman to stay the arbitration on the

grounds that there was no agreement to arbitrate these issues, Kurins withdrew the arbitration. Further unsuccessful negotiations ensued. Kurins then filed this proceeding on or about October 30, 2007. Accordingly, SilverSeal and Silverman also request a judicial determination of the fair value of Kurins' shares, also pursuant to BCL Section 1118(b).

6.    Parsing the petition, Kurins claims that he was frozen out of the company, and that Silverman used corporate funds for improper purposes.[1] But these issues are now moot in light of the election to purchase, since Kurins' remedy is now a fair price for his stock, computed after taking back into corporate assets the value of any corporate expenditures proven to the Court's satisfaction to have been improper.   For this reason, the first cause of action should be severed and stayed pending valuation of Kurins' shares, and the rest of the claims should be dismissed.

7.    Messrs. Kurins and Silverman entered into an Amended and Restated Shareholders' Agreement, a copy of which is annexed as Exhibit 1 to Mr. Kurins October 24, 2007 affidavit ("Kurins Aff.") in support of the petition.  Paragraph 8(f) of that Agreement states:

> "This agreement constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior oral and written agreements and understandings between the parties with respect to the subject matter of this Agreement."

---

[1] Although not relevant to the instant motion which addresses only points of law (*see* CPLR Section 404), the petition alleges that $1,000,000 was used from the escrow fund I maintained to pre-pay Respondents' legal fees herein.  This is untrue, and Kurins knows it is untrue because his representatives have been given full and complete access to the escrow records, which they have in fact reviewed.  The only other alleged diversion was payment made more than five years ago (for corporate services to Mr. Silverman's supposed then "girlfriend").  Beyond that, the petition is general and conclusory only.

8.     The Shareholders Agreement does **not** contain any provision that requiring equal compensation for Messrs. Silverman and Kurins.[2]  Nevertheless, the third cause of action in the petition avers an oral contract for equal compensation.  Since such a purported oral agreement would be barred as a matter of law by the extant Shareholders' Agreement, irrespective of any other argument, the third count should be dismissed.[3]

9.     The fourth claim seeks to recapture for Kurins personally corporate assets that Silverman allegedly misused and wasted.   While SilverSeal vigorously disputes that any corporate funds were misused or wasted, even assuming *arguendo* that had happened, as set forth in the accompanying Memorandum, such a cause of action vests in SilverSeal only, and Kurins could have only alleged it derivatively.  There are no derivative claims in the petition.

10.     If any issues other than valuation remain after determination of this motion, SilverSeal and Silverman should be allowed discovery.   Annexed hereto as Exhibit C are minutes of the SilverSeal Board meeting which established Mr. Kurins present corporate position. The Board had ample cause for the actions it took:  the SilverSeal Board rewarded Mr. Silverman for originating over 90% of SilverSeal's business, while the company's divisions managed by Kurins consistently lost money, at best on occasion breaking even.   Moreover, Respondents deny any misappropriate use of corporate funds (*see* n. 1, *supra.*).  These issues of fact can only be resolved by trial on the merits after full and fair discovery.

11.     Accordingly, Respondents SilverSeal Corporation and John Silverman respectfully request that their motion be granted, that the dissolution cause of action in the

---

[2] Although again not relevant to the legal issues this motion presents, the SilverSeal Board rewarded Mr. Silverman for originating over 90% of SilverSeal's business, while the company's divisions managed by Kurins consistently lost money, at best on occasion breaking even.  One of these divisions employed Kurins' son-in-law.

[3] I or my firm has been the regular outride counsel for SilverSeal and its predecessors since the inception of the business.  I am not aware of any such agreement.

petition be severed and stayed, that the issue of valuation be judicially determined, that the balance of the petition be dismissed, but if not, then that Silverman be permitted discovery as to disputed issues of fact, and such other, further and different relief as the Court deems just and proper.

Dated:  New York, New York
       November 27, 2007

_____
ALAN SERRINS

# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| In the matter of the Application of<br>ANDRIS KURINS,<br>      Petitioner,<br><br>For the Dissolution of<br>  SILVERSEAL CORPORATION, a New York<br>Corporation, Pursuant to BCL §1104-a,<br><br>  -against-<br><br>SILVERSEAL CORPORATION and JOHN<br>SILVERMAN,<br><br>      Respondents. | Index No. 603565/07<br><br><br>**ELECTION TO**<br>**PURCHASE SHARES**<br><br><br>I.A.S. Part 49<br>Cahn, J.S.C. |

PLEASE TAKE NOTICE that Respondent SilverSeal Corporation ("SilverSeal") hereby elects, pursuant to Section 1118 of the Business Corporation Law ("BCL"), to purchase the shares of SilverSeal owned by Petitioner Andris Kurins at their fair value and upon such terms and conditions as may be approved by the Court.

PLEASE TAKE FURTHER NOTICE that annexed hereto as Exhibit A is a copy of a resolution by the Board of Directors of Respondent SilverSeal directing the exercise of such right of election under BCL §1118.

Dated: New York, New York
   November 28, 2007

         GARVEY SCHUBERT BARER

         By:

           Andrew J. Goodman, Esq.
           Attorneys for Respondents
           100 Wall Street, 20th Floor
           New York, New York 10005
           (212) 431-8700

# EXHIBIT "A"

### SilverSeal Corporation

Minutes of Special Meeting of the Board of Directors

November 28, 2007.

Pursuant to Notice, a Special Meeting of the Board of Directors of SilverSeal Corporation was held via telephonic Conference Call at Noon, New York Time, November 28, 2007. Present via teleconference were Richard Dienst, Andris Kurins, Alan Serrins and John Silverman, all of the Directors of the Corporation. Also present via teleconference and by invitation were Richard Gray, Esq., attorney for Mr. Kurins, and Jay Jacobson, Esq., an attorney with the firm of Garvey Schubert Barer, who served as the secretary of the Meeting.

Mr. Serrins acted as Chairman of the Meeting, and called it to order. Each person present identified himself to the other participants, and the Chairman established that each person participating could hear all of the other participants in the Meeting.

Mr. Serrins stated that the purpose of the Meeting was as set forth in the Notice of Meeting. That purpose was to consider the purchase by the Corporation of the shares of the Corporation owned by Mr. Kurins at their fair value and in accordance with such other terms and conditions as a Justice of the Supreme Court of the State of New York may approve. A draft resolution had been transmitted to each Director with the Notice of Meeting.

Mr. Serrins asked Mr. Jacobson to read the text of the draft resolution. Mr. Jacobson explained that the draft resolution as originally circulated, had been modified at the request of Mr.Gray, and, as modified, had been forwarded to each Director via email prior to the commencement of the Meeting. The text of the Resolution, as modified, was read by Mr. Jacobson, and that text is annexed hereto as Exhibit A.

Mr. Silverman moved to adopt the Resolution, and Mr. Dienst seconded the motion. There being no discussion, Mr. Serrins asked for a vote to approve the Resolution, as read. Messrs. Dienst, Serrins and Silverman voted "Aye", and Mr. Kurins abstained. The Resolution was adopted.

There being no further business set forth in the Notice of Meeting, Mr. Serrins declared the Meeting adjourned.

Respectfully submitted,

Jay Jacobson, Secretary of the Meeting

Approved:

Alan Serrins, Chairman of the Meeting

SilverSeal Corporation

Resolution of Board of Directors

Special Meeting of the Board of Directors
November 28, 2007

WHEREAS, Andris Kurins, a shareholder of SilverSeal Corporation (the "Corporation"), on or about July 27, 2007, filed a claim for arbitration (including a dissolution of the Corporation pursuant to New York Business Corporation Law ("BCL") Section 1104-a) which arbitration was permanently stayed and discontinued on consent of Mr. Kurins and the Corporation, and

WHEREAS, thereafter, on or about October 26, 2007, Mr. Kurins filed a petition for the dissolution of the Corporation which petition is now pending in the Supreme Court of the State of New York, County of New York (the "Court"), under Index No. 07/603565, and

WHEREAS, inasmuch as Mr. Kurins has brought a proceeding to dissolve the Corporation under BCL Section 1104-a, the Corporation has the right, pursuant to BCL Section 1118, to elect to purchase the shares owned by Mr. Kurins at their fair value and on such terms and conditions as shall be approved by the Court,

NOW, THEREFORE,

BE IT RESOLVED that the Corporation shall purchase the shares owned by Mr. Kurins, and shall petition the Court to permit the Corporation to effect such purchase at their fair value and on such terms and conditions as shall be approved by the Court, and be it

FURTHER RESOLVED that the President of the Corporation or its General Counsel shall instruct the attorneys for the Corporation in the pending proceeding to file with the Court an Election to Purchase Shares in accordance with the provisions of Section 1118 of the BCL.

