UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
ANDRIS KURINS, individually and as a Shareholder of
SILVERSEAL CORPORATION,                                    08-CIV-6886 (LTS) (GWG)

           *Plaintiff*,

       – against –

JOHN SILVERMAN and ALAN SERRINS,

           *Defendants*.
------------------------------------------------------------------------X

## PLAINTIFF'S RICO STATEMENT

Plaintiff Andris Kurins ("Kurins" or "Plaintiff") submits this RICO Statement pursuant to the Court's Initial Conference Order, dated August 14, 2008:

    **a.**     The alleged unlawful conduct is in violation of 18 U.S.C. § 1962(c).

    **b.**     **(1)**     Defendant John Silverman ("Silverman") is the President of Silverseal Corporation ("Silverseal"). He diverted corporate funds over a five year period to an escrow account maintained by company counsel in order to use those funds for the payment of funds to his girlfriend and to pay for legal services rendered to himself and his mother personally, as opposed to for the benefit of Silverseal. In the process, Silverman defrauded federal and state taxing authorities, because the funds paid to these attorneys and his girlfriend constituted income to Silverman subject to taxation.

**(2)** Defendant Alan Serrins ("Serrins"; Silverman and Serrins are collectively referred to herein as "Defendants") served as corporate counsel and maintained the above-described escrow account. In addition to facilitating the fraud through payments to Silverman's girlfriend and to Silverman's attorneys for personal legal services rendered to Silverman, Serrins also paid himself out of the escrow account for legal services rendered to Silverman personally, as opposed to for the benefit of Silverseal. Further, Serrins received $100,000 in Silverseal funds without performing services for those monies. In addition, Serrins thereby aided and abetted Silverman's tax fraud, as described above.

**c.** The other wrongdoers are: (1) Seth Mollod, Silverseal's accountant, who knew of the improper use of corporate funds, failed to disclose the misconduct to Kurins, and knowingly prepared false tax returns on behalf of Silverseal; and (2) Silverman's girlfriend, Maria Weissman ("Weissman"), who submitted fraudulent legal bills to Serrins for payment from the escrow account.

**d.** The victims are as follows: (1) Silverseal, which was injured because its funds were used for non-corporate purposes; and (2) federal and state taxing authorities, who were injured because Silverman failed to pay taxes on the monies paid to his girlfriend and his attorneys.

**e.** The pattern of racketeering activity is as follows:

**(1)** The predicate acts were all violations of 18 U.S.C. § 1341.

**(2 and 3)** Both Defendants participated in a scheme to defraud Silverseal, as well as federal and state taxing authorities, during the period from as early as January of 2002, through at least December of 2006. The purpose of the scheme was to permit Silverman to funnel funds to his girlfriend Weissman, and permit the use of corporate funds to pay Silverman's personal legal expenses. In addition, there was another scheme – alleged only to establish the "pattern" element of the RICO claim – to defraud federal and state taxing authorities by disguising Silverseal's payment of Silverman's personal expenses as legitimate business expenses, as opposed to taxable income to Silverman.

Defendants engaged in two types of fraudulent conduct. **First**, based upon the fact that both Silverman and Serrins were fiduciaries of Silverseal, their failure to disclose this misuse of corporate funds was a fraud upon the corporation. *See Kaufman v. Cohen*, 307 A.D.2d 113, 119-120, 760 N.Y.S.2d 157, 165 (1st Dep't 2003). **Second**, in December of 2002, Silverman defrauded Silverseal by convincing Plaintiff to deposit $300,000 in corporate funds into the escrow account (the existence of which had been hidden from Plaintiff throughout 2002) by falsely representing to him that the monies were to be held in the account as a "rainy day" fund in the event that one of Silverseal's subsidiaries, S.E.A.L. Security LLC, were to someday lose its major client and the parties needed cash to restructure the business.

Hence, the non-disclosure to Plaintiff, as a 50% shareholder of Silverseal, was a continuing fraud upon Silverseal from the secret creation of the escrow account in January 2002, through its continued use as late as December of 2006. Moreover, there was a specific false representation made orally by Silverman to Plaintiff in late 2002 about the purpose of the escrow account, the existence of which was revealed only at that point in time.