## Exhibit A

# EXHIBIT B

**SilverSeal Corporation**

Minutes of Special Meeting of the Board of Directors

November 28, 2007.

Pursuant to Notice, a Special Meeting of the Board of Directors of SilverSeal Corporation was held via telephonic Conference Call at Noon, New York Time, November 28, 2007. Present via teleconference were Richard Dienst, Andris Kurins, Alan Serrins and John Silverman, all of the Directors of the Corporation. Also present via teleconference and by invitation were Richard Gray, Esq., attorney for Mr. Kurins, and Jay Jacobson, Esq., an attorney with the firm of Garvey Schubert Barer, who served as the secretary of the Meeting.

Mr. Serrins acted as Chairman of the Meeting, and called it to order. Each person present identified himself to the other participants, and the Chairman established that each person participating could hear all of the other participants in the Meeting.

Mr. Serrins stated that the purpose of the Meeting was as set forth in the Notice of Meeting. That purpose was to consider the purchase by the Corporation of the shares of the Corporation owned by Mr. Kurins at their fair value and in accordance with such other terms and conditions as a Justice of the Supreme Court of the State of New York may approve. A draft resolution had been transmitted to each Director with the Notice of Meeting.

Mr. Serrins asked Mr. Jacobson to read the text of the draft resolution. Mr. Jacobson explained that the draft resolution as originally circulated, had been modified at the request of Mr. Gray, and, as modified, had been forwarded to each Director via email prior to the commencement of the Meeting. The text of the Resolution, as modified, was read by Mr. Jacobson, and that text is annexed hereto as Exhibit A.

Mr. Silverman moved to adopt the Resolution, and Mr. Dienst seconded the motion. There being no discussion, Mr. Serrins asked for a vote to approve the Resolution, as read. Messrs. Dienst, Serrins and Silverman voted "Aye", and Mr. Kurins abstained. The Resolution was adopted.

There being no further business set forth in the Notice of Meeting, Mr. Serrins declared the Meeting adjourned.

Respectfully submitted,

Jay Jacobson, Secretary of the Meeting

Approved:

Alan Serrins, Chairman of the Meeting

NY_DOCS:600287.1

SilverSeal Corporation

Resolution of Board of Directors

Special Meeting of the Board of Directors
November 28, 2007

WHEREAS, Andris Kurins, a shareholder of SilverSeal Corporation (the "Corporation"), on or about July 27, 2007, filed a claim for arbitration (including a dissolution of the Corporation pursuant to New York Business Corporation Law ("BCL") Section 1104-a) which arbitration was permanently stayed and discontinued on consent of Mr. Kurins and the Corporation, and

WHEREAS, thereafter, on or about October 26, 2007, Mr. Kurins filed a petition for the dissolution of the Corporation which petition is now pending in the Supreme Court of the State of New York, County of New York (the "Court"), under Index No. 07/603565, and

WHEREAS, inasmuch as Mr. Kurins has brought a proceeding to dissolve the Corporation under BCL Section 1104-a, the Corporation has the right, pursuant to BCL Section 1118, to elect to purchase the shares owned by Mr. Kurins at their fair value and on such terms and conditions as shall be approved by the Court,

NOW, THEREFORE,

BE IT RESOLVED that the Corporation shall purchase the shares owned by Mr. Kurins, and shall petition the Court to permit the Corporation to effect such purchase at their fair value and on such terms and conditions as shall be approved by the Court, and be it

FURTHER RESOLVED that the President of the Corporation or its General Counsel shall instruct the attorneys for the Corporation in the pending proceeding to file with the Court an Election to Purchase Shares in accordance with the provisions of Section 1118 of the BCL.

**Exhibit A**

NY_DOCS:600287.1

# EXHIBIT C

# COPY

1

1  ----------------------------------------X

2  SILVERSEAL

3

4  SPECIAL MEETING OF STOCKHOLDERS

5  ----------------------------------------X

6

7

8  233 Broadway, 18th Floor
   New York, New York

9  February 5, 2007
   2:36 p.m.

10

11

12

13  SPECIAL MEETING OF STOCKHOLDERS

14  before Stacey Raikes, CSR, a Notary Public of

15  the State of New York.

16

17

18

19

20

21

22

23  ELLEN GRAUER COURT REPORTING CO. LLC
    126 East 56th Street, Fifth Floor

24  New York, New York 10022
    212-750-6434

25  REF: 83358

2

1    A P P E A R A N C E S :

2

3        ALAN SERRINS, ESQ.

4

5        RICHARD DIENST, ESQ.

6

7        JOHN L. SILVERMAN

8

9        ANDRIS KURINS

10

11       SETH MOLOD

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

<pre>
 1                    PROCEEDINGS
 2          MR. SERRINS:  Good afternoon.  I'm
 3     going to put everything on the record,
 4     Stacey, and we're here today pursuant to a
 5     Notice of a Special Meeting of SilverSeal
 6     Corporation.
 7          The first thing I'd like to do is go
 8     around the room and everybody introduce
 9     themselves.  So starting here, Andy.
10          MR. KURINS:  Stacey, Andy Kurins,
11     K-U-R-I-N-S.
12          MR. SERRINS:  Next?
13          MR. MOLOD:  Seth Molod, M-O-L-O-D.
14          MR. SILVERMAN:  John Silverman.
15          MR. DIENST:  Richard Dienst.
16          MR. SERRINS:  And Alan Serrins.
17          The Notice of meeting of the Board
18     of Directors of SilverSeal Corporation,
19     which was dated January 24, 2007, in
20     accordance with the agreements of the
21     corporation set forth a special meeting to
22     be held today, February 5 at 2:30.  The
23     first part of the meeting deals with
24     electing additional persons as directors
25     of the corporation.
</pre>

4

```
 1              PROCEEDINGS
 2         At this point, pursuant to notice --
 3    and I am general counsel for the
 4    corporation, so I'll be running the
 5    meeting -- there's a proposal to elect the
 6    following persons as directors of the
 7    corporation:  That would be myself and
 8    Richard Dienst.
 9         Although the notice indicates that
10    Seth Molod would also be a person who
11    would be elected, Seth is not able to do
12    that, but will serve as an advisor to the
13    board.
14         I'd like to propose a resolution to
15    increase the persons as directors of the
16    corporation to include Alan Serrins,
17    Richard Dienst and also the individuals
18    who are currently directors, John
19    Silverman, and Andris Kurins.
20         Now, I should note for the record
21    that the shareholders agreement requires
22    that the minority shareholder, Mr. Kurins,
23    vote in the same manner as the majority
24    shareholder, Mr. Silverman, so I'll call
25    for a proposal for the resolution that the
```

5

PROCEEDINGS

1                PROCEEDINGS

2     board be expanded to include myself and

3     Richard Dienst and I call for a vote on

4     that resolution.

5         Mr. Silverman?

6         MR. SILVERMAN:  I approve the

7     resolution.

8         MR. SERRINS:  Okay, so that

9     resolution is carried.

10        Any objections?

11        MR. KURINS:  I guess the meeting's

12     been called to order.

13        MR. SERRINS:  Yes.

14        MR. KURINS:  Okay.  Since we're on

15     the record, just for the record, I do want

16     to tell you that I do object to the

17     meeting because the obvious purpose of

18     this meeting, in my mind, is to try to

19     increase pressure on me to sell my shares

20     of SilverSeal, which I've never been

21     willing or wanted to sell, I should say.

22        John's asked me to avoid going to

23     the office and to avoid contact with any

24     Bloomberg people, which I've done.  I've

25     honored his request to the extent that I

6

PROCEEDINGS

1
2    could.

3        Inasmuch as we're currently in

4    negotiations, I will attempt to go work

5    out a sale for my shares.  I think that

6    any attempt to try to squeeze me out is

7    not productive.

8        MR. SERRINS:  Okay.  That's so

9    noted.