With respect to the mailing element of the mail fraud allegations, the Complaint alleges the following:

> 10. On or about January 28, 2002, Silverman arranged for the deposit of $25,000 in Silverseal funds into the escrow account. On information and belief, Silverman sent this check to Serrins by mail or overnight interstate carrier.
>
> 11. On or about February 21, 2002, Silverman arranged for the deposit of $25,000 in Silverseal funds into the escrow account. On information and belief, Silverman sent this check to Serrins by mail or overnight interstate carrier.
>
> 12. On or about February 26, 2002, Serrins authorized payment of $1,487.50 to Weissman. On information and belief, this payment was made by a check sent to Weissman from Serrins by mail or overnight interstate carrier. At the time, Weissman was Silverman's girlfriend. Although she is a lawyer, Weissman, on information and belief, had no litigation experience. Nonetheless, in order to fraudulently provide her with tax-deductible monies from Silverseal, Silverman arranged for her to provide entirely superfluous "assistance" to Serrins in connection with a sexual harassment complaint made at Silverseal. However, with respect to this February 26, 2002 payment, Silverseal's books and records do not even reflect that Weissman ever submitted an invoice.
>
> 13. On or about March 14, 2002, Silverman arranged for the deposit of $12,663.50 in Silverseal funds into the escrow account. On information and belief, Silverman sent this check to Serrins by mail or overnight interstate carrier.
>
> 14. On or about October 1, 2002, Silverman arranged for the deposit of $25,000 in Silverseal funds into the escrow account. On information and belief, Silverman sent this check to Serrins by mail or overnight interstate carrier.
>
> 15. In or about late 2002, Silverman advised Kurins that Silverseal should begin creating a "rainy day" fund in the event that one of its subsidiaries, S.E.A.L. Security LLC ("Seal Security") were to someday lose its major client and the parties needed cash to restructure.
>
> 16. Based upon this representation, Kurins agreed that Silverseal should deposit $300,000 into the escrow account. In discussing the matter, Silverman fraudulently hid the fact that the escrow account had been in existence for almost a year and was being used to make improper payments for the benefit of Silverman.
>
> 17. In addition, Silverman needed to inform Kurins about the escrow account because, on or about December 12, 2002, Silverman had used a Silverseal

check to funnel $100,000 to Serrins personally, and needed an explanation from Kurins should he enquire about it. On information and belief, the sources of which include the fact that the check has a notation of "Escrow" on it, but it was never deposited into the escrow account, this check was either (a) a payoff to Serrins so that he would allow his escrow account to be used to pay Silverman's non-corporate expenses, or (b) a payment that was then funneled to Silverman by Serrins. On information and belief, Silverman either mailed or sent the check to Serrins by mail or overnight interstate carrier.

18. The $300,000 was deposited into the escrow account by way of a check, dated December 19, 2002, signed by Kurins. On information and belief, this check was sent to Serrins by mail or overnight interstate carrier.

19. Following the deposit of the $300,000 into the escrow account, Silverman's and Serrins's fraud continued.

20. On or about March 18, 2003, the law firm of Kurzman Eisenberg Corbin Lever & Goodman LLP ("Kurzman") sent Silverman an invoice for legal services rendered to him in connection with "Account No. 57054-001M," a matter entitled "Real Estate Entity (Matrimonial)" ("Matrimonial Matter"). These charges were for personal legal services rendered to Silverman and were not a proper Silverseal corporate expense. On information and belief, this invoice was either mailed or sent by overnight interstate carrier.

21. On or about April 1, 2003, Serrins signed a check payable to Kurzman from the escrow account in payment of a number of invoices which included the invoice for the Matrimonial Matter. On information and belief, this check was either mailed or sent by overnight interstate carrier.

22. On or about April 24, 2003, Kurzman sent Silverman an invoice for legal services rendered to him in connection with "Account No. 57054-003M," a matter entitled "Estate and Will Planning" ("Estate Matter"). These charges were for personal legal services rendered to Silverman and were not a proper Silverseal corporate expense. On information and belief, this invoice was either mailed or sent by overnight interstate carrier.

23. On or about May 2, 2003, Serrins signed a check payable to Kurzman from the escrow account in payment of a number of invoices which included the invoice for the Estate Matter. On information and belief, this check was either mailed or sent by overnight interstate carrier.

24. On or about July 30, 2003, Serrins authorized payment of $3,850 to Weissman. On information and belief, this payment was made by a check sent to

Weissman from Serrins by mail or overnight interstate carrier. Silverseal's records do not reflect any bill for these services.