10        In accordance with the Notice of

11    Meeting of the Board of Directors,

12    immediately following the special meeting,

13    which is just to appoint the additional

14    directors, a notice was sent out for the

15    board as constituted to consider the

16    compensation of the officers of the

17    corporation.

18        Now, just as information to the

19    board, in order to make a decision as to

20    how the compensation should be adjusted,

21    I'd like to make a presentation as to my

22    understanding of what the various roles

23    and responsibilities have been and it's a

24    short presentation.

25        When the corporation first started,

PROCEEDINGS

1
2  there was an agreed upon division of
3  responsibilities between Mr. Silverman and
4  Mr. Kurins.  It was agreed upon that
5  Mr. Silverman would handle the Seal side
6  of the business as he had established
7  relationships which brought in the major
8  and primary client of Seal Security.  And
9  it was agreed upon that Mr. Kurins, given
10  his background and experience, would
11  handle the investigations, Computer
12  Forensics, side of the business.  Given
13  that division of responsibilities, in the
14  preceding years, there's been significant
15  differences in the way those two parts of
16  the corporation have grown.
17        In regard to the investigative side
18  of the business, there's been a failure to
19  grow the investigative side of the
20  business, and I have an analysis of the
21  net income 2004 to 2006 and I'd like to
22  indicate for the record what that analysis
23  shows.
24        In 2004, Seal Security had net
25  income of $3,811,652.  Silverman

8

```
1                    PROCEEDINGS
2        Associates, the investigative part of the
3        corporation, in 2004 had $184,771 of net
4        income.
5            In 2005, Seal Security had net
6        income of $3,201,781.  Silverman
7        Associates had net income of $45,948.
8            In 2006, Seal Security had net
9        income of $2,879,176.  Silverman
10       Associates, $14,167.
11           Now, on the Computer Forensics side
12       of the business, there's two components:
13       There was SDT and the Computer Forensics.
14       Since Security Data Technologies was shut
15       down in 2006, I'd like to indicate what
16       the figures were for 2003 to 2005.
17           Net revenue for SDT in 2003 was
18       $539,239.  Expenses for that year was
19       $630,668 for a net loss of $91,429.
20           In 2004, net revenue for Security
21       Data Technologies was $150,541 and
22       expenses were $388,797 for a net loss of
23       $238,256.
24           In 2005, net revenue for Security
25       Data Technologies was $68,200.  Expenses
```

9

1                    PROCEEDINGS
2       were $205,657 for a net loss of $137,457.
3            Net losses 2003 through 2005 total
4       $723,172.
5            Now, for 2006, in regard to Computer
6       Forensics --
7            MR. MOLOD:  Alan, can I just tell
8       you one thing:  That number that I think
9       you threw out as losses is not for those
10      three years.
11           MR. SERRINS:  Since inception.
12           MR. MOLOD:  Since inception.
13           MR. SERRINS:  Okay, I stand
14      corrected.  Since inception.  There were
15      losses before that?
16           MR. MOLOD:  Yes.
17           MR. SERRINS:  Okay.
18           In regard to Computer Forensics, for
19      2006, the billable hours for Paul Sevis,
20      who was the principal running that end,
21      were 951-and-a-half hours for an average
22      of 18 hours weekly.
23           For Jon Paul Cruz, second member of
24      that group, billable hours were 677.75
25      hours for an average of 13 hours weekly.

10

PROCEEDINGS

1
2      Mr. Kurins billed 159.25 hours for
3      an average of four hours weekly.
4          Now, also during 2006, there was a
5      situation that occurred where in direct
6      contravention of the controlling
7      shareholder's explicit direction, a car
8      was purchased and then subsequently
9      Mr. Kurins reimbursed the corporation with
10     a personal check for the purchase of that
11     car.
12         Given the figures and the realities
13     of the agreed upon division of
14     responsibilities and the income generated,
15     I'm going to present a resolution to
16     adjust the compensation of the two
17     principal shareholders and I'm going to
18     propose that a fair and reasonable
19     compensation in light of the presentation
20     would be $100,000 per anum for Mr. Kurins
21     and $1.5 million for Mr. Silverman, and
22     also, that expenses -- all expenses for
23     Mr. Kurins be cut.
24         I propose that resolution.  Since
25     the two principals are interested parties,

11

1                   PROCEEDINGS
2       they cannot vote and so I ask for a vote
3       of the two other directors, myself and
4       Mr. Dienst.
5              Mr. Dienst, how do you vote?
6              MR. DIENST:  I vote in favor of the
7       resolution.
8              MR. SERRINS:  Okay.
9              And I, Alan Serrins, vote in favor
10      of the resolution, so the resolution
11      carries.
12             Any objections to the resolution?
13             MR. KURINS:  Am I allowed to object?
14             MR. SERRINS:  Yes.
15             MR. KURINS:  Of course I object to
16      it.
17             MR. SERRINS:  Okay.
18             MR. KURINS:  Yes, I do object to it.
19      I object to any motion that would dilute
20      my role, you know, in adding new board
21      members or reduce my role as an officer or
22      employee.  I do object to that.
23             And just for the record also, this
24      agreed upon division of responsibilities
25      is the first time I've heard of this.

12

PROCEEDINGS

1
2  Maybe you can enlighten me on that.  I
3  always thought this was a joint company
4  since I hold the security licenses for the
5  running of that aspect of the business and
6  I think I've been an integral part in
7  trying to grow the security part of the
8  business, not just the investigation
9  alone, and all decisions, you correctly
10  point out, in growing the business in
11  general were Mr. Silverman's ultimate call
12  to yeah or nay as to how we should
13  proceed, so in that regard, I do object to
14  the resolution.
15      MR. SERRINS:  Okay.  Thank you.
16  Your objections are noted.
17      Any other business that anybody
18  feels they want to conduct at this board
19  meeting?
20      (No response.)
21      MR. SERRINS:  If not, I'll move that
22  the meeting be closed.
23      Second?
24      MR. DIENST:  Second.
25      MR. SERRINS:  Okay.

13

1                   PROCEEDINGS
2          MR. KURINS:  When is the effective
3      date of this?
4          MR. SERRINS:  Today.
5          MR. KURINS:  Today?
6          MR. SERRINS:  Uh-huh.
7          So we have a second.
8          All in favor of closing the board
9      meeting?
10         MR. SILVERMAN:  In favor.
11         MR. SERRINS:  Okay, so the meeting
12     is closed.  Thank you very much.  That's
13     the end of the record at this point.
14         MR. DIENST:  Before you close the
15     record, was there something else that you
16     wanted to say?
17         MR. KURINS:  What's at issue as of
18     today?  You mentioned that in addition to
19     my compensation being terminated also,
20     obviously, that of my daughter's and
21     Mr. Silverman's ex-wife is also being
22     terminated, right, as of this date?
23         MR. SERRINS:  I think they were
24     terminated last week; is that correct?
25         MR. KURINS:  Last week, okay, thank

14

1                    PROCEEDINGS

2          you.

3                    MR. SERRINS:  Yeah, they were

4          terminated last week is my understanding.

5                    MR. KURINS:  Thank you.

6                    MR. SERRINS:  Any other business

7          that anybody wants to raise?

8                    (No response.)

9                    MR. SERRINS:  If not, again, there's

10         been a vote to close the meeting and the

11         meeting is hereby closed.  Thank you.