25. On or about October 14, 2003, Weissman sent an invoice to Serrins. On information and belief, this invoice was sent to Serrins by mail or overnight interstate carrier.

26. On or about October 15, 2003, Weissman was paid by a check from Serrins that was, on information and belief, sent to her by mail or overnight interstate carrier.

27. The manner in which Weissman's October 2003 "bill" was paid further evidences the fact that the invoices and "services" provided by Weissman were merely a conduit for Silverman to give gifts to his girlfriend. Rather than paying Weissman directly from the escrow account, Serrins paid her from his firm's account and then repaid his firm with a check from the escrow account. On information and belief, Serrins paid Weissman in this fashion so that the payments to Weissman would not be reflected in the escrow account bank records were Kurins ever to seek to review them. Further, Serrins immediately approved payment of Weissman's invoice on October 15, 2003. In addition to the fact that this instantaneous approval was in marked contrast to Serrins practice of not paying other lawyers' bills for weeks or months, the invoice submitted by Weissman was totally inadequate in terms of detail. Indeed, it asked for payment for the time that Weissman spent merely depositing an envelope in the mail.

28. On or about December 3, 2003, Weissman sent a letter to Silverseal in which she discussed the balance of monies left on retainer with her office, and asking for a check for $6,325 "in order to fully replenish the retainer." On information and belief, the books and records of Silverseal do not reflect any retainer agreement with Weissman providing for leaving monies on retainer. Moreover, the amount of money requested by Weissman suggests that she had at one point been paid a $7,500 retainer fee by Silverseal for "legal services." This payment is not reflected in the escrow account records. On information and belief, then, all or at least most of the monies paid to Weissman from the escrow account were not for legal services that she rendered. Rather, to the extent that she did provide "legal services," Silverseal paid for those services directly, and the monies paid from the escrow account were not a proper corporate expense of Silverseal.

29. On or about December 19, 2003, Weissman sent an invoice to Silverman at Silverseal which reflected that, at some point between December 3 and December 19, Weissman had been paid an amount in excess of $5,000. This money, which, information and belief, was paid through a check that was sent by mail or overnight interstate carrier, did not come from the escrow account.

30. On or about January 12, 2004, Kurzman sent Silverman an invoice for legal services rendered to Yolanda Rubel for "Estate Planning." The invoice was marked "PERSONAL AND CONFIDENTIAL." Yolanda Rubel is Silverman's mother, and the legal services rendered to her were not a proper Silverseal corporate expense. On information and belief, this invoice was either mailed or sent by overnight interstate carrier.

31. On or about January 15, 2004, Serrins, either individually or pursuant to his direction, sent Weissman a check for $3,850, curiously the same amount he had sent her the preceding July. On information and belief, this check was sent either by mail or overnight interstate carrier. Moreover, on information and belief, this money was not in payment for legal services, because Weissman's billing records do not reflect any such payment, whereas they do reflect payments directly from Silverseal of $4,225 on or about January 16, 2004, $3,587.50 on or about February 21, 2004, and another $6,000 or more in March of 2004. None of these payments came from the escrow account and, further, none of the payments from the escrow account (other than the October 2003 bill discussed above in Paragraph 25) are supported by bills from Weissman.

32. On or about March 15, 2004, Kurzman sent Silverman two invoices. On information and belief, these invoices were sent together to Silverman by mail or overnight interstate carrier. The first invoice sought payment of an invoice for legal services rendered to Silverman in connection with the Estate Matter. These services were for personal legal services rendered to Silverman and were not a proper Silverseal corporate expense.

33. The second invoice was for the same legal services rendered to Yolanda Rubel for which Kurzman had sought payment through its January 12, 2004 invoice to Silverman.

34. On or about May 2, 2003, Serrins signed a check from the escrow account payable to Kurzman in payment of a number of invoices which included the invoice for the Estate Matter and the invoice for the Yolanda Rubel work. On information and belief, this check was either mailed or sent by overnight interstate carrier.

35. On or about December 16, 2004, Kurzman sent Silverman invoices for legal services rendered to him in the Estate Matter and the Matrimonial Matter. These charges were for personal legal services rendered to Silverman and were not a proper Silverseal corporate expense. On information and belief, these invoices were either mailed or sent by overnight interstate carrier.