12                   (Time noted: 2:52 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

15

```
 1                    C E R T I F I C A T E
 2
 3    STATE OF NEW YORK        )
 4                              :ss
 5    COUNTY OF NEW YORK       )
 6
 7            I, STACEY RAIKES, CSR, a Notary
 8    Public within and for the State of New York, do
 9    hereby certify that the within is a true and
10    accurate transcript of the proceedings taken on
11    February 5, 2007.
12            I further certify that I am not
13    related to any of the parties to this action by
14    blood or marriage; and that I am in no way
15    interested in the outcome of this matter.
16            IN WITNESS WHEREOF, I have hereunto
17    set my hand this 8th day of February, 2007.
18
19
20            _____
21                 STACEY RAIKES, CSR
22
23
24
25
```

SILVERSEAL SPECIAL

BSA XMAX(1)

PROCEEDINGS - 2/5/07

MEETING OF STOCKHOLDERS

**Concordance Report**

Unique Words: 352
Total Occurrences: 833
Noise Words: 382
Total Words In File: 1,732

Single File Concordance

Case Insensitive

Noise Word List(s):

**NOISE.NOI**

Cover Pages = 0

Includes **ALL** Text

Occurrences

Dates **ON**

Includes Pure Numbers

Possessive Forms **ON**

**\* \* $ \* \***

**$1.5** [1]
10:21
**$100,000** [1]
10:20
**$137,457** [1]
9:2
**$14,167** [1]
8:10
**$150,541** [1]
8:21
**$184,771** [1]
8:3
**$2,879,176** [1]
8:9
**$205,657** [1]
9:2
**$238,256** [1]
8:23
**$3,201,781** [1]
8:6
**$3,811,652** [1]
7:25
**$388,797** [1]
8:22
**$45,948** [1]
8:7
**$539,239** [1]
8:18
**$630,668** [1]
8:19
**$68,200** [1]
8:25
**$723,172** [1]
9:4
**$91,429** [1]
8:19

**\* \* 1 \* \***

**10022** [1]

1:24
**126** [1]
1:23
**13** [1]
9:25
**159.25** [1]
10:2
**18** [1]
9:22
**18th** [1]
1:7

**\* \* 2 \* \***

**2003** [3]
8:16, 17; 9:3
**2004** [4]
7:21, 24; 8:3, 20
**2005** [4]
8:5, 16, 24; 9:3
**2006** [6]
7:21; 8:8, 15; 9:5, 19; 10:4
**2007** [4]
1:9; 3:19; 15:11, 17
**212-750-6434** [1]
1:24
**233** [1]
1:7
**24** [1]
3:19
**2:30** [1]
3:22
**2:36** [1]
1:9
**2:52** [1]
14:12

**\* \* 5 \* \***

**5** [3]
1:9; 3:22; 15:11
**56th** [1]
1:23

**\* \* 6 \* \***

**677.75** [1]
9:24

**\* \* 8 \* \***

**83358** [1]
1:25
**8th** [1]
15:17

**\* \* 9 \* \***

**951-and-a-half** [1]
9:21

**\* \* A \* \***

**able** [1]

**4:11**
**accordance** [2]
3:20; 6:10
**accurate** [1]
15:10
**action** [1]
15:13
**adding** [1]
11:20
**addition** [1]
13:18
**additional** [2]
3:24; 6:13
**adjust** [1]
10:16
**adjusted** [1]
6:20
**advisor** [1]
4:12
**afternoon** [1]
3:2
**agreed** [5]
7:2, 4; 9:10:13; 11:24
**agreement** [1]
4:21
**agreements** [1]
3:20
**alan** [5]
2:3; 3:16; 4:16; 9:7; 11:9
**allowed** [1]
11:13
**alone** [1]
12:9
**analysis** [2]
7:20, 22
**andris** [2]
2:9; 4:19
**andy** [2]
3:9, 10
**anum** [1]
10:20
**anybody** [2]
12:17; 14:7
**appoint** [1]
6:13
**approve** [1]
5:6
**aspect** [1]
12:5
**associates** [3]
8:2, 7, 10
**attempt** [2]
6:4, 6
**average** [3]
9:21, 25; 10:3
**avoid** [2]
5:22, 23

**\* \* B \* \***

**background** [1]
7:10

**billable** [2]
9:19, 24
**billed** [1]
10:2
**blood** [1]
15:14
**bloomberg** [1]
5:24
**board** [9]
3:17; 4:13; 5:2; 6:11, 15, 19; 11:20; 12:18; 13:8
**broadway** [1]
1:7
**business** [10]
7:6, 12, 18, 20; 8:12; 12:5, 8, 10, 17; 14:6

**\* \* C \* \***

**call** [3]
4:24; 5:3; 12:11
**car** [2]
10:7, 11
**carried** [1]
5:9
**carries** [1]
11:11
**certify** [2]
15:9, 12
**check** [1]
10:10
**client** [1]
7:8
**closed** [3]
12:22; 13:12; 14:11
**closing** [1]
13:8
**co** [1]
1:23
**company** [1]
12:3
**compensation** [5]
6:16, 20; 10:16, 19; 13:19
**components** [1]
8:12
**computer** [5]
7:11; 8:11, 13; 9:5, 18
**conduct** [1]
12:18
**consider** [1]
6:15
**constituted** [1]
6:15
**contact** [1]
5:23
**contravention** [1]
10:6
**controlling** [1]
10:6
**corporation** [12]
3:6; 18, 21, 25; 4:4, 7, 16; 6:17, 25; 7:16; 8:3; 10:9

**corrected** [1]
9:14
**correctly** [1]
12:9
**counsel** [1]
4:3
**county** [1]
15:5
**course** [1]
11:15
**court** [1]
1:23
**cruz** [1]
9:23
**csr** [3]
1:14; 15:7, 21
**currently** [2]
4:18; 6:3
**cut** [1]
10:23

**\* \* D \* \***

**data** [3]
8:14, 21, 25
**date** [2]
13:3, 22
**dated** [1]
3:19
**daughter's** [1]
13:20
**day** [1]
15:17
**deals** [1]
3:23
**decision** [1]
6:19
**decisions** [1]
12:9
**dienst** [11]
2:5; 3:15; 4:8, 17; 5:3; 11:4, 5, 6; 12:24; 13:14
**differences** [1]
7:15
**dilute** [1]
11:19
**direct** [1]
10:5
**direction** [1]
10:7
**directors** [8]
3:18, 24; 4:6, 15, 18; 6:11, 14; 11:3
**division** [4]
7:2, 13; 10:13; 11:24

**\* \* E \* \***

**east** [1]
1:23
**effective** [1]
13:2

SILVERSEAL SPECIAL

BSA XMAX(3)

PROCEEDINGS - 2/5/07

MEETING OF STOCKHOLDERS

7:8
**principal** [2]
9:20; 10:17
**principals** [1]
10:25
**proceed** [1]
12:13
**proceedings** [1]
15:10
**productive** [1]
6:7
**proposal** [2]
4:5, 25
**propose** [3]
4:14; 10:18, 24
**public** [2]
1:14; 15:8
**purchase** [1]
10:10
**purchased** [1]
10:8
**purpose** [1]
5:17
**pursuant** [2]
3:4; 4:2

**\* \* R \* \***

**raikes** [3]
1:14; 15:7, 21
**raise** [1]
14:7
**realities** [1]
10:12
**reasonable** [1]
10:18
**record** [8]
3:3; 4:20; 5:15; 7:22; 11:23;
13:13, 15
**reduce** [1]
11:21
**ref** [1]
1:25
**regard** [4]
7:17; 9:5, 18; 12:13
**reimbursed** [1]
10:9
**related** [1]
15:13
**relationships** [1]
7:7
**reporting** [1]
1:23
**request** [1]
5:25
**requires** [1]
4:21
**resolution** [12]
4:14, 25; 5:4, 7, 9; 10:15,
24; 11:7, 10, 12; 12:14
**response** [2]
12:20; 14:8

**responsibilities** [5]
6:23; 7:3, 13; 10:14; 11:24
**revenue** [3]
8:17, 20, 24
**richard** [5]
2:5; 3:15; 4:8, 17; 5:3
**right** [1]
13:22
**role** [2]
11:20, 21
**roles** [1]
6:22
**room** [1]
3:8
**running** [3]
4:4; 9:20; 12:5

**\* \* S \* \***

**sale** [1]
6:5
**sdt** [2]
8:13, 17
**seal** [5]
7:5, 8, 24; 8:5, 8
**second** [4]
9:23; 12:23, 24; 13:7
**security** [9]
7:8, 24; 8:5, 8, 14, 20, 24;
12:4, 7
**sell** [2]
5:19, 21
**serrins** [26]
2:3; 3:2, 12, 16; 4:16; 5:8,
13; 6:8; 9:11, 13, 17; 11:8,
9, 14, 17; 12:15, 21, 25;
13:4, 6, 11, 23; 14:3, 6, 9
**serve** [1]
4:12
**seth** [4]
2:11; 3:13; 4:10, 11
**sevis** [1]
9:19
**shareholder** [2]
4:22, 24
**shareholder's** [1]
10:7
**shareholders** [2]
4:21; 10:17
**shares** [2]
5:19; 6:5
**shows** [1]
7:23
**shut** [1]
8:14
**significant** [1]
7:14
**silverman** [14]
2:7; 3:14; 4:19, 24; 5:5, 6;
7:3, 5, 25; 8:6, 9; 10:21;
13:10
**silverman's** [2]