36.     On or about January 26, 2005, Kurzman resent these invoices to Silverman, together with an additional charge for the Matrimonial Matter. These additional services were for personal legal services rendered to Silverman and were not a proper Silverseal corporate expense. On information and belief, these invoices were either mailed or sent by overnight interstate carrier.

37.     On or about February 10, 2005, Serrins signed a check from the escrow account for payment of a D&S invoice dated February 10, 2005. Some of this payment was for personal legal services rendered to Silverman that were not a proper Silverseal corporate expense. The precise breakdown of which charges were for personal services is peculiarly within the knowledge of Serrins. However, at least one of the charges – related to "Montclair Multiples" – was plainly not a legitimate Silverseal corporate expense.

38.     On or about February 28, 2005, Serrins signed a check payable to Kurzman from the escrow account in payment of a number of invoices which included the invoices described above in Paragraphs 35 and 36. On information and belief, this check was either mailed or sent by overnight interstate carrier.

39.     On or about May 11, 2005, Silverman arranged for the deposit of $152,777.24 in Silverseal funds into the escrow account. On information and belief, Silverman sent this check to Serrins by mail or overnight interstate carrier.

40.     On September 21, 2005, Serrins wrote a check from the escrow account to D&S in payment of a September 21, 2005 invoice. Some of this payment was for personal legal services rendered to Silverman and was not a proper Silverseal corporate expense. The precise breakdown of which charges were for personal services is peculiarly within the knowledge of Serrins. However, at least one of the charges – for the drafting of an April 25, 2005 letter to a co-op board – was plainly not a legitimate Silverseal corporate expense.

41.     On or about January 17, 2006, Kurzman sent Silverman an invoice for legal services rendered to him in connection with the Estate Matter. These charges were for personal legal services rendered to Silverman and were not a proper Silverseal corporate expense. On information and belief, this invoice was either mailed or sent by overnight interstate carrier.

42.     On or about March 21, 2006, Kurzman sent Silverman an invoice for legal services rendered to him in connection with the Estate Matter, and an invoice for legals services rendered to him in connection with Montclair Multiples. These services were for personal legal services rendered to Silverman and were not a proper Silverseal corporate expense. On information and belief, this invoice was either mailed or sent by overnight interstate carrier.

43. On or about April 12, 2006, Serrins signed a check payable to Kurzman from the escrow account in payment of the invoice described above in Paragraph 42. On information and belief, this check was either mailed or sent by overnight interstate carrier to Kurzman.

44. On or about April 21, 2006, Kurzman sent Silverman an invoice for legal services rendered to him in connection with the Estate Matter. These charges were for personal legal services rendered to Silverman and were not a proper Silverseal corporate expense. On information and belief this invoice was either mailed or sent by overnight interstate carrier.

45. On or about April 28, 2006, Serrins signed a check payable to Kurzman from the escrow account which included partial payment of the invoice described above in Paragraph 44. On information and belief, this check was either mailed or sent by overnight interstate carrier to Kurzman.

46. On or about June 22, 2006, Kurzman sent Silverman an invoice for services rendered to him on the Estate Matter and in connection with Montclair Multiples. These charges were for personal legal services rendered to Silverman and were not a proper Silverseal corporate expense. On information and belief, this invoice was either mailed or sent by overnight interstate carrier to Kurzman.

47. On or about July 10, 2006, Serrins signed a check payable to Kurzman from the escrow account which included payment of the invoice described above in Paragraph 46. On information and belief, this check was either mailed or sent by overnight interstate carrier to Kurzman.

48. On or about October 19, 2006, Silverman arranged for the deposit of $156,968.15 in Silverseal funds into the escrow account. On information and belief, Silverman sent this check to Serrins by mail or overnight interstate carrier.

49. On or about October 12, 2006, the law firm of Garvey Schubert Barer ("Garvey") sent Silverman an invoice for legal services rendered to him in connection with "Montclair Multiples." These charges were for personal legal services rendered to Silverman and were not a proper Silverseal corporate expense. On information and belief, this invoice was either mailed or sent by overnight interstate carrier.

50. On or about October 30, 2006, Serrins signed a check payable to Garvey from the escrow account in payment of a number of invoices which included the invoice referenced above in Paragraph 49. On information and belief, this check was either mailed or sent by overnight interstate carrier.