12:11; 13:21
**silverseal** [4]
1:2; 3:5, 18; 5:20
**situation** [1]
10:5
**special** [5]
1:4, 13; 3:5, 21; 6:12
**squeeze** [1]
6:6
**ss** [1]
15:4
**stacey** [5]
1:14; 3:4, 10; 15:7, 21
**stand** [1]
9:13
**started** [1]
6:25
**starting** [1]
3:9
**state** [3]
1:15; 15:3, 8
**stockholders** [2]
1:4, 13
**street** [1]
1:23
**subsequently** [1]
10:8

**\* \* T \* \***

**technologies** [3]
8:14, 21, 25
**terminated** [4]
13:19, 22, 24; 14:4
**thank** [5]
12:15; 13:12, 25; 14:5, 11
**there's** [5]
4:5; 7:14, 18; 8:12; 14:9
**three** [1]
9:10
**threw** [1]
9:9
**total** [1]
9:3
**transcript** [1]
15:10
**true** [1]
15:9

**\* \* U \* \***

**uh-huh** [1]
13:6
**ultimate** [1]
12:11
**understanding** [2]
6:22; 14:4

**\* \* V \* \***

**vote** [8]
4:23; 5:3; 11:2, 5, 6, 9;

14:10

**\* \* W \* \***

**wanted** [2]
5:21; 13:16
**wants** [1]
14:7
**we're** [3]
3:4; 5:14; 6:3
**week** [3]
13:24, 25; 14:4
**weekly** [3]
9:22, 25; 10:3
**what's** [1]
13:17
**whereof** [1]
15:16
**willing** [1]
5:21
**witness** [1]
15:16
**work** [1]
6:4

**\* \* Y \* \***

**yeah** [2]
12:12; 14:3
**year** [1]
8:18
**years** [2]
7:14; 9:10
**york** [8]
1:8, 15, 24; 15:3, 5, 8

SUPREME COURT OF THE STATE OF NEW
YORK COUNTY OF NEW YORK

| | |
|---|---|
| In the matter of the Application of<br>ANDRIS KURINS,<br><div style="text-align:center">Petitioner,</div><br>For the Dissolution of<br>SILVERSEAL CORPORATION, a New York<br>Corporation, Pursuant to BCL §1104-a,<br><br>   -against-<br><br>SILVERSEAL CORPORATION and JOHN<br>SILVERMAN,<br><div style="text-align:center">Respondents.</div> | Index No. 603565/07<br><br><br>I.A.S. Part 49<br>Cahn, J.S.C. |

STATE OF NEW YORK       )

COUNTY OF NEW YORK     ) ss.:

DAVID GERARD, being duly sworn, deposes and says:

I am employed by the firm of Garvey Schubert Barer, attorneys for Respondents; I am not a party to the above action; I am over 18 years of age and reside at Brooklyn, New York. On November 29, 2007, I served the annexed **NOTICE OF CROSS-MOTION AND AFFIRMATION IN SUPPORT (And Exhibits Thereto)** via HAND DELIVERY to the following email addresses:

<div style="text-align:center">

Richard N. Gray, Esq.
Mayers Tersigni Feldman & Gray LLP
14 Wall Street, 19th Floor
New York, New York 10005

</div>

<div style="text-align:right">

_____
DAVID GERARD

</div>

Sworn to before me this
_18_ day of November 2007

_____
Notary Public

ROBERTO CARRILLO
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 02CA6142896
Qualified in New York County
Commission Expires March 27, 2010

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

In the matter of the Application of
ANDRIS KURINS,
                Petitioner,

For the Dissolution of
SILVERSEAL CORPORATION, a New York
Corporation, Pursuant to BCL §1104-a,

    -against-

SILVERSEAL CORPORATION and JOHN
SILVERMAN,

              Respondents.

Index No. 603565/07

I.A.S. Part 49
Cahn, J.S.C.

## MEMORANDUM OF LAW
## IN SUPPORT OF CROSS-MOTION

Dated: New York, New York
      November 28, 2007

**GARVEY SCHUBERT BARER**
Andrew J. Goodman, Esq.
Robert Carillo, Esq.
Attorneys for Respondents
100 Wall Street, 20th Floor
New York, New York 10005
(212) 431-8700

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ................................................................................................ i

PRELIMINARY STATEMENT ......................................................................................... 1

ARGUMENT ....................................................................................................................... 3

POINT I ............................................................................................................................... 3

THE SECOND THROUGH FIFTH CAUSES
OF ACTION SHOULD BE DISMISSED ......................................................................... 3

A.    THE ELECTION TO PURCHASE KURINS' SHARES
      MOOTS THE BALANCE OF THE PETITION ................................................. 3

B.    ALTERNATIVELY, THE THIRD CAUSE OF ACTION
      FOR BREACH OF ORAL CONTRACT SHOULD BE DISMISSED
      BECAUSE THE SHAREHOLDERS' AGREEMENT ENCOMPASSES
      THE ENTIRETY OF THE PARTIES' CONTRACTUAL AGREEMENT ....................... 5

C.    ALTERNATIVELY, THE FOURTH CAUSE OF ACTION SHOULD
      BE DISMISSED BECAUSE IT CAN ONLY BE ASSERTED DERIVATIVELY .......... 8

POINT II .............................................................................................................................. 9

RESPONDENTS SHOULD BE ALLOWED
DISCOVERY ON ANY SURVIVING ISSUES .............................................................. 9

CONCLUSION .................................................................................................................. 10

# TABLE OF AUTHORITIES

*Page*

*Statutes*

Civil Practice Law & Rules Article 31 ..................................................2

Civil Practice Law & Rules Section 404 and Rule 406 ...............................2

Civil Practice Law & Rules Section 407 ...............................................1

Civil Practice Law & Rules Section 408 ..............................................2, 9

Business Corporation Law Section 1104-a ..............................................4

Business Corporation Law Section 1118 ................................................2

Business Corporation Law Section 1118(a) ...........................................1, 4

Business Corporation Law Section 1118(b) .............................................1

McKinney's, 7B <u>Civil Practice Law & Rules</u>, Section 408, Practice Commentaries ...........9

*Legislations*

N.Y.Adv. Comm. On Prac. & Proc., Third Prelim Rep., Legis.Doc.No. 17, p. 160 (1959) ..........9

*Miscellaneous*

Davidian, Corporation Dissolution in New York: Liberalizing the Rights of
Minority Shareholders, 56 St. John's L.Rev. 24 [1981] ...............................4

*Cases*

Abrams v. Donati ..................................................................8, 9
66 N.Y.2d 951, 953, 489 N.E.2d 751, 754 (N.Y., 1985)

AFA Protective Systems, Inc. v. Lincoln Sav. Bank, FSB ..............................6, 7
194 A.D.2d 509, 598 N.Y.S.2d 543 (2nd Dep't. 1993)

Benjamin Goldstein Productions, Ltd. v. Fish ..........................................6
198 A.D.2d 137, *137, 603 N.Y.S.2d 849, 850 (1st Dep't. 1993)

Blake v. Blake Agency, Inc. ............................................................5
107 A.D.2d 139, 486 N.Y.S.2d 341 (2nd Dept.1985)

Citigifts, Inc. v. Pechnik ............................................................................................6
112 A.D.2d 832, 492 N.Y.S.2d 752 (1st Dep't. 1985)

Corso v. Byron ...........................................................................................................8
2006 WL 825216, 11 Misc.3d 1072(A) (Suffolk Cty. 2006)

Diamond v. 87 Nassau Street Corp. ..........................................................................9
1 Misc.2d 802, 147 N.Y.S.2d 660 (S.Ct., NY Co. 1955)

Edmonds v. Amnews Corp. ........................................................................................5
224 A.D.2d 358, 638 N.Y.S.2d 85 (1st Dept. 1996)

Gerzof v. Coons ........................................................................................................4
168 A.D.2d 619, 621, 563 N.Y.S.2d 458, 459 (2nd Dept. 1990)

Hall v. King ...............................................................................................................5
177 Misc.2d 126, 675 N.Y.S.2d 810 (SCt., NY Co. 1998)

Marx v. Akers ...........................................................................................................8
88 N.Y.2d 189, 193, 666 N.E.2d 1034, 1037 (N.Y., 1996)

In re Pace Photographers, Ltd. (Rosen) ...................................................................4
71 N.Y.2d 737, 744-745, 530 N.Y.S.2d 67, 70, 525 N.E.2d 713, 716 (1988)

In re Walt's Submarine Sandwiches, Inc. .................................................................5
173 A.D.2d 980, 569 N.Y.S.2d 492 (3rd Dept. 1991)

Lev v. Lader .............................................................................................................9
115 A.D.2d 522, 496 N.Y.S.2d 52 (3rd Dept. 1985).