>51. On or about December 14, 2006, Serrins directed another authorized signatory on the escrow account to send a check to the law firm of Kossoff & Unger for services rendered or to be rendered to Silverman personally, as opposed to Silverseal. As such, the payment was not for a proper Silverseal expense. On information and belief, this check was either mailed or sent by overnight interstate carrier.

(Complaint at ¶¶ 10-51).

To be clear, Plaintiff does not allege that these bills or checks (other than the Weissman bills) were fraudulent in themselves. Rather, they were "'incident to an essential part of the scheme...,' or 'a step in [the] plot.'" *Schmuck v. United States*, 489 U.S. 705, 710-711, 109 S. Ct. 1443, 1448 (1989) (Citations omitted).

**(4)** There have been no criminal convictions for violation of the predicate acts.

**(5)** No civil litigation with regard to the predicate acts has resulted in a judgment.

**(6)** The predicate acts form a pattern of racketeering activity. **First**, as they are all connected to and committed in furtherance of the same scheme of defrauding Silverseal and taxing authorities, they are related to each other. **Second**, they meet RICO's continuity requirement because they span more than five years. Further, the continuity requirement is also met because (a) there were multiple victims (Silverseal and the taxing authorities), (b) there were separate schemes (one to funnel money to Silverman's girlfriend and one to use corporate funds to pay Silverman's non-corporate legal expenses), (c) there were numerous participants (both culpable and innocent) in the scheme (Silverman, Silverman's mother, Serrins, Weissman, Mollod, and the law firms that were

paid from the escrow account for non-corporate legal services rendered to Silverman and his mother), and (d) the sheer number of racketeering acts (33 – involving payments to different law firms and Weissman over a five year period) makes it impossible to conclude that this conduct was sporadic or isolated.

(7)     As discussed directly above, the predicate acts relate to each other as part of a common plan to loot Silverseal and defraud taxing authorities.

(f)     (1)     The enterprise is Silverseal Corporation, a corporation organized under the laws of New York State.

(2)     The purpose of the enterprise is to provide legitimate security services.

(3)     Silverman is an officer and director of the enterprise, and Serrins is presently a director of the enterprise.

(4)     Both Defendants are associated with the enterprise by reason of their positions with the enterprise. In addition, Serrins is associated with the enterprise as its attorney. However, he did not act merely as outside counsel facilitating the fraud because: (a) he paid himself from the escrow account for non-corporate legal services rendered to Silverman, and (b) he received an additional $100,000 payment for no apparent reason other than for participating in the fraud.

  **(5)**  The defendants are separate from the enterprise.

  **(6)**  N/A.

 **g.**  The enterprise and the pattern of racketeering activity are separate.

 **h.**  The pattern of racketeering activity is distinct from the enterprise because the enterprise carries on lawful activities as a security firm, and the pattern of racketeering activity served to loot the enterprise of monies that had been legitimately earned from providing those services.

 **i.**  The enterprise receives no benefits from the pattern of racketeering activity.

 **j.**  Silverseal and its subsidiaries provide security investigative services in, among other places, New York, Washington, D.C., and London, England.

 **k.**  N/A.

 **l.**  N/A.

 **m.** **(a)** Both Defendants are employed by and associated with the enterprise, and **(b)** no entity is both the liable person and the enterprise.

    **n.**    N/A.

    **o.**    Silverseal has been injured by reason of the monies stolen from it as described above. In addition, because they committed the fraud in their role as fiduciaries of Silverseal, Silverseal has been damaged in an amount equal to all compensation paid to Silverman and all legal fees paid to Serrins since January of 2002. *See TPL Associates v. Helmsley-Spear, Inc.*, 146 A.D.2d 468, 536 N.Y.S.2d 754 (1st Dep't 1989).

    **p.**    In the absence of the fraud committed by Defendants, there would have been no injury.

    **q.**    Each Defendant is jointly and severally liable for the damages described above in section **(o)**. The precise amount of those damages awaits discovery, although the total is in the millions.

    **r.**    N/A.

    **s.**    Fraud and breach of fiduciary duty.

t.   N/A.

Dated:   New York, New York
         August 25, 2008

                                  Respectfully submitted,

                                  JUDD BURSTEIN, P.C.

                                  By _____
                                  Judd Burstein (JB-9585)
                                  *Attorneys for Plaintiff*
                                  1790 Broadway, Suite 1501
                                  New York, New York 10019
                                  (212) 974-2400
                                  (212) 974-2944 (Fax)
                                  jburstein@burlaw.com