Oppman v. IRMC Holdings, Inc. ...........................................................................6, 7
2007 WL 151355, 14 Misc.3d 1219 (S.Ct. NY Co. 2007)

Roy v. Vayntrub .....................................................................................................8, 9
2007 WL 1218356, 841 N.Y.S.2d 221 (S.Ct., N.Y.Co., 2007)

Sahara Beach Club, Inc. ...........................................................................................9
3 A.D.2d 933, 163 N.Y.S.2d 315 (2nd Dept. 1957)

Seagroatt Floral Company, Inc. v. Henry J. Seagroatt, Co., Inc. ...............................4
78 N.Y.2d 439, 445, 576 N.Y.S.2d 831, 834, 583 .N.E.2d 287, 290 (1991)

Sook Hi Lee v. 401-403 57th St. Realty Corp. ............................................................................8
306 A.D.2d 108, 109, 759 N.Y.S.2d 873 (1st Dept. 2003)

Vision Development Group of Broward County, LLC v. Chelsey Funding, LLC.........................7
43 A.D.3d 373, 841 N.Y.S.2d 272 (1st Dep't. 2007)

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| In the matter of the Application of<br>ANDRIS KURINS,<br>　　　　　　　　　　Petitioner,<br><br>For the Dissolution of<br>SILVERSEAL CORPORATION, a New York<br>Corporation, Pursuant to BCL §1104-a,<br><br>　　　-against-<br><br>SILVERSEAL CORPORATION and JOHN<br>SILVERMAN,<br>　　　　　　　　　　Respondents. | Index No. 603565/07<br><br><br>I.A.S. Part 49<br>Cahn, J.S.C. |

## MEMORANDUM OF LAW
## IN SUPPORT OF CROSS-MOTION

### PRELIMINARY STATEMENT

Respondents SilverSeal Corporation ("SilverSeal") and John Silverman ("Silverman") respectfully submit this Memorandum in support of their cross-motion for an order:

(a)　　pursuant to Section 407 of the Civil Practice Law & Rules ("CPLR"), severing the first (corporate dissolution) cause of action from the remaining causes in the Petition;

(b)　　pursuant to BCL Section 1118(b) staying prosecution of the first cause of action on the grounds that Respondent SilverSeal Corporation ("SilverSeal") has elected to purchase Petitioner's shares of SilverSeal pursuant to BCL Section 1118(a);

(c)　　pursuant to BCL Section 1118(b), directing the judicial determination of the fair value of Petitioner's SilverSeal shares;

(d)    pursuant to CPLR Section 404 and Rule 406, dismissing the second, third, fourth and fifth causes of action for points of law; and

(e)    in the event the motion to dismiss is denied in whole or in part, pursuant to CPLR Section 408, permitting discovery in accordance with CPLR Article 31 as if this were an action on any of the second, third, fourth and fifth causes of action which are not dismissed.

The relevant facts are set forth in the accompanying affirmation of Alan Serrins, dated November 27, 2007, and will not be repeated in full here. Briefly stated, the Petition on behalf of Andres Kurins ("Kurins") seeks SilverSeal's dissolution for purportedly freezing him out and wasting corporate assets. As set forth in Mr. Serrins' affirmation, SilverSeal has elected to purchase the Kurins shares, thereby staying dissolution, rendering fault irrelevant and leaving only valuation for judicial determination. BCL Section 1118.

The petition alleges four additional counts: damages for breach of fiduciary duty (second), damages for breach of an alleged oral agreement for equal compensation (third),[1] damages for purported corporate waste (fourth) and injunctive relief to reverse the reduction of Mr. Kurins' compensation (fifth).[2] However, once a buy-out is elected, fault becomes irrelevant, and the only remaining judicial issue is valuation. Questions of misappropriation, excessive compensation and the like are addressed in determining the fair value of the minority's shares. In any event, any purported oral agreement (third count) is barred by the parties' subsequent

---

[1] This claim also alleges violation of the parties' written shareholders agreement in failing to make corporate distributions for personal tax payments and to pay disability insurance premiums. Petition, para. 49. However, the petition admits, as it must, that the payments have been made (petition, para. 38). The petition alleges that this was for "tactical" reasons. The reason is irrelevant; the point is that there is no unremedied breach of the shareholders' agreement.

[2] The fifth cause of action also sought restraints against access to corporate books and records. Respondents never denied Kurins access and in any event stipulated (in resolving on consent a motion for a preliminary injunction herein) to Kurins total access.

written shareholders' agreement. Any claim (fourth) for corporate waste is derivative on behalf of the corporation only, while here asserted on behalf of Kurins personally.

If any of these claims beyond valuation nevertheless survive, SilverSeal and Silverman are entitled to discovery because the factual allegations are sharply disputed. Kurins compensation was reduced because of poor performance. The SilverSeal Board rewarded Mr. Silverman for originating over 90% of SilverSeal's business, while the company's divisions managed by Kurins consistently lost money, at best on occasion breaking even. One of these divisions employed Kurins' son-in-law. *See* Serrins Aff., at n. 2. Neither did Silverman divert any corporate funds. *See* Serrins Aff., at n. 1, 2. Mr. Serrins' affirmation demonstrates, at the very least, issues of fact.

Accordingly, and for the reasons set forth below, the petition should be denied except to the extent of a judicial determination of the fair value of Kurins' shares, the cross-motion should be granted, causes two through five of the petition dismissed, or alternatively, discovery permitted thereon.

<div align="center">

**ARGUMENT**

**POINT I**

**THE SECOND THROUGH FIFTH CAUSES
OF ACTION SHOULD BE DISMISSED**

</div>

A.  THE ELECTION TO PURCHASE KURINS' SHARES
    MOOTS THE BALANCE OF THE PETITION

> Prior to 1979, minority shareholders in close corporations who suffered abuse at the hands of the majority lacked the options available to business partners and shareholders in public corporations to extricate the value of their investments. To preserve and protect the interests of minority shareholders in such situations, the Legislature in 1979 provided a mechanism-a petition for dissolution-by which holders of at least 20% of the outstanding shares of a corporation whose stock is not traded on a securities market could salvage the value of their investments. Section

1104-a of the Business Corporation Law sets forth two possible grounds for such a petition: that those in control of the corporation have been guilty of illegal, fraudulent or oppressive actions toward the complaining shareholders, and that the property or assets of the corporation are being looted, wasted or diverted for noncorporate purposes by those in control.

Concomitantly, the Legislature provided a defensive mechanism for the other shareholders and the corporation, giving them an absolute right to avoid the dissolution proceedings and any possibility of the company's liquidation by electing to purchase petitioner's shares at their fair value and upon terms and conditions approved by the court (Business Corporation Law § 1118 [a]). Whatever the true facts regarding oppression or wrongdoing, the corporation and the remaining shareholders have the unconditioned right within 90 days of the petition (and later within the court's discretion), to avoid the potential drain and risk of dissolution proceedings by simply offering to buy out the minority interest; the minority is protected by a court-approved determination of fair value and other terms and conditions of the purchase. (*See generally,* Davidian, *Corporation Dissolution in New York: Liberalizing the Rights of Minority Shareholders,* 56 St. John's L.Rev. 24 [1981].) (Italics and underlining in original)

In re Pace Photographers, Ltd. (Rosen), 71 N.Y.2d 737, 744-745, 530 N.Y.S.2d 67, 70, 525 N.E.2d 713, 716 (1988).

Thus, once Respondents "elected to buy out petitioners, the misconduct became irrelevant. The issue became one of valuation." Seagroatt Floral Company, Inc. v. Henry J. Seagroatt, Co., Inc., 78 N.Y.2d 439, 445, 576 N.Y.S.2d 831, 834, 583 .N.E.2d 287, 290 (1991). The whole point then of BCL 1104-a is precisely to moot the type of claims asserted here in the second through fifth causes of action in the petition.

This does not render a petitioner without remedy. Quite to the contrary, the very types of misconduct Kurins (incorrectly) alleges become questions in fixing the fair value of his shares. Whether any misconduct, "if proven, adversely impacted upon the 'fair value' of the corporation" is a question for "consideration and determination in accordance with accepted valuation methodologies." Gerzof v. Coons, 168 A.D.2d 619, 621, 563 N.Y.S.2d 458, 459 (2nd

Dept. 1990). *See also* <u>Hall v. King</u>, 177 Misc.2d 126, 675 N.Y.S.2d 810 (SCt., NY Co. 1998)("The Order of Reference included the issues of necessary and appropriate adjustments and surcharges."). Likewise, questions of any excessive compensation are part of the valuation process. <u>Blake v. Blake Agency, Inc.</u>, 107 A.D.2d 139, 486 N.Y.S.2d 341 (2nd Dept.1985); <u>In re Walt's Submarine Sandwiches, Inc.</u>, 173 A.D.2d 980, 569 N.Y.S.2d 492 (3rd Dept. 1991); <u>Hall v. King</u>, *supra.*[3]

Accordingly, Kurins is fully protected for any wrongdoing he may be able to prove by receiving the fair value of his shares. The balance of the petition is moot and should therefore be dismissed.

B.    ALTERNATIVELY, THE THIRD CAUSE OF ACTION
FOR BREACH OF ORAL CONTRACT SHOULD BE DISMISSED
BECAUSE THE SHAREHOLDERS' AGREEMENT ENCOMPASSES
THE ENTIRETY OF THE PARTIES' CONTRACTUAL AGREEMENT [4]

Kurins' third cause of action alleges breach of an oral contract between Silverman and Kurins. See <u>Petition For Dissolution</u>, ¶¶ 47-49. As stated in the Petition, the alleged agreement between Silverman and Kurins provided that "so long as Kurins remained a shareholder in the business, he would receive compensation equal to that of Silverman and the remaining profits of the business would be split 50-50." <u>Id.</u> at ¶ 48. However, in January 2003 Kurins and Silverman entered in an Amended and Restated Shareholders Agreement (the "Shareholders Agreement") covering each individual's participation in SilverSeal and the two predecessor entities, Silverman Associates, Inc. ("SAI") and S.E.A.L. Inc. ("SEAL"). <u>Id.</u> at 1. The Court should dismiss

---

[3] <u>Edmonds v. Amnews Corp.</u>, 224 A.D.2d 358, 638 N.Y.S.2d 85 (1st Dept. 1996) holds that a buy-out election does not deprive petitioner of derivative standing. Here, no derivative claims are asserts; Kurins prays only for personal compensation. In any event, the <u>Edmonds</u> holding would be inapplicable here where there are only two shareholders. In such a situation, any derivative claim by the selling shareholder would benefit only the respondent.

[4] Any alleged breach of the written shareholders' agreement has been remedied. *See* n. 1, *supra.*

Petitioner's third cause of action because the Shareholders Agreement includes a merger clause that effectively precludes Kurins' breach of contract claim.

The Shareholders' Agreement captured the parties' entire and complete agreement with regard to SilverSeal and the predecessor companies. Section 8(f), page 9 of the Shareholders Agreement unambiguously states:

> Entire Agreement. This Agreement constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior oral and written agreements and understandings between the parties with respect to the subject matter of this Agreement.

Shareholders Agreement, page 9. The intent of this merger clause is apparent on its face, and is confirmed in language found elsewhere in the Agreement: "The Shareholders desire now to amend and restate in its entirety the Shareholders Agreement and to continue its applicability to the Company, all as more particularly set forth herein." Finally, the Shareholders Agreement also stipulates that it cannot be modified except in writing. Shareholders Agreement, Section 8(c), page 9.

"Where a written contract contains a merger clause, negotiated at arm's length, inserted by sophisticated parties and stating that the written agreement constitutes the entire agreement of the parties, the parol evidence rule bars plaintiffs from introducing evidence of an oral contract between those parties." Oppman v. IRMC Holdings, Inc., 2007 WL 151355, *4, 14 Misc.3d 1219 (S.Ct. NY Co. 2007) (citing Benjamin Goldstein Productions, Ltd. v. Fish, 198 A.D.2d 137, *137, 603 N.Y.S.2d 849, 850 (1st Dep't. 1993)). New York courts give full effect to integration and merger clauses. Citigifts, Inc. v. Pechnik, 112 A.D.2d 832, *834, 492 N.Y.S.2d 752 (1st Dep't. 1985); AFA Protective Systems, Inc. v. Lincoln Sav. Bank, FSB, 194 A.D.2d 509, *510, 598 N.Y.S.2d 543 (2nd Dep't. 1993). "When parties set down their agreement in a clear,

complete document, their writing should as a rule be enforced according to its terms." <u>AFA</u> <u>Protective Systems</u>, 194 A.D.2d at *510, 598 N.Y.S.2d at 544.

Turning to the case at hand, on account of the merger clause in the Shareholders Agreement, Kurins' breach of contract claim, based on an alleged oral agreement that pre-dated the Shareholders Agreement, should be dismissed based on documentary evidence pursuant to CPLR Rule 3211 (a)(1).  The instant facts are not unlike those demonstrated in <u>Oppman v.</u> <u>IRMC Holdings, Inc.</u>, *supra*.  In <u>Oppman</u>, plaintiffs (company shareholders) alleged that defendants breached an oral agreement providing that they would be treated on a par with institutional investors in terms of opportunities to reinvest in the defendant corporation. <u>Oppman</u>, 2007 WL 151355 at *4.  The defendants argued that plaintiffs' claim could not survive a motion to dismiss because their allegations for breach of an alleged oral contract were barred by an integration clause found in the stockholders agreement.  <u>Id</u>.  The Court dismissed, enforcing the merger clause and finding that the stockholder agreement preempted any further or different agreement concerning plaintiffs' rights as stockholders.  <u>Id</u>.  The same result is called for here.  The Shareholders Agreement covers the entirety of the parties' contractual relationship as to SilverSeal and the predecessor corporations.  As "the agreement contains a merger clause and a 'no oral modification' clause, the court should not resort to extrinsic evidence in construing the language of the agreement" and should dismiss Petitioner's claim for breach of oral contract. <u>Vision Development Group of Broward County, LLC v. Chelsey Funding, LLC</u>, 43 A.D.3d 373, *374, 841 N.Y.S.2d 272 (1st Dep't. 2007).

C.    ALTERNATIVELY, THE FOURTH CAUSE OF ACTION SHOULD
      BE DISMISSED BECAUSE IT CAN ONLY BE ASSERTED DERIVATIVELY

Petitioner pled his fourth cause of action, for waste of corporate assets, individually and

not in a derivative capacity.  Kurins alleges that Silverman wasted corporate assets, by among

other things improperly retaining Maria Weisman to render services for SilverSeal and causing

the company to fund a company escrow account.  Petitioner's claim for corporate waste alleges

an injury to the corporation, and not to him personally in an individual capacity.  Thus, the Court

should dismiss Kurins' claim for waste of corporate assets because this claim can only be

brought in a shareholder derivative suit, and cannot be sustained in an individual, direct action.[5]

Pursuant to his fourth cause of action, Kurins seeks compensatory damages for the

alleged corporate waste of SilverSeal's assets.  See Petition For Dissolution, page 14.  However,

the "gravamen of the complaint is injury to the corporation", not Kurins personally, and thus any

suit based on Kurins' claims must be brought in a derivative capacity.  Roy v. Vayntrub, 2007

WL 1218356, *3, 841 N.Y.S.2d 221 (S.Ct., N.Y.Co., 2007).  "Claims against corporate directors

or others in control of the corporation for mismanagement, [and] waste of corporate assets […]

are clearly derivative in nature."  Roy,  2007 WL 1218356, at *3.  New York Courts have

expressly found that claims for corporate waste or mismanagement can only be brought by way

of a shareholder derivative action under the BCL.  Abrams v. Donati, 66 N.Y.2d 951, 953, 489

N.E.2d 751, 754 (N.Y., 1985) ("Allegations of mismanagement or diversion of assets by officers

or directors to their own enrichment, without more, plead a wrong to the corporation only, for

which a shareholder may sue derivatively but not individually"); Marx v. Akers, 88 N.Y.2d 189,

193, 666 N.E.2d 1034, 1037 (N.Y., 1996);  Sook Hi Lee v. 401-403 57th St. Realty Corp., 306

A.D.2d 108, 109, 759 N.Y.S.2d 873 (1st Dept. 2003); Corso v. Byron, 2006 WL 825216, *5, 11

---

[5] Although not relevant on this point, Silverman of course denies that any corporate assets were spent
improperly.

Misc.3d 1072(A) (Suffolk Cty. 2006) (When it comes to claims of corporate waste, "New York does not favor direct litigation on behalf of the shareholder as an individual.").

Thus, a complaint making allegations "which confuse a shareholder's derivative and individual rights will, therefore, be dismissed." Abrams, 66 N.Y.2d at 953; Roy, 2007 WL 1218356, at *3. This is the case here. Plaintiff's fourth cause of action confuses Kurins' individual rights with a shareholder's derivative rights and thus should be dismissed.

## POINT II

### RESPONDENTS SHOULD BE ALLOWED DISCOVERY ON ANY SURVIVING ISSUES

CPLR Section 408 permits disclosure in a special proceeding in the Court's discretion. Generally, discovery is contemplated where there are issues of fact to resolve at trial. McKinney's, 7B Civil Practice Law & Rules, Section 408, Practice Commentaries, citing N.Y.Adv. Comm. On Prac. & Proc., Third Prelim Rep., Legis.Doc.No. 17, p. 160 (1959) and Lev v. Lader, 115 A.D.2d 522, 496 N.Y.S.2d 52 (3rd Dept. 1985).

Accordingly, courts have permitted discovery in corporate dissolution proceedings. In re Sahara Beach Club, Inc., 3 A.D.2d 933, 163 N.Y.S.2d 315 (2nd Dept. 1957)(permitting depositions in corporate dissolution proceedings). Cf. Diamond v. 87 Nassau Street Corp., 1 Misc.2d 802, 147 N.Y.S.2d 660 (S.Ct., NY Co. 1955)(permitting discovery in special proceeding to inspect corporate books and records). The Practice Commentaries offer a corporate proceeding as an example of a special proceeding where discovery should be allowed:

> Assume, for example, that a shareholders' petition to review corporate books and records is met with a counterclaim for damages for theft of trade secrets. A bill of particulars to the counterclaims would be feasible because such proceeding is unlikely to be decided in summary fashion.

McKinney's, 7B Civil Practice Law & Rules, Section 408, Practice Commentaries.

Likewise, here, given the vigorously disputed fact issues, any claims beyond valuation are "unlikely to be decided in summary fashion," so that Respondents should be permitted discovery, on such issues for example as Kurins' management of unprofitable divisions and employment of his son-in-law. The second through fifth causes in the petition sound as standard claims in a complaint. To the extent they survive this motion, Kurins should not be permitted to avoid discovery by appending them to a dissolution proceeding..

## CONCLUSION

Accordingly, Respondents SilverSeal Corporation and John Silverman respectfully request their cross-motion be granted, that the petition be dismissed in all respects except for judicial valuation of the fair value of Petitioner's SilverSeal shares, althernatively that the first cause of action be severed and stayed, and that the Respondents be permitted discovery on the balance of the causes of action in the Petition, and such other, further and different relief as the Court deems just and proper.

Dated: New York, New York
      November 28, 2007

GARVEY SCHUBERT BARER

By: _____
      Andrew J. Goodman, Esq.
      A Member of the Firm
      Attorneys for Respondents
      100 Wall Street, 20th Floor
      New York, New York 10005
      (212) 431-8700

SUPREME COURT OF THE STATE OF NEW
YORK COUNTY OF NEW YORK

In the matter of the Application of
ANDRIS KURINS,
                  Petitioner,

For the Dissolution of
SILVERSEAL CORPORATION, a New York
Corporation, Pursuant to BCL §1104-a,

    -against-

SILVERSEAL CORPORATION and JOHN
SILVERMAN,

               Respondents.

Index No. 603565/07

I.A.S. Part 49
Cahn, J.S.C.

STATE OF NEW YORK       )

COUNTY OF NEW YORK    ) ss.:

    DAVID GERARD, being duly sworn, deposes and says:

    I am employed by the firm of Garvey Schubert Barer, attorneys for Respondents; I am not a party to the above action; I am over 18 years of age and reside at Brooklyn, New York.  On November 29, 2007, I served the annexed **MEMORANDUM OF LAW IN SUPPORT OF CROSS-MOTION** via HAND DELIVERY to the following email addresses:

<div align="center">

Richard N. Gray, Esq.
Mayers Tersigni Feldman & Gray LLP
14 Wall Street, 19th Floor
New York, New York 10005

</div>

<div align="right">

_____
DAVID GERARD

</div>

Sworn to before me this
_29_ day of November 2007

_____
Notary Public
**ROBERTO CARRILLO**
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 02CA6142896
Qualified in New York County
Commission Expires March 27, 20_10_

# EXHIBIT E



SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
--------------------------------------------------------------------X
ANDRIS KURINS, individually and as a Shareholder of,
SILVERSEAL CORPORATION,

<div align="center">*Plaintiff,*</div>

**AFFIDAVIT OF SERVICE**

- against –

Index No: 08/602048

JOHN SILVERMAN and ALAN SERRINS,

Plaintiff resides at
3 Merrill Road

<div align="center">*Defendants.*</div>

Norwalk, CT 06851
--------------------------------------------------------------------X

STATE OF NEW YORK, COUNTY OF NEW YORK        :SS:

**SANDRA GUZMAN**    being duly sworn, deposes and says:
I am over 18 years of age, not a party to this action, and reside in Rego Park, New York. That on
the 11th day of July, 2008, I served a true copy of the within **SUMMONS and attached
COMPLAINT**

**FILED**

Upon:        **Alan Serrins, Esq.**
233 Broadway, 18th Floor
New York, New York 10279

JUL 21 2008

NEW YORK

the **Defendant** herein named, by delivering 1 (one) true copy of such to personally upon Zulma E.
Verdejo, receptionist for Alan Serrins, Esq.,..

Deponent describes the person served as aforesaid to the best of deponent's ability at the time
and circumstances of the aforesaid service as follows:

SEX: Female        EYES: Brown        HAIR: Brown
APP. AGE: 50        APP. HT: 5' 1"        APP. WT: 175 lbs.

Deponent further says: that at the time of such service I knew the person so served as
aforesaid to be the same person described in the aforementioned **SUMMONS and attached
COMPLAINT**.

Sworn to before me this
11th day of July, 2008

_____
Notary Public

_____
SANDRA GUZMAN

PAUL GUZMAN
Notary Public, State of New York
No. 01GU6081645
Qualified in Queens County
Commission Expires 10/15/2010

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------X

ANDRIS KURINS, individually and as a Shareholder of,
SILVERSEAL CORPORATION,

**AFFIDAVIT OF SERVICE**

*Plaintiff,*

- against –

Index No: 08/602048

JOHN SILVERMAN and ALAN SERRINS,

Plaintiff resides at
3 Merrill Road
Norwalk, CT 06851

*Defendants.*

-------------------------------------------------------------------X

STATE OF NEW YORK, COUNTY OF NEW YORK        :SS:

    **ROGAN MCCALLY**    being duly sworn, deposes and says:
I am over 18 years of age, not a party to this action, and reside in Westport, Connecticut. That on the 11th day of July, 2008, I served a true copy of the within **SUMMONS and attached COMPLAINT**

Upon:      John Silverman, Esq.
             19 Fulton Street 3rd Floor
             New York, New York 10038

the **Defendant** herein named, by delivering 1 (one) true copy of such to personally upon the Receptionist for John Silverman, Esq.

    Deponent describes the person served as aforesaid to the best of deponent's ability at the time and circumstances of the aforesaid service as follows:

SEX: Female      EYES: Brown      HAIR: Dark Blond
APP. AGE: 45     APP. HT: 5' 5"     APP. WT: 160 lbs.

    Deponent further says: that at the time of such service I knew the person so served as aforesaid to be the same person described in the aforementioned **SUMMONS and attached COMPLAINT**.

Sworn to before me this
11th day of July, 2008

_____
Notary Public

_____
**ROGAN MCCALLY**

**PAUL GUZMAN**
**Notary Public, State of New York**
**No. 01GU6081645**
**Qualified In Queens County**
**Commission Expires 10/15/2010**